UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| L. LIN WOOD, JR., | ) | |
| | ) | |
| Plaintiff, | ) | **CIVIL ACTION** |
| | ) | **FILE NO. _____** |
| v. | ) | |
| | ) | |
| BRAD RAFFENSPERGER, in his official | ) | |
| capacity as Secretary of State of the State | ) | |
| of Georgia, REBECCA N. SULLIVAN, | ) | |
| in her official capacity as Vice Chair of | ) | |
| the Georgia State Election Board, | ) | |
| DAVID J. WORLEY, in his official | ) | |
| capacity as a Member of the Georgia | ) | |
| State Election Board, MATTHEW | ) | |
| MASHBURN, in his official capacity as | ) | |
| a Member of the Georgia State Election | ) | |
| Board, and ANH LE, in her official | ) | |
| capacity as a Member of the Georgia | ) | |
| State Election Board, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## VERIFIED COMPLAINT FOR DECLARATORY
## AND INJUNCTIVE RELIEF

COMES NOW Plaintiff **L. Lin Wood, Jr.** ("Plaintiff"), by and through his

undersigned counsel of record, and file this his Verified Complaint for

Declaratory and Injunctive Relief (the "Complaint"), respectfully showing this

honorable Court as follows:

## INTRODUCTION

1.

The citizens of the State of Georgia deserve fair elections, untainted by violations of the United States Constitution and other federal and state laws governing elections.

2.

The validity of the results of the November 3, 2020 general election in Georgia are at stake as a result of Defendants' unauthorized actions in the handling of absentee ballots within this state, actions that were contrary to the Georgia Election Code.

3.

Defendants' unilaterally, and without the approval or direction of the Georgia General Assembly, changed the process for handling absentee ballots in Georgia, including those cast in the general election.

4.

As a result, the inclusion and tabulation of absentee ballots for the general election (and potentially, for all future elections held within this state) is improper and must not be permitted.  To allow otherwise would erode the sacred and basic

rights of Georgia citizens under the United States Constitution to participate in and rely upon a free and fair election.

## JURISDICTION AND VENUE

5.

This action arises under 42 U.S.C. § 1983, Articles I and II of the United States Constitution, and the First and Fourteenth Amendments to the United States Constitution.

6.

This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343 because this action arises under the United States Constitution and laws of the United States and involves a federal election for President of the United States. "A significant departure from the legislative scheme for appointing Presidential electors presents a federal constitutional question." *Bush v. Gore*, 531 U.S. 98, 113 (Rehnquist, C.J., concurring); *Smiley v. Holm*, 285 U.S. 355, 365 (1932). This Court has supplemental jurisdiction over any state law claims pursuant to 28 U.S.C. § 1367.

7.

Venue is proper under 28 U.S.C. § 1391(a) because a substantial part of the events giving rise to the claim occurred or will occur in this District. Alternatively,

venue is proper under 28 U.S.C. § 1391(b) because at least one Defendant to this action resides in this District and all Defendants reside in this State.

## PARTIES

8.

Plaintiff L. Lin Wood, Jr. is an adult individual who is a qualified registered elector residing in Fulton County, Georgia.  Plaintiff constitutes an "elector" who possesses all of the qualifications for voting in the State of Georgia, as set forth in O.C.G.A. §§ 21-2-2(7) and 21-2-216(a).  Plaintiff brings this suit in his capacity as a private citizen.  As a qualified elector and registered voter, Plaintiff has Article III standing to bring this action. *See Meek v. Metro. Dade County*, 985 F.2d 1471, 1480 (11th Cir. 1993).

9.

Defendant Brad Raffensperger ("Secretary Raffensperger") is named herein in his official capacity as Secretary of State of the State of Georgia.  Secretary Raffensperger is a state official subject to suit in his official capacity because his office "imbues him with the responsibility to enforce the [election laws]." *Grizzle v. Kemp*, 634 F.3d 1314, 1319 (11th Cir. 2011).  Secretary Raffensperger serves as the Chairperson of Georgia's State Election Board, which promulgates and enforces rules and regulations to (i) obtain uniformity in the practices and

proceedings of election officials as well as legality and purity in all primaries and general elections, and (ii) be conducive to the fair, legal, and orderly conduct of primaries and general elections. *See* O.C.G.A. §§ 21-2-30(d), 21-2-31, 21-2-33.1. Secretary Raffensperger, as Georgia's chief elections officer, is further responsible for the administration of the state laws affecting voting, including the absentee voting system. *See* O.C.G.A. § 21-2-50(b).

