## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| **L. LIN WOOD, JR.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **CIVIL ACTION FILE NO.** |
| | ) | **1:20-cv-04651-SDG** |
| **v.** | ) | |
| | ) | |
| **BRAD RAFFENSPERGER, in his official** | ) | |
| **capacity as Secretary of State of the State** | ) | |
| **of Georgia, *et al.*,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## PLAINTIFF'S EMERGENCY MOTION FOR INJUNCTIVE RELIEF AND MEMORANDUM OF LAW IN SUPPORT THEREOF

COMES NOW Plaintiff **L. Lin Wood, Jr.** ("Plaintiff"), by and through his undersigned counsel of record, and files this his Emergency Motion for Injunctive Relief and Memorandum of Law in Support Thereof (the "Motion"), respectfully showing this honorable Court as follows:[1]

Plaintiff, an individual residing in Fulton County, Georgia, is a qualified, registered "elector" who possesses all of the qualifications for voting in the State of

---

[1] This action and the instant Motion pertain to the certification of Georgia's results from the November 3, 2020 general election. The results are to be certified on November 20, 2020, and as such, Plaintiff request an immediate hearing on this Motion and that review of the Motion otherwise be expedited pursuant to Local Rule 7.2(B).

Georgia. *See* O.C.G.A. §§ 21-2-2(7), 21-2-216(a); (*see also* Verified Am. Compl. for Decl. and Inj. Relief (the "Complaint"), ¶ 8). Plaintiff seeks declaratory relief and an emergency injunction from this Court halting the certification of Georgia's results for the November 3, 2020 presidential election. As a result of the defendants' violations of the United States Constitution and other election laws, Georgia's election tallies are suspect and tainted with impropriety. Thus, this Court should issue an injunction to bar the certification of those results until Plaintiff's substantive claims can be heard to ensure that Georgia's electoral process is restored to a system of fairness.

## II.   STATEMENT OF FACTS AND PROCEDURAL HISTORY.

### A.   The Complaint.

On November 13, 2020, Plaintiff filed his original Verified Complaint for Declaratory and Injunctive Relief, which was subsequently amended. The named defendants include Defendant Brad Raffensperger, in his official capacity as Secretary of State of Georgia and as Chairperson of Georgia's State Election Board, as well as the other members of the State Election Board in their official capacities – Rebecca N. Sullivan, David J. Worley, Matthew Mashburn, and Anh Le (hereinafter the "State Election Board"). (*See* Compl., ¶¶ 9-10.)

The Complaint alleges violations of the United States Constitution and the

amendments thereto in the regards to the November 3, 2020 general election, as well as the "full hand recount" of all ballots cast in that election, to be completed by November 18, 2020 (the "Hand Recount"), with those same violations likely to occur again in the January 5, 2021 run-off election for Georgia's United States Senators. (*See generally id.*)  The Complaint sets forth the following:

### B.   Federal Constitutional Protections for Free and Fair Elections.

The Elections Clause of the United States Constitution states that "[t]he Times, Places and Manner of holding Elections for Senators and Representatives *shall be prescribed in each State by the Legislature thereof*; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators."  U.S. Const. Art. I, § 4, cl. 1 (emphasis added); (*see* Compl., ¶ 12).  Regulations of congressional and presidential elections, thus, "must be in accordance with the method which the state has prescribed for legislative enactments." *Smiley v. Holm*, 285 U.S. 355, 367 (1932); *see also Ariz. St. Leg. v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 807-08 (2015); (*see* Compl., ¶ 13).  In Georgia, the "legislature" is the General Assembly (the "Georgia Legislature"). *See* Ga. Const. Art. III, § I, Para. I; (*see* Compl., ¶ 14).

Because the Constitution reserves for state legislatures the power to set the time, place, and manner of holding federal elections, state executive officers have

3

no authority to unilaterally exercise that power, much less flout existing legislation, nor to ignore existing legislation. (*See* Compl., ¶ 15.)  While the Elections Clause "was not adopted to diminish a State's authority to determine its own lawmaking processes," it does hold states accountable to their chosen processes in regulating federal elections. *Ariz. St. Leg.*, 135 S.Ct. at 2677, 2668.

### C.   Georgia Law Governing the Handling of Absentee Ballots.

The Georgia Legislature established a clear an efficient process for handling absentee ballots.  To the extent that there is any change in that process, that change must, under Article I, Section 4 of the Constitution, be prescribed by the Georgia Legislature. (*See* Compl., ¶¶ 17-18.)

