## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

L. Lin Wood, Jr.,

        Plaintiff,

v.

Brad Raffensperger, in his official capacity
as Secretary of the State of Georgia, et al.,

        Defendants.

CIVIL ACTION FILE NO.
1:20-cv-04651-SDG

## MOTION TO INTERVENE AND INCORPORATED BRIEF IN SUPPORT

COMES NOW THE DEMOCRATIC PARTY OF GEORGIA, INC., the
DSCC, and the DCCC (collectively, the "Political Party Committees") by and
through their undersigned counsel of record, and file this *Motion to Intervene and
Incorporated Brief in Support* in the above-referenced matter. Intervention is
appropriate under Federal Rule of Civil Procedure 24(a) and (b) for the following
reasons:

### I.     INTRODUCTION

On September 15, 2020, local election officials began mailing absentee
ballots for the November 3 general election. On October 12, Georgia voters began
casting ballots in person for the same. As of November 3, nearly *five million*

Georgians had voted, including over one million by absentee ballot. To ensure the accuracy of the election, on November 11, 2020, Republican Secretary of State Brad Raffensperger ("the Secretary") ordered a "full by-hand recount in each county" of the presidential race.[1]  Many counties, including Fulton County, have finished their recount through the tremendous efforts of hundreds of volunteers working multiple shifts.[2]

Plaintiff's Amended Complaint—filed thirteen days *after* the general election concluded—seeks to invalidate at least one million Georgians' votes, throw out the results of the recount statewide and order yet a third tallying of Georgia ballots, and implement by judicial fiat sweeping, illegal, one-party oversight of Georgia's statutory absentee voting process. Plaintiff asks the Court to do so under the guise of a constitutional challenge to the validity of a March 6, 2020, settlement agreement between the Secretary, the State Election Board (the "Board"), and the Political Party Committees (the "Settlement Agreement"), that was entered into in a separate

---

[1] Quinn Scanlan, *Georgia's top election official announces there will be 'full by-hand recount in each county' for presidential race*, ABC News (November 11, 2020), https://abcnews.go.com/Politics/georgias-top-election-official-announces-full-hand-recount/story?id=74146620.

[2] Audrey Washington, *Fulton, DeKalb counties finish ballot recount, officials say*, WSB-TV 2 (November 15, 2020), https://www.wsbtv.com/news/politics/fulton-county-has-finished-ballot-recount-officials-say/GQ4QUCZDEVEBPMUUFDFEIYOXHI/.

federal case in this district, *Democratic Party of Georgia v. Raffensperger*, Civil Action File No. 1:19-cv-5028-WMR ("*DPG v. Raffensperger*"), which was then pending before Judge William M. Ray, II, as well as unsupported allegations that Republican monitors were excluded from observing the recount in Fulton County. None of this relief is even remotely warranted.

First, the Settlement Agreement was not a radical revision of Georgia's elections laws as Plaintiff insinuates. In fact, it did not change the law in Georgia at all. Rather, it clarified the standards for signature matching and cure on absentee ballots and memorialized the parties' agreement that rules and regulations should be adopted to give local authorities clear and uniform guidance across the state. And, in any event, the Settlement Agreement in *DPG v. Raffensperger* was entered into on March 6, more than eight full months ago. Following that agreement, the Board went through a public notice and comment period that resulted in a new notice and rule, and the Secretary promulgated new guidance for signature matching pursuant to his authority under Georgia law, both of which were firmly in place months before the first absentee ballot was cast in the general election.

Yet, Plaintiff inexcusably waited—until after the election, which was administered in accordance with the guidance resulting from the Settlement Agreement; until Georgia's voters cast their ballots and had their ballots counted;

and until the results of the election were clear—before launching this collateral attack. And though Plaintiff takes issue with every absentee ballot cast in the State, he fails to identify even a *single* absentee ballot he claims was wrongly counted. Plaintiff's lawsuit is as meritless as it is late.

Second, there is no basis for Plaintiff's request that the results of the recount statewide be disregarded and a new recount ordered based on allegations that two Republican election monitors—neither of whom are parties to this case—were not able to adequately observe the recount in Fulton County on a particular hour of a particular day. Instead, the whole effort appears to be little more than a transparent effort to delay the certification of the election.

The Political Party Committees—who were parties to the underlying lawsuit, signatories to the Settlement Agreement, and whose candidates will be impacted if the election is not certified or the results are discarded—have an undeniable interest in this litigation and should be granted intervention.