10.

Defendants Rebecca N. Sullivan, David J. Worley, Matthew Mashburn, and Anh Le (hereinafter the "State Election Board") are members of the State Election Board in Georgia, responsible for "formulat[ing], adopt[ing], and promulgat[ing] such rules and regulations, consistent with law, as will be conducive to the fair, legal, and orderly conduct of primaries and elections." O.C.G.A. § 21-2-31(2). Further, the State Election Board "promulgate[s] rules and regulations to define uniform and nondiscriminatory standards concerning what constitutes a vote and what will be counted as a vote for each category of voting system" in Georgia. O.C.G.A. § 21-2-31(7). The State Election Board, personally and through the conduct of the Board's employees, officers, agents, and servants, acted under color of state law at all times relevant to this action and are sued for declaratory and injunctive relief in their official capacities.

## FACTS

I.    **Federal Constitutional Protections for Free and Fair Public Elections.**

11.

Free, fair, and transparent public elections are crucial to democracy – a government of the people, by the people, and for the people.

12.

The Elections Clause of the United States Constitution states that "[t]he Times, Places, and Manner of holding Elections for Senators and Representatives ***shall be prescribed in each State by the Legislature thereof***; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators." U.S. Const. Art. I, § 4, cl. 1 (emphasis added).

13.

The Legislature is "the representative body which ma[kes] the laws of the people." *Smiley*, 285 U.S. at 365.  Regulations of congressional and presidential elections, thus, "must be in accordance with the method which the state has prescribed for legislative enactments." *Id.* at 367; *see also Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 807-08 (2015).

14.

In Georgia, the "legislature" is the General Assembly.  *See* Ga. Const. Art. III, § I, Para. I.

15.

Because the United States Constitution reserves for state legislatures the power to set the time, place, and manner of holding elections for Congress and the President, state executive officers, including but not limited to Secretary Raffensperger, have no authority to unilaterally exercise that power, much less flout existing legislation.

16.

Nor can the authority to ignore existing legislation be delegated to an executive officer.  While the Elections Clause "was not adopted to diminish a State's authority to determine its own lawmaking processes," *Ariz. State Legislature*, 135 S. Ct. at 2677, it does hold states accountable to their chosen processes when it comes to regulating federal elections, *id.* at 2668.  "A significant departure from the legislative scheme for appointing Presidential electors presents a federal constitutional question."  *Bush*, 531 U.S. at 113 (Rehnquist, C.J., concurring); *Smiley*, 285 U.S. at 365.

## II.    The Georgia Legislature's Laws Governing the Handling of Absentee Ballots.

17.

The Georgia General Assembly (the "Georgia Legislature") provided a generous absentee ballot statute, O.C.G.A. § 21-2-380(b), which provides, in pertinent part, "An elector who votes by absentee ballot shall not be required to provide a reason in order to cast an absentee ballot in any primary, election, or runoff."

18.

The Georgia Legislature also established a clear an efficient process for handling absentee ballots.  To the extent that any change in that process could or could be expected to change the process, that change must, under Article I, Section 4 of the United States Constitution, be prescribed by the Georgia Legislature.

19.

Under O.C.G.A. § 21-2-386(a)(1)(B), the Georgia Legislature instructed the county registrars and clerks (the "County Officials") to handle the absentee ballots as directed therein.  The Georgia Legislature set forth the procedures to be used by each municipality for appointing the absentee ballot clerks to ensure that such clerks would "perform the duties set forth in this Article."  *See* O.C.G.A. § 21-2-380.1.

8

20.