The Georgia Legislature instructed county registrars and clerks (the "County Officials") regarding the handling of absentee ballots in O.C.G.A. §§ 21-2-386(a)(1)(B), 21-2-380.1. (*See* Compl., ¶ 19.)  The Georgia Election Code instructs those who handle absentee ballots to follow a clear procedure:

> Upon receipt of each [absentee] ballot, a registrar or clerk ***shall*** write the day and hour of the receipt of the ballot on its envelope.  The registrar or clerk ***shall*** then compare the identifying information on the oath with the information on file in his or her office, ***shall*** compare the signature or make on the oath with the signature or mark on the absentee elector's voter card or the most recent update to such absentee elector's voter registration card and application for absentee ballot or a facsimile of said signature or maker taken from said card or application, and ***shall***, if the information and signature appear to be valid and other identifying information appears to be correct, so

certify by signing or initialing his or her name below the voter's oath…

O.C.G.A. § 21-2-386(a)(1)(B) (emphasis added); (*see* Compl., ¶ 20).

The Georgia Legislature also established a clear and efficient process to be used by County Officials if they determine that an elector has failed to sign the oath on the outside envelope enclosing the ballot or that the signature does not conform with the signature on file in the registrar's or clerk's office (a "defective absentee ballot"). *See* O.C.G.A. § 21-2-386(a)(1)(C); (Compl., ¶ 22.) With respect to defective absentee ballots:

> ***If the elector has failed to sign the oath, or if the signature does not appear to be valid***, or if the elector has failed to furnish required information ***or information so furnished does not conform with that on file in the registrar's or clerk's office***, or if the elector is otherwise found disqualified to vote, the registrar or clerk ***shall*** write across the face of the envelope "Rejected," giving the reason therefor. The board of registrars or absentee ballot clerk ***shall*** promptly ***notify the elector of such rejection***, a copy of which notification ***shall*** be retained in the files of the board of registrars or absentee ballot clerk for at least one year.

O.C.G.A. § 21-2-386(a)(1)(C) (emphasis added); (*see* Compl., ¶ 23). The Georgia Legislature clearly contemplated the use of written notification by the county registrar or clerk in notifying the elector of the rejection. (*See* Compl., ¶ 24.)

### D.    Defendants' Unauthorized Actions to Alter the Georgia Election Code and the Processing of Defective Absentee Ballots.

In March 2020, Secretary Raffensperger, and the State Election Board, who

administer the state elections (collectively the "Administrators") entered into a "Compromise and Settlement Agreement and Release" (the "Litigation Settlement") with the Democratic Party of Georgia, Inc., the Democrat Senatorial Campaign Committee, and the Democratic Congressional Campaign Committee (the "Democrat Agencies"), *setting forth different standards to be followed by County Officials in processing absentee ballots in Georgia*.[2] (*See* Compl., ¶¶ 25-26.) Although Secretary Raffensperger is authorized to promulgate rules and regulations that are "conducive to the fair, legal, and orderly conduct of primaries and elections," all such rules and regulations must be "consistent with law." O.C.G.A. § 21-2-31(2); (*see* Compl., ¶ 28).

Under the Litigation Settlement, the Administrators agreed to change the statutorily-prescribed process of handling absentee ballots in a manner that was not consistent with the laws promulgated by the Georgia Legislature. (*See* Compl., ¶ 28.) The Litigation Settlement provides that the Secretary of State would issue an "Official Election Bulletin" to County Officials overriding the prescribed statutory procedures. The unauthorized Litigation Settlement procedure, set forth below, is more cumbersome, and makes it much more difficult to follow the statute

---

[2] *See Democratic Party of Georgia, Inc., et al. v. Raffensperger, et al.*, Civil Action File No. 1:19-cv-05028-WMR, United States District Court for the Northern District of Georgia, Atlanta Division, Doc. 56-1. A true and correct copy of the Litigation Settlement is attached hereto and incorporated herein as **Exhibit A**.

with respect to defective absentee ballots. (*See* Compl., ¶¶ 30-32.)

Under the Litigation Settlement, the following language added to the pressures and complexity of processing defective absentee ballots, making it less likely that they would be identified or, if identified, processed for rejection:

> County registrars and absentee ballot clerks ***are required***, upon receipt of each mail-in absentee ballot, to compare the signature or make of the elector on the mail-in absentee ballot envelope with the signatures or marks in eNet and on the application for the mail-in absentee ballot. If the signature does not appear to be valid, registrars and clerks are required to follow the procedure set forth in O.C.G.A. § 21-2-386(a)(1)(C). When reviewing an elector's signature on the mail-in absentee ballot envelope, the registrar or clerk must compare the signature on the mail-in absentee ballot envelope to each signature contained in such elector's voter registration record in eNet and the elector's signature on the application for the mail-in absentee ballot. ***If the registrar or absentee ballot clerk determines that the voter's signature on the mail-in absentee ballot envelope does not match any of the voter's signatures on file in eNet or on the absentee ballot application, the registrar or absentee ballot clerk must seek review from two other registrars, deputy registrars, or absentee ballot clerks. A mail-in absentee ballot shall not be rejected unless a majority of the registrars, deputy registrars, or absentee ballot clerks reviewing the signature agree that the signature does not match any of the voter's signatures on file in eNet or on the absentee ballot application. If a determination is made that the elector's signature on the mail-in absentee ballot envelope does not match any of the voter's signatures on file in eNet or on the absentee ballot application, the registrar or absentee ballot clerk shall write the names of the three elections officials who conducted the signature review across the face of the absentee ballot envelope, which shall be in addition to writing "Rejected" and the reason for the rejection as required under O.C.G.A. § 21-2-386(a)(1)(C).*** Then, the registrar or absentee ballot clerk shall commence the notification procedure set forth in O.C.G.A. § 21-2-386(a)(1)(C) and State Election Board Rule

183-1-14-.13.

(*See* Compl., ¶ 33; *see* Ex. A, Litigation Settlement, p. 3-4, ¶ 3, "Signature Match" (emphasis added).)

The underlined language above is not consistent with the statute adopted by the Georgia Legislature. (*See* Compl., ¶ 34.) First, the Litigation Settlement overrides the clear statutory authorities granted to County Officials individually and forces them to form a committee of three if any one official believes that an absentee ballot is a defective absentee ballot. (*See* Compl., ¶ 35.) Such a procedure creates a cumbersome bureaucratic procedure to be followed with each defective absentee ballot – and makes it likely that such ballots will simply not be identified by the County Officials.  (*See id.*, ¶ 36.)

Second, the Litigation Settlement allows a County Official to compare signatures in ways not permitted by the statutory structure created by the Georgia Legislature. (*See id.*, ¶ 37.) The Georgia Legislature prescribed procedures to ensure that any request for an absentee ballot must be accompanied by sufficient identification of the elector's identity. *See* O.C.G.A. § 21-2-381(b)(1) (providing, in pertinent part, "In order to be found eligible to vote an absentee ballot in person at the registrar's office or absentee ballot clerk's office, such person shall show one of the forms of identification listed in Code Section 21-2-417…"); (*see* Compl.,

¶ 38.) Under O.C.G.A. § 21-2-220(c), the elector must present identification, but need not submit identification if the electors submit with their application information such that the County Officials are able to match the elector's information with the state database, generally referred to as the eNet system. (*See* Compl., ¶ 39.) The system for identifying absentee ballots was carefully constructed by the Georgia Legislature to ensure that electors were identified by acceptable identification, but at some point in the process, the Georgia Legislature mandated the system whereby the elector be identified for each absentee ballot. (*See* Compl., ¶ 40.) Under the Litigation Settlement, any determination of a signature mismatch would lead to the cumbersome process described in the settlement, which was not intended by the Georgia Legislature, which authorized those decisions to be made by single election officials. (*See id.*, ¶ 41.) The Georgia Legislature also provided for the opportunity to cure (again, different from the opportunity to cure in the Litigation Settlement), but did not allocate funds for three County Officials for every mismatch decision. (*See id.*, ¶ 42.)

Finally, under paragraph 4 of the Litigation Settlement, the Administrators delegated their responsibilities for determining when there was a signature mismatch by considering in good faith "additional guidance and training materials" drafted by the "handwriting and signature review expert" of the Democrat

Agencies. (*See* Compl., ¶ 47; *see* Ex. A, Litigation Settlement, p. 4, ¶ 4, "Consideration of Additional Guidance for Signature Matching.") Allowing a single political party to write rules for reviewing signatures is not "conducive to the fair...conduct of primaries and elections" or "consistent with law" under O.C.G.A. § 21-2-31. (*See* Compl., ¶ 48.)

In short, the Litigation Settlement by itself has created confusion, misplaced incentives, and undermined the confidence of the voters of the State of Georgia in the electoral system. (*See* Compl., ¶ 49.) Neither it nor any of the activities spawned by it were authorized by the Georgia Legislature, as required by the United States Constitution. (*See* Compl., ¶ 50.)