## II.    BACKGROUND

On November 6, 2019, the Political Party Committees sued the Secretary and members of the Board, challenging Georgia's signature matching laws under the First and Fourteenth Amendments to the U.S. Constitution. The Political Party Committees asserted that Georgia's arbitrary and unreliable procedures for

comparing absentee ballot signatures and rejecting absentee ballots unconstitutionally deprived Georgians of their right to vote. *DPG v. Raffensperger*, No. 1:19-cv-5028 (N.D. Ga.) (ECF Nos. 1, 30) (complaint and amended complaint). After several weeks of arms-length negotiations, the parties entered into the Settlement Agreement on March 6, 2020, which was publicly filed with the court that day.

Throughout the negotiations, as memorialized in the Settlement Agreement, both the Secretary and Board maintained that Georgia's laws and processes were constitutional. They did not agree to any modification of Georgia's elections statutes. Rather, they agreed to initiate rulemaking and issue guidance to help ensure uniform and fair treatment of voters *within* the existing statutory framework. Thus, the Secretary agreed to issue official guidance intended to increase uniformity in processing absentee ballot signatures, and the Board agreed to promulgate and enforce a more robust voter notification and cure process. Neither step was unusual: The Secretary routinely offers such guidance and one of the functions of the Board is to promulgate and enforce rules regulating the conduct of Georgia elections.  The Office of the Georgia Attorney General and private counsel (who regularly represents both the Georgia Republican Party and prominent Republican leaders)

represented the Secretary and the other Board members during the negotiations and personally signed the Settlement Agreement.

For its part, the Board implemented the Settlement Agreement by promulgating State Election Board Rule 183-1-14-.13 (the "Notice Rule"). *See* O.C.G.A. § 50-13-4. Under the Notice Rule, counties contact voters about rejected mail ballots within three business days after receipt of the absentee ballot and within one business day for ballots received within eleven days of election day. Notably, under Georgia law, the Board could only implement and enforce this type of rule after an official rulemaking. And that is precisely what occurred: over the course of several months, beginning in December 2019 (before the Settlement Agreement was finalized), and in accordance with the Georgia Administrative Procedures Act, the Board gave notice about the intended rulemaking, accepted comments from the public, and, only after that process was complete, implemented the new Notice Rule.[3] The Notice Rule was initially adopted on February 28, 2020, and went into effect on March 23. The rule was subsequently amended subject to a *second* round

---

[3] *See* Georgia State Elections Board, *Notice of Intent to Post a Rule of the State Elections Board, Chapter 183-1-14 and Notice of Public Hearing* (Dec. 19, 2019) (scheduling public hearing for January 22, 2020).

of public rulemaking.[4] In fact, the rule that was finally adopted after the amendment differed slightly from the rule in the Settlement Agreement, confirming that the rulemaking process was far from a rubberstamp of the Settlement Agreement. *See* Ga. Comp. R. & Regs. 183-1-14-.13 (Amended March 22, 2020); Ga. Comp. R. & Regs. 183-1-14-.13 (May 21, 2020); Ga. Comp. R. & Regs. 183-1-14-.13 (Aug. 31, 2020).[5]

The Secretary in turn issued the procedures for the signature matching process at issue here—i.e., review of allegedly-mismatched signatures by two additional registrars, deputy registrars, and absentee ballots clerk—on May 1. These procedures were issued by the Secretary via an Official Election Bulletin ("OEB"). OEBs are election guidance documents that provide technical guidance to local election administrators regarding new rules, court orders, and other binding law to ensure consistency in the administration of elections statewide. The OEB in question accords with O.C.G.A. §§ 21-2-31 and 21-2-300(a), which empower the Board and

[4] Georgia State Elections Board, *Notice of Intent to Post a Rule of the State Elections Board, Chapter 183-1-14 and Notice of Public Hearing* (Mar. 5, 2020), https://sos.ga.gov/admin/files/SEB%20Rule%20183.1.14.13%20Reposted%20Rules%20RE%20SEB%202.28.2020.pdf (scheduling public hearing for April 15, 2020).
[5] The amended Notice Rule effective August 31, 2020, corrected a scrivener's error in the amended Notice Rule effective May 21, 2020, that altered the event triggering the obligation of the board of registrars or absentee ballot clerk to notify the elector whose timely-submitted absentee ballot was rejected.

the Secretary in his role as the chief elections official and Chair of the Board, to obtain uniformity in the practices and proceedings of local elections officials such as superintendents and registrars in administering Georgia's Election Code. *See also* O.C.G.A. § 21-2-50(a), (b); *Grizzle v. Kemp*, 634 F.3d 1314, 1319 (11th Cir. 2011).