The Georgia Election Code instructs those who handle absentee ballots to
follow a clear procedure:

> Upon receipt of each [absentee] ballot, a registrar or clerk ***shall*** write
> the day and hour of the receipt of the ballot on its envelope.  The
> registrar or clerk ***shall*** then compare the identifying information on
> the oath with the information on file in his or her office, ***shall***
> compare the signature or make on the oath with the signature or mark
> on the absentee elector's voter card or the most recent update to such
> absentee elector's voter registration card and application for absentee
> ballot or a facsimile of said signature or maker taken from said card or
> application, and ***shall***, if the information and signature appear to be
> valid and other identifying information appears to be correct, so
> certify by signing or initialing his or her name below the voter's oath.
> Each elector's name so certified shall be listed by the registrar or clerk
> on the numbered list of absentee voters prepared for his or her
> precinct.

O.C.G.A. § 21-2-386(a)(1)(B) (emphasis added).

21.

The Georgia Legislature's use of the word "shall" on three separate
occasions indicates the clear process that ***must*** be followed by the County Officials
in processing absentee ballots.

22.

Under O.C.G.A. § 21-2-386(a)(1)(C), the Georgia Legislature also
established a clear and efficient process to be used by County Officials if they
determine that an elector has failed to sign the oath on the outside envelope

enclosing the ballot or that the signature does not conform with the signature on file in the registrar's or clerk's office (a "defective absentee ballot").

23.

The Georgia Legislature also provided for the steps to be followed by County Officials with respect to defective absentee ballots:

> *If the elector has failed to sign the oath, or if the signature does not appear to be valid*, or if the elector has failed to furnish required information *or information so furnished does not conform with that on file in the registrar's or clerk's office*, or if the elector is otherwise found disqualified to vote, the registrar or clerk *shall* write across the face of the envelope "Rejected," giving the reason therefor. The board of registrars or absentee ballot clerk *shall* promptly *notify the elector of such rejection*, a copy of which notification *shall* be retained in the files of the board of registrars or absentee ballot clerk for at least one year.

O.C.G.A. § 21-2-386(a)(1)(C) (emphasis added).

24.

The Georgia Legislature again used the word "shall" to indicate when a defective absentee ballot shall be "rejected." The Georgia Legislature also contemplated the use of a written notification to be used by the county registrar or clerk in notifying the elector of the rejection.

10

**III.**   **Defendants' Unauthorized Actions to Alter the Georgia Election Code and the Processing of Defective Absentee Ballots.**

25.

Notwithstanding the clarity of the applicable statutes and the constitutional authority for the Georgia Legislature's actions, on March 6, 2020, the Secretary of State of the State of Georgia, Secretary Raffensperger, and the State Election Board, who administer the state elections (the "Administrators") entered into a "Compromise and Settlement Agreement and Release" (the "Litigation Settlement") with the Democratic Party of Georgia, Inc., the Democrat Senatorial Campaign Committee, and the Democratic Congressional Campaign Committee (collectively, the "Democrat Party Agencies"), setting forth different standards to be followed by the clerks and registrars in processing absentee ballots in the State of Georgia.[1]  A true and correct copy of the Litigation Settlement is attached hereto and incorporated herein as **Exhibit A**.

26.

The Litigation Settlement sets forth different standards to be followed by the clerks and registrars in processing absentee ballots in the State of Georgia than those described above.

---

[1] *See Democratic Party of Georgia, Inc., et al. v. Raffensperger, et al.*, Civil Action File No. 1:19-cv-05028-WMR, United States District Court for the Northern District of Georgia, Atlanta Division, Doc. 56-1.

27.

Although Secretary Raffensperger, as the Secretary of State, is authorized to promulgate rules and regulations that are "conducive to the fair, legal, and orderly conduct of primaries and elections" but all such rules and regulations must be "consistent with law." O.C.G.A. § 21-2-31(2).

28.

Under the Litigation Settlement, however, the Administrators agreed to change the statutorily-prescribed manner of handling absentee ballots in a manner that was not consistent with the laws promulgated by the Georgia Legislature for elections in this state.

29.

The Litigation Settlement provides that the Secretary of State would issue an "Official Election Bulletin" to county Administrators overriding the statutory procedures prescribed for those officials. That power, however, does not belong to the Secretary of State under the United States Constitution.

30.

The Litigation Settlement procedure, set forth in pertinent part below, is more cumbersome, and makes it much more difficult to follow the statute with respect to defective absentee ballots.

31.

Because of the COVID-19 pandemic and the pressures created by a larger number of absentee ballots, County Officials were under great pressure to handle an historical level of absentee voting.

32.