### E.    The November 3, 2020 Election and "Full Hand Recount."

According to Secretary Raffensperger, in the November 3, 2020 general election: (1) in the presidential race, 2,457,880 votes were cast for President Donald J. Trump, and 2,472,002 for Joseph R. Biden; (2) in one U.S. Senate race, 2,458,665 votes were cast for Senator David A. Perdue, and 2,372,086 for Jon Ossoff; and (3) in the special election for the other of Georgia's U.S. Senators, 1,271,106 votes were cast for Senator Kelly Loeffler, and 1,615,402 for Reverend Raphael Warnock. (*See* Compl., ¶¶ 52-54.)   A run-off election for the U.S. Senators will occur on January 5, 2021.   (*See id.*, ¶¶ 53-54.)

Secretary Raffensperger directed a "full [H]and [R]ecount" of all ballots in the State of Georgia to be completed by Wednesday, November 18, 2020. (*See* Compl., ¶ 55.) Secretary Raffensperger declared that for the Hand Recount,

> Per the instructions given to counties as they conduct their audit triggered *full hand recounts*, designated monitors will be given *complete access to observe the process from the beginning*. While the audit triggered recount must be open to the public and media, designated monitors will be able to observe more closely… Designated monitors will be able to *watch the recount while standing close to the elections workers conducting the recount*.

> Political parties are allowed to designate *a minimum of two monitors per county* at a ratio of one monitor per party for every ten audit boards in a county… Beyond being able to watch to ensure the recount is conducted fairly and securely, the two-person audit boards conducting the hand recount call out the votes as they are recounted, providing monitors and the public an additional way to keep tabs on the process.

(*See* Compl., ¶ 56 (emphasis added).)

Non-parties Amanda Coleman and Maria Diedrich are two individuals who volunteered to serve as designated monitors for the Donald J. Trump Presidential Campaign, Inc. (the "Trump Campaign") on behalf of the Georgia Republican Party (the "Republican Party") at the Hand Recount.[3] (*See* Compl., ¶ 57; Ex. B, Coleman Aff., ¶ 2; Ex. C, Diedrich Aff., ¶ 2.) Non-party Susan Voyles is a poll

---

[3] Attached hereto and incorporated herein as **Exhibits B and C**, respectively, are true and correct copies of (1) the Affidavit of Amanda Coleman (the "Coleman Affidavit"), and (2) the Affidavit of Maria Diedrich (the "Diedrich Affidavit").

manager for Fulton County and participated in the Hand Recount as an auditor.[4]
(*See* Ex. D, Voyles Aff., ¶ 2.)

The Affidavits set forth various improprieties and improper handling of
ballots by County Officials and their employees that were personally observed
while monitoring the Hand Recount. (*See* Compl., ¶ 58; Ex. B, Coleman Aff.,
¶¶ 3-10; Ex. C, Diedrich Aff., ¶¶ 4-14; Ex. D, Voyles Aff., ¶¶ 4-28.) For example,
Ms. Coleman was directed to arrive at the Hand Recount between 8:00 a.m. and
9:00 a.m. on November 15, 2020, and arrived at 9:00 a.m. (*See* Ex. B, Coleman
Aff., ¶¶ 3-4.) As she arrived, Ms. Coleman was informed by a large crowd that
"they had 'just finished' the hand recount." (*See id.*, ¶ 5.)

Ms. Diedrich arrived at the Hand Recount at 8:00 a.m. on November 15,
2020.  (*See* Compl., ¶ 60; Ex. C, Diedrich Aff., ¶ 4.)  Ms. Diedrich reports that,
"By 9:15 a.m., officials announced that voting was complete and sent everyone
home…  The officials announced that they had counted all the absentee [ballots]
on November 14 at night and they were already boxed up." (*See id.*, ¶¶ 4-5.)  As a
result of her observations of the Hand Recount as a Republican Party monitor, Ms.

---

[4] Attached hereto and incorporated herein as **Exhibit D** is the Affidavit of Susan
Voyles (the "Voyles Affidavit"). Further, attached hereto and incorporated herein
as **Exhibits E through M and R through U** are ten (10) additional affidavits of
individuals who personally observed the irregularities occurring during the Hand
Recount and the Georgia election process.  Together with the Coleman, Diedrich,
and Voyles Affidavits, these are collectively referred to as the "Affidavits."

Diedrich declared, "There had been no meaningful way to review or audit any activity" at the Hand Recount. (*See* Compl., ¶ 61; Ex. C, Diedrich Aff., ¶ 14.) Ms. Coleman likewise declared, "There was no way to tell if any counting was accurate or if the activity was proper." (*See* Compl., ¶ 62; Ex. B, Coleman Aff., ¶ 10.) Ms. Voyles, a Hand Recount auditor, observed numerous irregularities, including a batch of "pristine" ballots that appeared to be machine-marked, with the vast majority of those ballots being votes for Joseph Biden. (*See* Ex. D, Voyles Aff., ¶¶ 12-16.) There was no actual "hand" recounting of the ballots during the Hand Recount, but rather, County Officials and their employees simply conducted another machine count of the ballots.[5] (*See* Compl., ¶ 63.)