The OEB required counties to continue to verify absentee voters' identities by comparing signatures as required by Georgia law. Chris Harvey, Official Election Bulletin (May 1, 2020). All of these statewide changes—the Settlement Agreement, rulemaking, the Notice Rule, and process changes—were widely publicized. *See supra* at n.2-4. All were in place for the June 9 primary election, August 11 primary runoff Election, and November 3 general election. Georgia rejected absentee ballots due to purported signature mismatches across those elections.

On November 3, following nearly a month and a half of absentee early voting, the general election took place. Votes were tallied across the state over the following week, and on November 11 the Secretary announced that a statewide, hand recount of the presidential election would take place. Many counties began the recount the next day, and all counties were instructed to begin by 9:00 a.m. November 13. To date, 144 counties have completed their recount. Plaintiff's Amended Complaint alleges that members of the public—who are not parties to this suit—were unable to watch the State's hand recount in Fulton County on particular days and times.

Plaintiff does not argue that *he* was designated as a monitor or that he attempted to observe any counting, nor does he argue that other Republican observers were unable to observe the State's hand recount in Fulton County at any time.

Plaintiff filed his Complaint on November 13 challenging the Settlement Agreement, more than *eight months* after the Agreement was finalized, and amended the Complaint 13 days after nearly five million Georgians cast their votes in the general election and the results of the election became clear for all offices, 5 days after the hand recount began, and 32 days after election officials started separating the absentee envelopes subject to the signature matching procedures from the enclosed ballots. Indeed, the signature matching process for over one million absentee ballots cast in Georgia for the 2020 general election has long since concluded and cannot be recreated. Georgia's statutory signature matching process happens *before* ballots are separated from their container envelopes containing the voter's signature and, to protect the secrecy of those ballots, once the signature is accepted and local election officials otherwise deem the ballot valid, the envelopes and ballots are separated and cannot be subsequently re-married. *See* O.C.G.A. § 21-2-386(a)(2)-(3); Ga. Comp. R. & Regs. 183-1-14-0.9-.15(1), (4) (emergency rule authorizing county election superintendents "to open the outer envelope of accepted absentee ballots, [and to] remove the contents including the absentee ballot" "in a

manner that ensures that the contents of the envelope cannot be matched back to the outer envelope" "[b]eginning at 8:00 a.m. on the third Monday prior to Election Day").

Plaintiff is clearly aware of this reality and thus suggests that, instead of discarding only "defective ballots," the remedy should be to discard either *every single* ballot cast in Georgia or at least *every single absentee* ballot cast statewide, to throw out the results of the recount statewide and order a new recount, and to wholly rewrite Georgia's absentee voting laws. Such relief is unwarranted, unprecedented, and would disenfranchise millions of lawful voters. Plaintiff filed an Amended Complaint on November 16 to include a claim that the hand recount should be redone and to seek specific remedies on the part of the Republican Party, which is *not* a party to this lawsuit.

The Political Party Committees would have a legally protectable interest in intervening to prevent that outcome and protect their Democratic voters and candidates even if they were not parties to the Settlement Agreement that forms the purported basis of Plaintiff's challenge here. But they were also parties to the underlying *DPG v. Raffensperger* litigation and Settlement Agreement. Accordingly, they respectfully move this Court for an Order allowing them to intervene as of right or, in the alternative, permissively.

## III.   ARGUMENT

**A.   This Court should grant the motion to intervene as of right.**

The Political Party Committees qualify for intervention as of right. Intervention as of right must be granted when (1) the motion to intervene is timely; (2) the proposed intervenors possess an interest in the subject matter of the action; (3) denial of the motion to intervene would affect or impair the proposed intervenors' ability to protect their interests; and (4) the proposed intervenor's interests are not adequately represented by the existing parties to the lawsuit. Fed. R. Civ. P. 24(a)(2); *Georgia v. U.S. Army Corps of Eng'rs*, 302 F.3d 1242, 1250 (11th Cir. 2002). The Political Party Committees satisfy each of these factors.

### 1.   The motion to intervene is timely.

The Political Party Committees' motion is timely. Plaintiff filed the Complaint on November 13, 2020, and the Amended Complaint on November 16. *See* Compl.; *see also* Am. Compl. This motion follows two business days after the filing of the Amended Complaint, before any significant action has occurred in the case. *See* Am. Compl. As there has been no delay, there is no risk of prejudice. *See Chiles v. Thornburgh,* 865 F.2d 1197, 1213 (11th Cir. 1989).