Additionally, the County Officials were required to certify the speed with which they were handling absentee ballots on a daily basis, with the goal of processing absentee ballots faster than they had been processed in the past.

33.

Under the Litigation Settlement, the following language added to the pressures and complexity of processing defective absentee ballots, making it less likely that they would be identified or, if identified, processed for rejection:

> County registrars and absentee ballot clerks ***are required***, upon receipt of each mail-in absentee ballot, to compare the signature or make of the elector on the mail-in absentee ballot envelope with the signatures or marks in eNet and on the application for the mail-in absentee ballot. If the signature does not appear to be valid, registrars and clerks are required to follow the procedure set forth in O.C.G.A. § 21-2-386(a)(1)(C). When reviewing an elector's signature on the mail-in absentee ballot envelope, the registrar or clerk must compare the signature on the mail-in absentee ballot envelope to each signature contained in such elector's voter registration record in eNet and the elector's signature on the application for the mail-in absentee ballot. ***If the registrar or absentee ballot clerk determines that the voter's signature on the mail-in absentee ballot envelope does not match any of the voter's signatures on file in eNet or on the absentee ballot***

*application, the registrar or absentee ballot clerk must seek review from two other registrars, deputy registrars, or absentee ballot clerks.  A mail-in absentee ballot shall not be rejected unless a majority of the registrars, deputy registrars, or absentee ballot clerks reviewing the signature agree that the signature does not match any of the voter's signatures on file in eNet or on the absentee ballot application.  If a determination is made that the elector's signature on the mail-in absentee ballot envelope does not match any of the voter's signatures on file in eNet or on the absentee ballot application, the registrar or absentee ballot clerk shall write the names of the three elections officials who conducted the signature review across the face of the absentee ballot envelope, which shall be in addition to writing "Rejected" and the reason for the rejection as required under O.C.G.A. § 21-2-386(a)(1)(C).*  Then, the registrar or absentee ballot clerk shall commence the notification procedure set forth in O.C.G.A. § 21-2-386(a)(1)(C) and State Election Board Rule 183-1-14-.13.

(*See* Ex. A, Litigation Settlement, p. 3-4, ¶ 3, "Signature Match" (emphasis added).)

34.

The underlined language above is not consistent with the statute adopted by the Georgia Legislature.

35.

First, the Litigation Settlement overrides the clear statutory authorities granted to County Officials individually and forces them to form a committee of three if any one official believes that an absentee ballot is a defective absentee ballot.

36.

Such a procedure creates a cumbersome bureaucratic procedure to be followed with each defective absentee ballot – and makes it likely that such ballots will simply not be identified by the County Officials.

37.

Second, the Litigation Settlement allows a County Official to compare signatures in ways not permitted by the statutory structure created by the Georgia Legislature.

38.

The Georgia Legislature prescribed procedures to ensure that any request for an absentee ballot must be accompanied by sufficient identification of the elector's identity. *See* O.C.G.A. § 21-2-381(b)(1) (providing, in pertinent part, "In order to be found eligible to vote an absentee ballot in person at the registrar's office or absentee ballot clerk's office, such person shall show one of the forms of identification listed in Code Section 21-2-417…").

39.

Under O.C.G.A. § 21-2-220(c), the elector must present identification, but need not submit identification if the electors submit with their application

15

information such that the County Officials are able to match the elector's information with the state database, generally referred to as the eNet system.

40.

The system for identifying absentee ballots was carefully constructed by the Georgia Legislature to ensure that electors were identified by acceptable identification (O.C.G.A. § 21-2-417 even permits the use of an expired driver's license), but at some point in the process, the Georgia Legislature mandated the system whereby the elector be identified for each absentee ballot.

41.

Under the Litigation Settlement, any determination of a signature mismatch would lead to the cumbersome process described in the settlement, which was not intended by the Georgia Legislature, which authorized those decisions to be made by single election officials.

42.

The Georgia Legislature also provided for the opportunity to cure (again, different from the opportunity to cure in the Litigation Settlement), but did not allocate funds for three County Officials for every mismatch decision.

43.