## III.   ARGUMENT AND CITATION OF AUTHORITIES.

### A.   The Standard for Relief.

The United States Supreme Court summarized the test for the granting of a

---

[5] Additional areas of investigation are underway regarding the legitimacy and validity of Georgia's election results, as evidenced by: (1) the redacted Declaration dated November 15, 2020, attached hereto and incorporated herein as **Exhibit N** (the "Redacted Declaration"); (2) the Declaration of Christos A. Makridis dated November 16, 2020, attached hereto and incorporated herein as **Exhibit O** (the "Makridis Declaration"); and (3) the article entitled "Ballot-Marking Devices Cannot Ensure the Will of the Voters," published in the *Election Law Journal* on November 3, 2020, a true and correct copy of which is attached hereto and incorporated herein as **Exhibit P** (the "Ballot Marking Devices Failure Study"); *see generally* the Affidavit of Russell James Ramsland, Jr., attached hereto and incorporated herein as **Exhibit Q**.

preliminary injunction in *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008):

> A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.

*See also Alabama v. U.S. Army Corps of Eng's*, 424 F.3d 1117, 1131 (11th Cir. 2005). These are not rigid requirements to be applied by rote. "The essence of equity jurisdiction has been the power of the Chancellor to do equity and to mold each decree to the necessities of the particular case. Flexibility rather than rigidity has distinguished it." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982). "[T]he granting of [a] preliminary injunction rests in the sound discretion of the district court." *Harris Corp. v. Nat'l Iranian Radio & Television*, 691 F.2d 1344, 1354 (11th Cir. 1982).

"[A] preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981); *Levi Strauss & Co. v. Sunrise Int'l Trading, Inc.*, 51 F.3d 982, 985 (11th Cir. 1994) (at the "preliminary injunction stage, a district court may rely on affidavits and hearsay materials which would not be admissible evidence for a permanent injunction").

### B.   This Court Should Enter Emergency Injunctive Relief.

Plaintiff demonstrates herein all four elements for equitable relief. "When

the state legislature vests the right to vote for President in its people, the right to vote *as the legislature has prescribed is fundamental*; and one source of its fundamental nature lies in the equal weight accorded to each vote and the equal dignity owed to each voter." *Bush v. Gore*, 531 U.S. 98, 104 (2000) (emphasis added). The evidence here shows not only that Defendants failed to administer the November 3, 2020 election and Hand Recount in compliance with the manner prescribed by the Georgia Legislature, but also that Defendants violated Plaintiff's equal protection and due process rights. Unless Defendants are enjoined from certifying the results of the election, Plaintiff will be left with no remedy because Georgia's electoral votes for President will not be awarded to the proper candidate.

### 1.    Plaintiff has a substantial likelihood of success.

Plaintiff has made a credible showing that Defendants' intentional actions jeopardized the rights of Georgia citizens to select their leaders under the process set out by the Georgia Legislature. Defendants' conduct violated Plaintiff's constitutional rights in at least three separate ways.

### a.    *Defendants violated the Equal Protection Clause.*

When deciding a constitutional challenge to state election laws, the flexible standard outlined in *Anderson v. Celebrezze*, 460 U.S. 780 (1983) and *Burdick v. Takushi*, 504 U.S. 428 (1992) applies. Under *Anderson* and *Burdick*, courts must

"weigh the character and magnitude of the burden the State's rule imposes on those rights against the interests the State contends justify that burden, and consider the extent to which the State's concerns make the burden necessary." *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997) (citations and quotations omitted). "[E]ven when a law imposes only a slight burden on the right to vote, relevant and legitimate interests of sufficient weight still must justify that burden." *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1318-19 (11th Cir. 2019).

"To establish an undue burden on the right to vote under the *Anderson-Burdick* test, Plaintiffs need not demonstrate discriminatory intent behind the signature-match scheme or the notice provisions because we are considering the constitutionality of a generalized burden on the fundamental right to vote, for which we apply the *Anderson-Burdick* balancing test instead of a traditional equal-protection inquiry." *Lee*, 915 F.3d at 1319.