Additionally, as discussed below, the Political Party Committees were signatories to the Settlement Agreement that Plaintiff's challenge. As such, they will

suffer prejudice if their request to intervene is denied because they will be unable to protect their own interests in the Settlement Agreement or that of their constituents or candidates. *Id*. (analyzing whether a motion to intervene is timely and considering "the extent of prejudice to the [proposed intervenors] if their motion is denied"). They will also suffer severe prejudice if, as Plaintiff requests, Republican monitors are allowed to engage in signature matching and to specifically observe signature verification on absentee ballots, processes that are reserved for trained county officials and do not, and should not, involve any political party. *See* Am. Compl. at Prayer for Relief ¶¶ (d)(1)-(6).

### 2.     The Political Party Committees have a strong interest in this litigation.

The Political Party Committees have significant and cognizable interests in intervening in this case.

As to the Settlement Agreement claims, the Political Party Committees are quintessential "real parties in interest in the transaction which is the subject of the proceeding," *Chiles*, 865 F.2d at 1214. A declaration that the Settlement Agreement is unconstitutional will indisputably impede the ability of the Political Party Committees to realize their interest in that agreement. *See Turn Key Gaming, Inc. v. Oglala Sioux Tribe*, 164 F.3d 1080, 1081-82 (8th Cir. 1999) (finding interest requirement "easily satisfie[d]" where "[t]he disposition of the lawsuit . . . may

require resolution of legal and factual issues bearing on the validity of [] agreements" in which proposed intervenor had interests); *see also Georgia v. U.S. Army Corps of Eng'rs*, 302 F.3d at 1258 (granting intervention where proposed intervenor had a contractual interest in the dispute and "[b]ecause a final ruling in this case may adversely impact [proposed intervenor's] ongoing lawsuit against" defendant); *In re Bayshore Ford Truck Sales, Inc.*, 471 F.3d 1233, 1246 (11th Cir. 2006) (intervention is proper where proposed intervenor "anchor[s] its request in the dispute giving rise to the pending lawsuit ... [and] demonstrate[s] 'an interest relating to the property or transaction which is the subject of the action.'" (citation and emphasis omitted)).

The Political Party Committees also have a clear interest in ensuring that eligible Democratic voters are not disenfranchised as the result of Plaintiff's meritless and untimely attack on the results of the election and that their candidates' results are not disturbed. Plaintiff asks this Court to prevent Defendants from certifying the results of the 2020 general election to the detriment of *all* Georgia voters or, in the alternative, to disenfranchise at least the one million primarily Democratic Georgia voters who cast their ballots by mail. Am. Compl. at 37-39. Putting aside the fact that Plaintiff does not identify a *single* absentee ballot he claims was wrongly counted as a result of the Settlement Agreement, should Plaintiff be

granted his requested relief, the Political Party Committees' supported candidates would lose lawfully cast votes and their members would be disenfranchised.

"The right to vote includes the right to have the ballot counted," *Reynolds v. Sims*, 377 U.S. 533, 555 n.29 (1964), and courts have repeatedly held that where proposed relief carries with it the prospect of disenfranchising a political party's members, the party has a legally cognizable interest at stake. *See, e.g.*, *Crawford v. Marion Cnty. Election Bd*., 553 U.S. 181, 189 n.7 (2008) (agreeing with the unanimous view of the Seventh Circuit that the Indiana Democratic Party had standing to challenge a voter identification law that risked disenfranchising its members); *Ne. Ohio Coal. for the Homeless v. Husted*, 696 F.3d 580 (6th Cir. 2012) (Ohio Democratic Party allowed to intervene in case where challenged practice would lead to disenfranchisement of its voters); *Stoddard v. Winfrey*, No. 20-014604-cz (Mich. Cir. Ct. Nov. 6, 2020) (granting intervention to Democratic National Committee in a lawsuit seeking to stop counting ballots in Detroit); Order, *Donald J. Trump for President, Inc. v. Boockvar*, No. 20-cv-2078 (M.D. Pa. Nov. 12, 2020), ECF No. 72 (granting intervention to Democratic National Committee in lawsuit seeking to invalidate ballots in Pennsylvania); Order, *Constantino v. City of*

*Detroit*, No. 20-014789-AW (Mich. Cir. Ct. Nov. 13, 2020) (granting Michigan Democratic Party's motion to intervene). [6]