In the primary preceding the November 3, 2020 election, news stories recorded that many absentee ballots did not reach voters until after the polls were closed. *See, e.g.*, F. Bajak and C. Cassidy, "Vote-by-mail worries: A 'leaky pipeline' in many states," Associated Press Aug. 8, 2020, https://apnews.com/article/u-s-news-ap-top-news-election-2020-technology-politics-52e87011f4d04e41bfffccd64fc878e7, retrieved Nov. 11, 2020).

44.

In response and to encourage confidence in absentee voting during the COVID-19 crisis, the Secretary of State launched Ballot Trax to track absentee ballots, permitting electors to track the progress of absentee ballots as they were processed.

45.

Announcing Ballot Trax further increased pressure on County Officials to process absentee ballot applications quickly, so that they would not be perceived as "falling behind" in processing ballots.

46.

County Officials were not incentivized to spend additional time to check absentee ballot applications – by increasing the number of reviewers and

complexity of the process, the Litigation Settlement procedures created further disincentives to accurate processing of signature matches.

47.

Finally, under paragraph 4 of the Litigation Settlement, the Administrators delegated their responsibilities for determining when there was a signature mismatch by considering in good faith "additional guidance and training materials" drafted by the "handwriting and signature review expert" of the Democrat Party Agencies. (*See* Ex. A, Litigation Settlement, p. 4, ¶ 4, "Consideration of Additional Guidance for Signature Matching.")

48.

Allowing a single political party to write rules for reviewing signatures is not "conducive to the fair…conduct of primaries and elections" or "consistent with law" under O.C.G.A. § 21-2-31.

49.

The Litigation Settlement by itself has created confusion, misplaced incentives, and undermined the confidence of the voters of the State of Georgia in the electoral system.

50.

Neither it nor any of the activities spawned by it were authorized by the Georgia Legislature, as required by the United States Constitution.

## COUNT I
### First Amendment and Equal Protection
### U.S. Const. amend. XIV, 42 U.S.C. § 1983

51.

Plaintiff incorporates by reference and realleges all prior paragraphs of this Complaint and the paragraphs in the counts below as though set forth fully herein.

52.

The right of qualified citizens to vote in a state election involving federal candidates is recognized as a fundamental right under the Fourteenth Amendment of the United States Constitution, which prohibits a state from "deny[ing] to any person within its jurisdiction the equal protection of the laws." U.S. Const. Amend. XIV, § 1.

53.

The equal enforcement of election laws is necessary to preserve our most basic and fundamental rights.

19

54.

The requirement of equal protection is particularly stringently enforced as to laws that affect the exercise of fundamental rights, including the right to vote.

55.

The Equal Protection Clause requires states to "'avoid arbitrary and disparate treatment of the members of its electorate.'" *Charfauros v. Bd. of Elections*, 249 F.3d 941, 951 (9th Cir. 2001) (quoting *Bush*, 531 U.S. at 105).

56.

That is, each citizen "has a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction." *Dunn v. Bloomstein*, 405 U.S. 330, 336 (1972).

57.

"Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another." *Bush*, 531 U.S. at 104-05. Among other things, this requires "specific rules designed to ensure uniform treatment" in order to prevent "arbitrary and disparate treatment to voters." *Id.* at 106-07.

58.

"The right to vote extends to all phases of the voting process, from being permitted to place one's vote in the ballot box to having that vote actually counted. Thus, the right to vote applies equally to the initial allocation of the franchise as well as the manner of its exercise.  Once the right to vote is granted, a state may not draw distinctions between voters that are inconsistent with the guarantees of the Fourteenth Amendment's equal protection clause." *Pierce v. Allegheny County Bd. of Elections*, 324 F.Supp.2d 684, 695 (W.D. Pa. 2003) (citations and quotations omitted).

59.

"[T]reating voters differently" thus "violate[s] the Equal Protection Clause" when the disparate treatment is the result of arbitrary, ad hoc processes. *Charfauros*, 249 F.3d at 954.  Indeed, a "minimum requirement for non-arbitrary treatment of voters [is] necessary to secure the fundamental right [to vote]." *Bush*, 531 U.S. at 105.

60.

Defendants are not part of the Georgia Legislature and cannot exercise legislative power to enact rules or regulations regarding the handling of defective absentee ballots that are contrary to the Georgia Election Code.

61.