Plaintiff's equal protection claim is straightforward: states may not, by arbitrary action or other unreasonable impairment, burden a citizen's right to vote. *See Baker v. Carr*, 369 U.S. 186, 208 (1962) ("citizen's right to a vote free of arbitrary impairment by state action has been judicially recognized as a right secured by the Constitution"). "Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value on

person's vote over that of another." *Bush*, 531 U.S. at 104-05.  Among other things, this requires "specific rules designed to ensure uniform treatment" in order to prevent "arbitrary and disparate treatment to voters." *Id.* at 106-07; *see also Dunn v. Bloomstein*, 405 U.S. 330, 336 (1972) (providing that each citizen "has a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction").

"The right to vote extends to all phases of the voting process, from being permitted to place one's vote in the ballot box to having that vote actually counted. Thus, the right to vote applies equally to the initial allocation of the franchise as well as the manner of its exercise.  Once the right to vote is granted, a state may not draw distinctions between voters that are inconsistent with the guarantees of the Fourteenth Amendment's equal protection clause." *Pierce v. Allegheny County Bd. of Elections*, 324 F.Supp.2d 684, 695 (W.D. Pa. 2003) (citations and quotations omitted).  "[T]reating voters differently" thus "violate[s] the Equal Protection Clause" when the disparate treatment is the result of arbitrary, ad hoc processes. *Charfauros v. Bd. of Elections*, 249 F.3d 941, 954 (9th Cir. 2001).  Indeed, a "minimum requirement for non-arbitrary treatment of voters [is] necessary to secure the fundamental right [to vote]." *Bush*, 531 U.S. at 105.

Defendants are not part of the Georgia Legislature and cannot exercise

legislative power to enact rules or regulations regarding the handling of defective absentee ballots that are contrary to the Georgia Election Code.  By entering the Litigation Settlement, however, Defendants unilaterally and without authority altered the Georgia Election Code and the procedure for processing defective absentee ballots.  The result is that absentee ballots have been processed differently by County Officials than the process created by the Georgia Legislature and set forth in the Georgia Election Code.  Further, allowing a single political party to write rules for reviewing signatures, as paragraph 4 of the Litigation Settlement provides, is not "conducive to the fair...conduct of primaries and elections" or "consistent with law" under O.C.G.A. § 21-2-31.

The rules and regulations set forth in the Litigation Settlement created an arbitrary, disparate, and ad hoc process for processing defective absentee ballots, and for determining which of such ballots should be "rejected," contrary to Georgia law.  *See* O.C.G.A. § 21-2-386; (*see also* Ex. A, Litigation Settlement, p. 3-4, ¶ 3, "Signature Match").  This disparate treatment is not justified by, and is not necessary to promote, any substantial or compelling state interest that cannot be accomplished by other, less restrictive means.  As such, there is a substantial likelihood that Plaintiff will be successful in demonstrating that he has been harmed by Defendants' violations of his equal protection rights, and an injunction

should be issued to temporarily stay the certification of Georgia's election results.

### b.     *Defendants violated the Electors Clause.*

Defendants further violated the Constitution by improperly requiring the use of a system for processing defective absentee ballots that is different from the procedures prescribed by the Georgia Legislature. Article II of the Constitution provides that the rules for presidential elections be established by each state "in such Manner as the Legislature thereof may direct." U.S. Const. Art. II § 1, cl. 2. Where, as here, the Georgia Legislature has enacted a specific election code, "the clearly expressed intent of the legislature must prevail." *Bush*, 531 U.S. at 120 (Rehnquist, C.J., concurring).

The Georgia Legislature provided the steps to be followed by County Officials with respect to defective absentee ballots, and the repeated use of the word "shall" in that section demonstrates the Georgia Legislature's intent that the requirements are mandatory, not discretionary. *See* O.C.G.A. § 21-2-386(a)(1)(C). By requiring County Officials to utilize the procedure set forth in the Litigation Settlement, however, Defendants altered the otherwise statutorily mandated procedure contrary to the Georgia Election Code and the United States Constitution. *See* U.S. Const. Art. II § 1, cl. 2; O.C.G.A. § 21-2-31(2); (*see also* Ex. A, Litigation Settlement, p. 3-4, ¶ 3, "Signature Match"). As such, Georgia's

results for the November 3, 2020 election are tainted with the improper handling and tabulation of defective absentee ballots in violation of the Electors and Election Clauses of the Constitution. Thus, Plaintiff has a substantial likelihood of success, and an emergency injunction should be issued to prevent the certification of any vote tabulation that includes improperly handled defective absentee ballots.