Moreover, the Political Party Committees have an obvious interest in a case where Plaintiff seeks individualized, special, and unprecedent treatment for *Republican* monitors and observers only. On its face, Plaintiff's Amended Complaint seeks *only* Republican monitors for an audit or recount that he claims

---

[6] While standing is not a separate consideration on a motion to intervene, courts have consistently recognized that political party committees have standing to advance claims to avoid the disenfranchisement of their members, thus recognizing their legitimate and cognizable interest in such claims. *See e.g.*, *Democratic Party of Georgia, Inc. v. Crittenden*, 347 F. Supp. 3d 1324, 1337 (N.D. Ga. 2018) (holding Democratic Party of Georgia had standing to sue on behalf of its members to challenge the state's rejection of absentee ballots); *Sandusky County Democratic Party v. Blackwell*, 387 F.3d 565, 573-74 (6th Cir. 2004) (holding Ohio Democratic Party, among other local party organizations, had standing to sue on behalf of members who would vote in the upcoming election and whose provisional ballots may be rejected); *Fla. Democratic Party v. Hood*, 342 F. Supp. 2d 1073, 1079 (N.D. Fla. 2004) (holding Florida Democratic Party "has standing to assert, at least, the rights of its members who will vote in the November 2004 election"); *Fla. Democratic Party v. Scott*, 215 F. Supp. 3d 1250, 1254 (N.D. Fla. 2016) (holding Florida Democratic Party had standing to assert the rights of voters "who intended to register as Democrats and will be barred from voting" given the state's closure of voter registration); *Texas Democratic Party et al. v. Hughs*, No. SA-20-CV-08-OG, 2020 WL 4218227, at *4-5 (W.D. Tex. July 22, 2020) (at the motion to dismiss stage, holding Texas Democratic Party, DCCC, and DSCC had adequately alleged associational standing on behalf of their members who will be registering to vote); *DSCC and DCCC v. Simon*, No. 62-CV-20-585, Dkt. 83 at *18 (Minn. Dist. Ct. July 28, 2020) (at motion to dismiss stage, holding DSCC and DCCC had adequately pled associational standing on behalf of their "members, constituents, canvassers, and volunteers" who wished to engage in voter assistance).

should start over entirely, and perhaps that such monitors actually be involved in the counting. *See* Am. Compl. at Prayer for Relief ¶¶ (d)(1)-(6). Plaintiff also asks that for future elections only Republican monitors be involved in signature matching and verification, *including doing it themselves*. *Id* ¶¶ (d)(6). Such a process would be a breathtaking insertion of partisanship in a process not only reserved for county officials but intended to be done in a way to preserve the secrecy of votes and would seriously risk the disenfranchisement of the members and constituents of Political Party Committees.

While these interests are sufficient for intervention, the Political Party Committees have a strong interest in addressing Plaintiff's claim that the audit— which is nearly complete—restart entirely because of threadbare allegations speculating that Republican monitors were excluded from the process in one county on a particular day and time. Such a result would likely put timely certification of the election at risk, and Political Party Committees whose candidate is the projected winner in Georgia have an interest in ensuring further delay of that certification does not occur. *See Texas Democratic Party v. Benkiser*, 459 F.3d 582, 588 (5th Cir. 2006) ("[A]fter the primary election, a candidate steps into the shoes of his party, and their interests are identical.").

Accordingly, the Political Party Committees clearly have an interest in intervening in this matter.

### 3.    Disposition of this matter would impair the Political Party Committees' ability to protect their interests as a practical matter.

The Political Party Committees' legally-cognizable interests will also be impaired by the disposition of this lawsuit if intervention is not granted.

*First*, as noted above, Plaintiff's relief would overturn an agreement to which Political Party Committees are parties, impairing their ability to realize their interest in that agreement. *See supra* at 12-13.

*Second*, the Political Party Committees have an interest in preventing the infringement of millions of their members' constitutional right to vote as well as harm to their supported candidates. Plaintiff also seeks to halt the certification process, which threatens the right to vote of the Political Party Committees' members. "[T]o refuse to count and return the vote as cast [is] as much an infringement of that personal right as to exclude the voter from the polling place." *United States v. Saylor*, 322 U.S. 385, 387-88 (1944).