By entering the Litigation Settlement and altering the process for handling defective absentee ballots in Georgia, Defendants unilaterally, and without authority, altered the Georgia Election Code.

62.

The result is that absentee ballots have been processed differently by County Officials than the process created by the Georgia Legislature and set forth in the Georgia Election Code.

63.

Further, allowing a single political party to write rules for reviewing signatures, as paragraph 4 of the Litigation Settlement provides, is not "conducive to the fair...conduct of primaries and elections" or "consistent with law" under O.C.G.A. § 21-2-31.

64.

The rules and regulations set forth in the Litigation Settlement created an arbitrary, disparate, and ad hoc process for processing defective absentee ballots, contrary to Georgia law that was utilized in determining the results of the November 3, 2020 general election.

65.

This disparate treatment is not justified by, and is not necessary to promote, any substantial or compelling state interest that cannot be accomplished by other, less restrictive means.

66.

The foregoing injuries, burdens, and infringements that are caused by Defendants' conduct violates the Equal Protection Clause of the Fourteenth Amendment.

67.

The foregoing violations occurred as a consequence of Defendants acting under color of state law.  Accordingly, Plaintiff is entitled to declaratory and injunctive relief against Defendants pursuant to 42 U.S.C. § 1983.

68.

As a result of Defendants' unauthorized actions and disparate treatment of defective absentee ballots, this Court should enter an order, declaration, and/or injunction that prohibits Defendants from certifying the results of the 2020 general election in Georgia on a statewide basis.

69.

Alternatively, this Court should enter an order, declaration, and/or injunction prohibiting Defendants from certifying the results of the General Elections which include the tabulation of defective absentee ballots, regardless of whether said ballots were cured.

70.

Alternatively, this Court should enter an order, declaration, and/or injunction that the results of the 2020 general election in Georgia are defective as a result of the above-described constitutional violations, and that Defendants are required to cure said deficiencies in a manner consistent with federal and Georgia law, and without the taint of the procedures described in the Litigation Settlement.

71.

Plaintiff has no adequate remedy at law and will suffer serious and irreparable harm unless the relief requested herein is granted.

## COUNT II
### Violation of the Electors & Election Clauses
### U.S. Const. Art. I, § 4, cl. 1 & Art. II, § 1, cl. 2

72.

Plaintiff incorporates by reference and realleges all prior paragraphs of this Complaint and the paragraphs in the counts below as though set forth fully herein.

73.

The Electors Clause states that "[e]ach State shall appoint, in such Manner as *the Legislature* thereof may direct, a Number of Electors" for President.  U.S. Const. art. II, § 1, cl. 2 (emphasis added).  Likewise, the Elections Clause of the United States Constitution states that "[t]he Times, Places, and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by *the Legislature* thereof."  U.S. Const. art. I, § 4, cl. 1 (emphasis added).

74.

Secretary Raffensperger is not part of the Georgia Legislature and cannot exercise legislative power.

75.

Further, because the United States Constitution reserves for the Georgia Legislature the power to set the "Times, Places, and Manner" of holding elections for President and Congress, the Administrators have no authority to unilaterally exercise that power, much less to hold them in ways that conflict with existing legislation.  U.S. Const. Art. I, § 4, cl. 1.

76.

By entering the Litigation Settlement, Secretary Raffensperger imposed a different procedure for handling defective absentee ballots that is contrary to the Georgia Election Code.  *See* O.C.G.A. § 21-2-386.

77.

The procedure set forth in the Litigation Settlement for the handling of defective absentee ballots is not consistent with the laws of the State of Georgia, and thus, Defendants' actions under the Litigation Settlement exceed their authority.  *See* O.C.G.A. § 21-2-31(2).

78.

Defendants are not the Georgia Legislature, and their unilateral decision to implement rules and procedures regarding absentee ballots that are contrary to the Georgia Election Code constitutes a violation of the Electors and Elections Clauses of the United States Constitution.

79.

The foregoing violations occurred as a consequence of Defendants acting under color of state law.  Accordingly, Plaintiff is entitled to declaratory and injunctive relief against Defendants pursuant to 42 U.S.C. § 1983.

80.

As a result of Defendants' unauthorized actions and disparate treatment of defective absentee ballots, this Court should enter an order, declaration, and/or injunction that prohibits Defendants from certifying the results of the 2020 general election in Georgia on a statewide basis.