### c.   *The Hand Recount was violated Due Process.*

Secretary Raffensperger announced that a "full [H]and [R]ecount" of Georgia's November 3, 2020 election results would occur. (*See* Compl., ¶ 55.) For the full Hand Recount, "Political parties are allowed to designate a minimum of two monitors per county" in order to "watch the recount while standing close to the elections workers conducting the recount" and provide "an additional way to keep tabs on the process" to "ensure the recount is conducted fairly and securely." (*See* Compl, ¶ 56.) The Georgia Election Code also sets forth the means in which a recount is to be conducted, and permits "each such party or body" to "send two representatives to be present at such recount." O.C.G.A. § 21-2-495(a)-(b).

Having declared that a full hand recount of Georgia's election results would occur, Secretary Raffensberger is required to comply with the procedures for the Hand Recount. The Affidavits attached hereto, however, demonstrate that the Hand Recount has not been conducted in a manner consistent with the Georgia Election

Code. Monitors have been denied the opportunity to be present throughout the entire Hand Recount, and when allowed to be present, they were denied the opportunity to observe the Hand Recount in any meaningful way. Further, monitors have been denied the ability to seek redress of the irregularities they have observed during their limited ability to monitor the Hand Recount.

The failure of Defendants to ensure that the Hand Recount is conducted fairly and in compliance with the Georgia Election Code is a deprivation of the Fourteenth Amendment's protection of the right to vote from conduct by state officials which seriously undermines the fundamental fairness of the electoral process. *See Marks v. Stinson*, 19 F.3d 873, 889 (3d Cir. 1994). Defendants have a duty to guard against the deprivation of the right to vote and ensure that the public has meaningful access to observe and monitor the electoral process.

Rather than heeding these mandates and duties, however, Defendants intentionally and/or arbitrarily and capriciously denied election monitors meaningful access to observe and monitor the electoral process. Defendants' failures constitute a deprivation of Plaintiff's due process rights and result in an election result that is tainted with constitutional violations and unfairness. As such, this Court should enjoin Defendants from certifying Georgia's election results, and should require that the Hand Recount be reperformed in a manner

consistent with the Georgia Election Code.

### 2.    Plaintiff will suffer irreparable harm.

The irreparable nature of the harm to Plaintiff is apparent.  "It is well-settled that an infringement on the fundamental right to vote amounts in an irreparable injury." *New Ga. Project v. Raffensperger*, 2020 U.S. Dist. LEXIS 159901, at *86 (N.D. Ga. Aug. 31, 2020).  If the Georgia vote count, including defective absentee ballots that were not processed according to the Georgia Election Code, is certified, and if the Hand Recount is not properly reconducted, then Georgia's election results are improper and suspect, resulting in Georgia's electoral college votes going to Joseph R. Biden contrary to the votes of the majority of Georgia qualified electors.  Plainly, there is no adequate remedy at law if this occurs.

### 3.    The Balance of Harms and Public Interest.

The remaining two factors for the preliminary injunction test, "harm to the opposing party and weighing the public interest merge when the Government is the opposing party." *New Ga. Project*, 2020 U.S. Dist. LEXIS 159901, at *86 (*quoting Nken v. Holder*, 556 U.S. 418, 435 (2009)) (alterations and punctuation omitted).  Plaintiff seeks a stay in the certification of Georgia's election results to preserve the status quo while this case proceeds.  Defendants will bear little harm so long as they certify the Georgia election results by November 20, 2020, the

federal safe-harbor date.  If Defendants prevail by or before that date, the same electors will be appointed with ample time to vote in the Electoral College.  If Plaintiff prevails, it can only be because Defendants had no legitimate interest in certifying a constitutionally flawed election outcome.  Either way, Defendants will not suffer harm from a slight delay.

By contrast, Plaintiff (and the citizens of Georgia) could lose his opportunity for meaningful relief entirely if the vote total is certified, since it is not clear what remedies would remain after that point.  *See New Ga. Project*, 2020 U.S. Dis. LEXIS 15901, at *86-87 (concluding that movant satisfied balance of harms/public interest factors, as "Plaintiffs will be forever harmed if they are unconstitutionally deprived of their right to vote").  The low costs to Defendants and high potential harm to Plaintiff make this a case with substantial net harm an injunction can prevent.  *See Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017).