The disruptive and disenfranchising effects of Plaintiffs' action, including a demand to restart the *hand counting of over five million ballots* or to simply cast out these ballots altogether, would also require the Political Party Committees to divert resources to work several times harder to achieve their mission. In particular, the

hand counting of each ballot has already required enormous resources from the Political Party Committees, especially DPG, to recruit, train, organize, and deploy both monitors and public observers in all of Georgia's 159 counties. Doing it again would continue to require significant resources that could be focused elsewhere. *See, e.g.*, *Ne. Ohio Coal. for Homeless v. Husted*, 837 F.3d 612, 624 (6th Cir. 2016) (finding concrete, particularized harm where organization had to "redirect its focus" and divert its "limited resources" due to election laws); *Crawford v. Marion Cnty. Election Bd.*, 472 F.3d 949, 951 (7th Cir. 2007) (concluding that electoral change "injure[d] the Democratic Party by compelling the party to devote resources" that it would not have needed to devote absent new law), *aff'd*, 553 U.S. 181 (2008); *Democratic Nat'l Comm. v. Reagan*, 329 F. Supp. 3d 824, 841 (D. Ariz. 2018) (finding standing where law "require[d] Democratic organizations … to retool their [get-out-the-vote] strategies and divert [] resources"), *rev'd on other grounds sub nom. Democratic Nat'l Comm. v. Hobbs*, 948 F.3d 989 (9th Cir. 2020) (en banc); *see also Issa v. Newsom*, No. 20-cv-01044-MCE-CKD, 2020 WL 3074351, at *3 (June 10, 2020) (granting intervention and citing this protected interest). Moreover, the Political Party Committees have spent millions of dollars getting out the vote and supporting their candidates in the 2020 general election; upending the results of that

election by baselessly discarding all or at least 20% of all votes cast will undermine and undo all of that work and investment.

Finally, Plaintiff's expansive requested relief—from halting certification of the election to inserting Republican monitors (and only Republican monitors) into signature verification and matching—would threaten the Political Party Committees' candidates' electoral prospects. In circumstances where political parties have faced similar risks of harm to their electoral prospects and mission, courts have routinely granted intervention. *E.g.*, Order, *Democratic Party of Ga., Inc. v. Crittenden*, No. 18-cv-5181 (N.D. Ga. Nov. 14, 2018), ECF No. 40 (granting intervention to political party in voting rights lawsuit); Order, *Parnell v. Allegheny Bd. of Elections*, No. 20-cv-01570 (W.D. Pa. Oct. 22, 2020), ECF No. 34 (granting intervention to DCCC in lawsuit regarding processing of ballots); Order, *Paher v. Cegavske*, No. 20-cv-00243-MMD-WGC, 2020 WL 2042365, at *4 (D. Nev. Apr. 28, 2020), ECF No. 39 (granting DNC intervention in election case brought by conservative interest group); *Donald J. Trump for President, Inc. v. Murphy*, No. 20-cv-10753 (MAS) (ZNQ), 2020 WL 5229209, at *1 (D. N.J. Sept. 01, 2020) (granting DCCC intervention in lawsuit by Republican candidate and party entities); *Cook Cnty. Republican Party v. Pritzker*, No. 20-cv-4676 (N.D. Ill. Aug. 28, 2020), ECF No. 37 (granting DCCC intervention in lawsuit by Republican party entity);

*Issa*, 2020 WL 3074351, at *3 (granting DCCC and California Democratic Party intervention in lawsuit by Republican congressional candidate); Order, *Donald J. Trump for President v. Bullock*, No. 20-cv-66 (D. Mont. Sept. 08, 2020), ECF No. 35 (granting DCCC, DSCC, and Montana Democratic Party intervention in lawsuit by four Republican party entities); *cf. DCCC v. Ziriax*, No. 20-CV-211-JED-JFJ, 2020 WL 5569576, at *2 (N.D. Okla. Sept. 17, 2020) ("DCCC and the Democratic candidates it supports . . . have an interest in ensuring that Democratic voters in Oklahoma have an opportunity to express their will regarding Democratic Party candidates running for elections."); *Owen v. Mulligan*, 640 F.2d 1130, 1132 (9th Cir. 1981) (holding "the potential loss of an election" is sufficient injury to confer Article III standing).

Here, the requested remedy and harm is extreme—Plaintiff seeks relief that would not just burden the Political Party Committees' voters but would completely disenfranchise them.

### 4. The Political Party Committees' interests are not adequately represented by the existing parties.

The Political Party Committees' interests are not adequately represented by the Defendants. First and perhaps most importantly, Defendants were the Political Party Committees' adversaries in the Settlement Agreement. The Settlement Agreement was the product of a lawsuit brought by Political Party Committees

against the Secretary, State Elections Board members, and others and it was the

result of arms-length negotiations and a balancing of the parties' distinct interests.