81.

Alternatively, this Court should enter an order, declaration, and/or injunction prohibiting Defendants from certifying the results of the General Elections which include the tabulation of defective absentee ballots, regardless of whether said ballots were cured.

82.

Alternatively, this Court should enter an order, declaration, and/or injunction that the results of the 2020 general election in Georgia are defective as a result of the above-described constitutional violations, and that Defendants are required to cure said deficiencies in a manner consistent with federal and Georgia law, and without the taint of the procedures described in the Litigation Settlement.

83.

Plaintiff has no adequate remedy at law and will suffer serious and irreparable harm unless the relief requested herein is granted.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests the following relief:

(a)     That, as a result of Defendants' violations of the United States Constitution and violations of other federal and state election laws, this Court should enter an order, declaration, and/or injunction that prohibits Defendants from certifying the results of the 2020 general election in Georgia on a statewide basis;

(b)     Alternatively, that, as a result of Defendants' violations of the United States Constitution and violations of other federal and state election laws, this Court should enter an order, declaration, and/or injunction prohibiting Defendants from certifying the results of the General Elections which include the tabulation of defective absentee ballots, regardless of whether said ballots were cured;

(c)     Alternatively, that, as a result of Defendants' violations of the United States Constitution and violations of other federal and state election laws, this Court should enter an order, declaration, and/or injunction that the results of the 2020 general election in Georgia are defective as a result of the above-described constitutional violations, and that Defendants are required to cure said deficiencies in a manner consistent with federal and Georgia law, and without the taint of the procedures described in the Litigation Settlement; and

(d)     Any and other such further relief that this Court or the Finder of Fact

deems equitable and just.

Respectfully submitted this 13th day of November, 2020.

SMITH & LISS, LLC

Ray S. Smith, III
Georgia Bar No. 662555
*Counsel for Plaintiff*

Five Concourse Parkway
Suite 2600
Atlanta, Georgia 30328
(404) 760-6000
rsmith@smithliss.com

## CERTIFICATE OF COMPLIANCE

The undersigned counsel certifies that the foregoing has been prepared in Times New Roman (14 point) font, as required by the Court in Local Rule 5.l (B).

Respectfully submitted this 13th day of November, 2020.

SMITH & LISS, LLC

Ray S. Smith, III
Georgia Bar No. 662555
*Counsel for Plaintiff*

Five Concourse Parkway
Suite 2600
Atlanta, Georgia 30328
(404) 760-6000
rsmith@smithliss.com

## CERTIFICATE OF SERVICE

I hereby certify that I have this day caused the foregoing and all exhibits and attachments thereto in the above-captioned matter to be filed with the United States District Court for the Northern District of Georgia, Atlanta Division, via the Court's CM-ECF system.  I also hereby certify that I caused the foregoing and all exhibits and attachments thereto in the above captioned matter to be served, via FedEx and email, with the appropriate Waiver of Service of Summons forms, upon:

> Secretary of State Brad Raffensperger
> 214 State Capitol
> Atlanta, Georgia 30334
> brad@sos.ga.gov
> soscontact@sos.ga.gov
>
> Rebecca N. Sullivan
> Georgia Department of Administrative Services
> 200 Piedmont Avenue SE
> Suite 1804, West Tower
> Atlanta, Georgia 30334-9010
> rebecca.sullivan@doas.ga.gov
>
> David J. Worley
> Evangelista Worley LLC
> 500 Sugar Mill Road
> Suite 245A
> Atlanta, Georgia 30350
> david@ewlawllc.com

Matthew Mashburn
Aldridge Pite, LLP
3575 Piedmont Road, N.E.
Suite 500
Atlanta, Georgia 30305
mmashburn@aldridgepite.com

Anh Le
Harley, Rowe & Fowler, P.C.
2700 Cumberland Parkway
Suite 525
Atlanta, Georgia 30339
ale@hrflegal.com

This 13th day of November, 2020.

SMITH & LISS, LLC

Ray S. Smith, III
Georgia Bar No. 662555
*Counsel for Plaintiff*

Five Concourse Parkway
Suite 2600
Atlanta, Georgia 30328
(404) 760-6000
rsmith@smithliss.com