Moreover, the public will be served by this injunction.  "[T]he public has a strong interest in exercising the fundamental political right to vote.  That interest is best served by favoring enfranchisement and ensuring that qualified voters' exercise of their right to vote is successful.  The public interest therefore favors permitting as many qualified voters to vote as possible," and having those votes properly processed and tallied pursuant to Georgia law.  *Obama for Am. v. Husted*,

697 F.3d 423, 436-37 (2012) (citations and quotations omitted).

WHEREFORE, Plaintiff prays that this Court enter an emergency injunction as to the following:

1.     Prohibiting the certification of the results of the 2020 general election in Georgia on a statewide basis; or

2.     Alternatively, prohibiting the certification of said results which include the tabulation of defective absentee ballots; and

3.     Declaring that:

a.     Any recount of the November 3, 2020 elections, including but not limited to the Hand Recount, must be reperformed in a manner consistent with the Georgia Election Code;

b.     Monitors designated by the Republican Party have the right to be present to meaningfully observe all election activity, from the receipt of a ballot to the entry or tabulation of the resulting vote, as to the Hand Recount, any reconducting of the Hand Recount, and the January 5, 2021 run-off election;

c.     That Plaintiff and the Republican Party by given at least 24 hours notice prior to any and all election activity;

d.     That all ballots in Georgia must be read by two persons employed by the County Officials, with said readings being overseen by Republican Party-

designated monitors;

e.     That the Republican Party immediately receive certified copies of all ballot envelopes and requests for absentee ballots received by Defendants, and further, that the Republican Party has the right to compare voter or application signatures on ballot envelopes and requests for absentee ballots with eNet, particularly as to the January 5, 2021 run-off election;

f.     That for the January 5, 2021 run-off election, the Republican Party has the right to have absentee ballot watchers/monitors present at all signature verification processes, from the receipt of the request for an absentee ballot to the opening and processing of the same; and

4.     Any and other such further relief that this Court deems equitable and just.

Respectfully submitted this 17th day of November, 2020.

**SMITH & LISS, LLC**

/s/ _____
Ray S. Smith, III
Georgia Bar No. 662555
*Counsel for Plaintiff*

Five Concourse Parkway
Suite 2600
Atlanta, Georgia 30328
(404) 760-6000
rsmith@smithliss.com

designated monitors;

e.     That the Republican Party immediately receive certified copies of all ballot envelopes and requests for absentee ballots received by Defendants, and further, that the Republican Party has the right to compare voter or application signatures on ballot envelopes and requests for absentee ballots with eNet, particularly as to the January 5, 2021 run-off election;

f.     That for the January 5, 2021 run-off election, the Republican Party has the right to have absentee ballot watchers/monitors present at all signature verification processes, from the receipt of the request for an absentee ballot to the opening and processing of the same; and

4.     Any and other such further relief that this Court deems equitable and just.

Respectfully submitted this 17th day of November, 2020.

SMITH & LISS, LLC

Ray S. Smith, III
Georgia Bar No. 662555
*Counsel for Plaintiff*

Five Concourse Parkway
Suite 2600
Atlanta, Georgia 30328
(404) 760-6000
rsmith@smithliss.com

## **CERTIFICATE OF COMPLIANCE**

The undersigned counsel certifies that the foregoing has been prepared in

Times New Roman (14 point) font, as required by the Court in Local Rule 5.l (B).

Respectfully submitted this 16th day of November, 2020.

SMITH & LISS, LLC

/s/

Ray S. Smith, III
Georgia Bar No. 662555
*Counsel for Plaintiff*

Five Concourse Parkway
Suite 2600
Atlanta, Georgia 30328
(404) 760-6000
rsmith@smithliss.com

## CERTIFICATE OF SERVICE

I hereby certify that I have this day caused the foregoing and all exhibits and attachments thereto in the above-captioned matter to be filed with the United States District Court for the Northern District of Georgia, Atlanta Division, via the Court's CM-ECF system.  I also hereby certify that I caused the foregoing and all exhibits and attachments thereto in the above captioned matter to be served, via FedEx and email, upon:

Secretary of State Brad Raffensperger
214 State Capitol
Atlanta, Georgia 30334
brad@sos.ga.gov
soscontact@sos.ga.gov

Rebecca N. Sullivan
Georgia Department of Administrative Services
200 Piedmont Avenue SE
Suite 1804, West Tower
Atlanta, Georgia 30334-9010
rebecca.sullivan@doas.ga.gov

David J. Worley
Evangelista Worley LLC
500 Sugar Mill Road
Suite 245A
Atlanta, Georgia 30350
david@ewlawllc.com

Matthew Mashburn
Aldridge Pite, LLP
3575 Piedmont Road, N.E.
Suite 500
Atlanta, Georgia 30305
mmashburn@aldridgepite.com

Anh Le
Harley, Rowe & Fowler, P.C.
2700 Cumberland Parkway
Suite 525
Atlanta, Georgia 30339
ale@hrflegal.com

This 16th day of November, 2020.

SMITH & LISS, LLC

/s/

Ray S. Smith, III
Georgia Bar No. 662555
*Counsel for Plaintiff*

Five Concourse Parkway
Suite 2600
Atlanta, Georgia 30328
(404) 760-6000
rsmith@smithliss.com

2