Where a "case is disposed of by settlement rather than by litigation, what the state

perceives as being in its interest may diverge substantially from" the interests of

proposed intervenors. *Mille Lacs Band of Chippewa Indians v. State of Minn.*, 989

F.2d 994, 1001 (8th Cir. 1993). As one court recently explained while granting

intervention under similar circumstances:

> Although Defendants and the Proposed Intervenors fall on
> the same side of the [present] dispute, Defendants'
> interests in the implementation of the [challenged law]
> differ from those of the Proposed Intervenors. While
> Defendants' arguments turn on their inherent authority as
> state executives and their responsibility to properly
> administer election laws, the Proposed Intervenors are
> concerned with ensuring their party members and the
> voters they represent have the opportunity to vote in the
> upcoming federal election … and allocating their limited
> resources to inform voters about the election procedures.
> As a result, the parties' interests are neither "identical" nor
> "the same."

*Issa*, 2020 WL 3074351, at *3 (citation omitted). Such is the case here.

Second, while the Secretary has an undeniable interest in defending his

inherent powers as a state executive, the Political Party Committees have different

focuses: ensuring that they and their members' fundamental rights are protected, and

that their members' eligible and legally cast votes are counted. *See Paher*, 2020 WL

2042365, at *3 (concluding that "Proposed Intervenors … have demonstrated entitlement to intervene as a matter of right" where they "may present arguments about the need to safeguard [the] right to vote that are distinct from Defendants' arguments").

Although a would-be intervenor has some burden to establish that its interest is not adequately protected by the existing parties to the action, "the burden of making that showing should be treated as minimal"; it is sufficient "if the applicant shows that representation of his interest 'may be' inadequate." *Trbovich v. United Mine Workers of Am.*, 404 U.S. 528, 538 n. 10 (1972) (citing 3B J. Moore, Federal Practice 24.09—1 (4) (1969)); *Chiles*, 865 F.2d at 1214. Especially where one of the parties to the suit is a government entity whose "views are necessarily colored by its view of the public welfare rather than the more parochial views of a proposed intervenor whose interest is personal to it," courts have found that "the burden [of establishing inadequacy of representation] is comparatively light." *Kleissler v. U.S. Forest Serv.*, 157 F.3d 964, 972 (3d Cir. 1998) (citing *Conservation Law Found. of New Eng., Inc. v. Mosbacher*, 966 F.2d 39, 44 (1st Cir. 1992), and *Mausolf v. Babbitt*, 85 F.3d 1295, 1303 (8th Cir. 1996)); *see also Meek v. Metro. Dade Cnty., Fla.*, 985 F.2d 1471, 1478 (11th Cir. 1993), *abrogated on other grounds by Dillard v. Chilton Cnty. Comm'n*, 495 F.3d 1324 (11th Cir. 2007) ("Any doubt concerning

the propriety of allowing intervention should be resolved in favor of the proposed intervenors because it allows the court to resolve all related disputes in a single action.").

Because the Political Party Committees cannot rely on the Secretary or anyone else in the litigation to protect these distinct, parochial interests, they have met their minimal burden here and satisfied the fourth requirement and are entitled to intervention as of right under Rule 24(a)(2). *See Paher*, 2020 WL 2042365, at *3; *Issa*, 2020 WL 3074351, at *4.

**B.    Proposed Intervenors are also entitled to permissive intervention.**

If the Court does not grant intervention as a matter of right, the Political Party Committees respectfully request that the Court exercise its discretion to allow it to intervene under Rule 24(b). The Court has broad discretion to grant a motion for permissive intervention when it determines that: (1) the proposed intervenor's claim or defense and the main action have a question of law or fact in common, and (2) the intervention will not unduly delay or prejudice the adjudication of the original parties' rights. *See* Fed. R. Civ. P. 24(b)(1)(B) and (b)(3); *Chiles*, 865 F.2d at 1213; *Ga. Aquarium, Inc. v. Pritzker*, 309 F.R.D. 680, 690 (N.D. Ga. 2014). Even where courts find intervention as of right may be denied, permissive intervention may nonetheless be proper or warranted. Moreover, "the claim or defense clause of Rule

24(b)(2) is generally given a liberal construction." *Id*.   The Political Party Committees easily meet these requirements.

*First*, the Political Party Committees' claims and defenses will inevitably raise common questions of law and fact because they seek to uphold the very Settlement Agreement that Plaintiff seeks to overturn, defend the constitutional right to vote of all the eligible voters who cast valid ballots in the November 3 general election, and ensure that any future signature verification or matching process does not become a partisan process or threaten the secrecy of the vote. *Wise v. N. Carolina State Bd. Elections*, No. 20-cv-912 (M.D.N.C. Oct 8, 2020) (ECF No. 67) (finding permissive intervention must be granted when proposed intervenors were parties to the agreement at issue); *see also Franconia Minerals (US) LLC v. United States*, 319 F.R.D. 261, 268 (D. Minn. 2017) ("Thus, applicant['s] claims and the main action obviously share many common questions of law and perhaps of fact."); *see also supra* at 12-13.

*Second*, for the reasons set forth above, the motion to intervene is timely, and given the early stage of this litigation, intervention will not unduly delay or prejudice the adjudication of the rights of the original parties. The Political Party Committees are prepared to proceed in accordance with the schedule this Court determines, and

intervention will only serve to contribute to the complete development of the factual and legal issues before the Court.

## IV.   CONCLUSION

For these reasons, the Political Party Committees respectfully request that the Court grant its motion to intervene as of right and, in the alternative, as permissive intervention.

Dated: November 18, 2020.                Respectfully submitted,

**Adam M. Sparks**
Halsey G. Knapp, Jr.
Georgia Bar No. 425320
Joyce Gist Lewis
Georgia Bar No. 296261
Susan P. Coppedge
Georgia Bar No. 187251
Adam M. Sparks
Georgia Bar No. 341578
**KREVOLIN AND HORST, LLC**
One Atlantic Center
1201 W. Peachtree Street, NW, Ste. 3250
Atlanta, GA 30309
Telephone: (404) 888-9700
Facsimile: (404) 888-9577
hknapp@khlawfirm.com
jlewis@khlawfirm.com
coppedge@khlawfirm.com
sparks@khlawfirm.com

Marc E. Elias*
Amanda R. Callais*
Alexi M. Velez*

Emily R. Brailey*
PERKINS COIE LLP
700 Thirteenth Street NW, Suite 800
Washington, DC 20005
Telephone: (202) 654-6200
melias@perkinscoie.com
acallais@perkinscoie.com
avelez@perkinscoie.com
ebrailey@perkinscoie.com

Kevin J. Hamilton*
Amanda J. Beane*
PERKINS COIE LLP
1201 Third Avenue, Suite 4900
Seattle, Washington 98101
Telephone: (206) 359-8000
khamilton@perkinscoie.com
abeane@perkinscoie.com

Gillian C. Kuhlmann*
PERKINS COIE LLP
1888 Century Park East, Suite 1700
Los Angeles, California 90067
Telephone: (310) 788-3900
gkuhlmann@perkinscoie.com

Matthew J. Mertens*
Georgia Bar No: 870320
PERKINS COIE LLP
1120 NW Couch Street, 10th Floor
Portland, Oregon 97209
Telephone: (503) 727-2000

*Counsel for Proposed Intervenor-Defendants*

*\*Pro Hac Vice Application Pending*

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| L. Lin Wood, Jr., | |
| Plaintiff, | CIVIL ACTION FILE NO. |
| | 1:20-cv-04651-SDG |
| v. | |
| Brad Raffensperger, in his official capacity as Secretary of the State of Georgia, et al., | |
| Defendants. | |

**CERTIFICATE OF COMPLIANCE**

I hereby certify that the foregoing document has been prepared in accordance with the font type and margin requirements of L.R. 5.1, using font type of Times New Roman and a point size of 14.

Dated: November 18, 2020.

**Adam M. Sparks**
*Counsel for Proposed Intervenor-Defendants*

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

L. Lin Wood, Jr.,

        Plaintiff,

v.

Brad Raffensperger, in his official capacity
as Secretary of the State of Georgia, et al.,

        Defendants.

CIVIL ACTION FILE NO.
1:20-cv-04651-SDG

**CERTIFICATE OF SERVICE**

I hereby certify that on November 18, 2020, I electronically filed the foregoing
with the Clerk of the Court using the CM/ECF system, which will send a notice of
electronic filing to all counsel of record. Counsel will also send a copy by email to
counsel of record for Defendants.

Dated: November 18, 2020.

**Adam M. Sparks**
*Counsel for Proposed Intervenor-
Defendants*