IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

L. Lin Wood, Jr.,

        Plaintiff,

v.

Brad Raffensperger, in his official capacity
as Secretary of the State of Georgia, et al.,

        Defendants.

CIVIL ACTION FILE NO.
1:20-cv-04651-SDG

## PROPOSED INTERVENORS' BRIEF IN SUPPORT OF PROPOSED MOTION TO DISMISS

## I.      INTRODUCTION

On September 15, 2020, election officials began mailing absentee ballots for the November 3 general election, and by election day, nearly *five million* Georgians had voted. To ensure the accuracy of the election, on November 11, 2020, Secretary of State Brad Raffensperger ("the Secretary") ordered a "full by-hand recount in each county" of the presidential race.[1] Many counties, including Fulton County, have finished their recount through the tremendous efforts of hundreds of volunteers

---

[1] Quinn Scanlan, *Georgia's top election official announces there will be 'full by-hand recount in each county' for presidential race*, ABC News (November 11, 2020), https://abcnews.go.com/Politics/georgias-top-election-official-announces-full-hand-recount/story?id=74146620.

working multiple shifts.[2] Nonetheless, Plaintiff's Amended Complaint—filed thirteen days *after* the general election concluded—invites the Court to invalidate at least one million Georgians' votes, throw out the results of the recount statewide and order yet a third tallying of Georgia's ballots, and implement by judicial fiat sweeping, unconstitutional, one-party oversight of Georgia's statutory absentee voting process. This Court should decline that invitation.

Under the guise of Equal Protection, Elections, and Electors Clause claims, Plaintiff challenges the legal validity of a March 6, 2020, settlement agreement ("Settlement Agreement") between the Secretary, the State Election Board (the "Board"), and the Democratic Party of Georgia, DSCC, and DCCC (collectively, the "Political Party Committees"), which set forth uniform, statewide procedures for matching signatures on absentee ballot envelopes and curing deficiencies on the same. Plaintiff's curious Due Process claim appears to allege that two Republican election monitors could not adequately observe the recount in Fulton County, and for some reason, Plaintiff believes *he* is permitted to assert this claim on their behalf.

---

[2] Audrey Washington, *Fulton, DeKalb counties finish ballot recount, officials say*, WSB-TV 2 (November 15, 2020), https://www.wsbtv.com/news/politics/fulton-county-has-finished-ballot-recount-officials say/GQ4QUCZDEVEBPMUUFDFEIYOXHI/.

Plaintiff's lawsuit is as meritless as it is late. Plaintiff lacks standing to assert his claims for several reasons, not the least of which is that he has not alleged a particularized injury-in-fact, much less suffered one. Plaintiff's unconscionable delay in waiting eight months to challenge the Settlement Agreement means that laches should bar this suit even if Plaintiff had standing. And in any event, Plaintiff has failed to plead cognizable claims, and his Amended Complaint should be dismissed under Federal Rule of Civil Procedure 12(b)(6).

## II.      BACKGROUND

On November 6, 2019, the Political Party Committees sued the Secretary, Board, and others challenging Georgia's signature matching laws and cure procedure under the First and Fourteenth Amendments to the U.S. Constitution. The Political Party Committees asserted that Georgia's arbitrary and unreliable procedures for comparing absentee ballot signatures and rejecting absentee ballots unconstitutionally deprived Georgians of their right to vote. *Democratic Party of Georgia, Inc., et al. v. Raffensperger, et al.*, No. 1:19-cv-5028 (ECF Nos. 1, 30) (complaint and amended complaint). After weeks of arms-length negotiations, on March 6, 2020, the parties entered into the Settlement Agreement, which was publicly docketed that same day.

Throughout the negotiations, as memorialized in the Settlement Agreement, the Secretary and Board maintained that Georgia's laws and processes were constitutional. ECF No. 5-1, at *1-2. They did not agree to modification of Georgia's elections statutes. *See id.* Rather, they agreed to initiate rulemaking and issue guidance to help ensure uniform and fair treatment of voters within the existing statutory framework. Thus, pursuant to the Settlement Agreement, the Secretary published an Official Election Bulletin ("OEB") providing statewide guidance on the signature matching procedures designed to increase uniformity in signature match determinations, and the Board promulgated and enforced a more robust voter notification and cure process. Both the Office of the Georgia Attorney General and private counsel (who regularly represents the Georgia Republican Party and prominent Republican leaders) represented the Secretary and Board during the negotiations and personally signed the Agreement. ECF No. 5-1, at *6.

The Board implemented its revised absentee ballot cure process by way of State Election Board ("S.E.B.") Rule 183-1-14-.13. *See* O.C.G.A. § 50-13-4. Under this rule, which was adopted after multiple rounds of formal rulemaking and public comment, counties are to contact voters about rejected mail ballots within three business days after receipt of the absentee ballot and within one business day for any ballots rejected within eleven days of election day. *See* Ga. Comp. R. & Regs. 183-

1-14-.13 (Amended March 22, 2020); Ga. Comp. R. & Regs. 183-1-14-.13 (May 21, 2020); Ga. Comp. R. & Regs. 183-1-14-.13 (Aug. 31, 2020).

On May 1, the Secretary issued an OEB addressing the signature matching procedures, providing that after an election official makes an initial determination that the signature on the absentee ballot envelope does not match the signature on file for the voter pursuant to O.C.G.A. §21-2-386(a)(1)(B) and (C), two additional registrars, deputy registrars, or absentee ballot clerks should also review the envelope. ECF No. 5-1, at *3. When two officials agree the signature does not match, the ballot is rejected. *Id.* These changes were widely publicized and in place for several subsequent elections, including the June 9 primary, the August 11 primary runoff, and the November 3 general elections. *See infra* at n.6.

On September 15, Georgia voters began casting absentee ballots for the general election. Election officials began reviewing signatures on absentee ballot envelopes as soon as the first absentee ballots were returned and concluded on November 6, when the deadline to cure absentee ballots passed. For envelopes where elections officials successfully matched signatures, they separated envelopes and ballots for counting to protect the secrecy of those ballots. *See* O.C.G.A. § 21-2-386(a)(2)-(3); *see also* S.E.B. Rule 183-1-14-0.9-15(4) (requiring absentee ballot envelopes to be processed "in a manner that ensures that the contents of the envelope

cannot be matched back to the outer envelope"). This separation began on October 19 and continued throughout the initial counting period.[3] Once a ballot is separated from its envelope, it is impossible to trace an absentee ballot to a specific voter, and any attempt would violate state law. *See* S.E.B. Rule 183-1-14-0.9-15(4). On November 11, the Secretary announced that a statewide hand recount of the presidential election would take place. *See* Am. Compl. ¶¶ 55-56. Virtually all of Georgia 159 counties, including Fulton County, have now finished this recount.

Plaintiff filed an Amended Complaint on November 16, more than *eight months* after the Settlement Agreement was finalized, 32 days after elections officials started separating absentee envelopes from ballots, and 13 days after the general election. Plaintiff challenges the signature verification procedures in the Settlement Agreement, arguing, in essence, that those signature matching procedures violate the U.S. Constitution because they are contrary to state law. He predicates his individual due process claim on allegations that two Republican election monitors—not Plaintiff—were unable to adequately observe the recount in Fulton County. Against the backdrop of this inexplicable delay, and on the slimmest of legal

---

[3] Mark Niesse, *Absentee ballots can begin to be opened, but not counted, in Georgia*, THE ATLANTA JOURNAL-CONSTITUTION (October 19, 2020), https://www.ajc.com/politics/absentee-ballots-can-begin-to-be-opened-but-not-counted-in-georgia/BRBLHVUJOFHB5OEHAMZV34HPDA/.

reeds, Plaintiff asks the Court to enjoin certification of the election (or alternatively, certification of any election tallies including absentee ballots), throw out the results of the recount statewide and order a new recount, and wholly rewrite Georgia's election laws by judicial fiat. *Id.* ¶¶ 68-70; ¶¶ 80-82. Both Plaintiff's claims and his requested relief are entirely meritless and should be dismissed.

### III.   LEGAL ARGUMENT

#### A. Plaintiff lacks Article III standing.

Plaintiffs' Amended Complaint fails at the very threshold. Plaintiff lacks standing, as he has neither pleaded nor suffered a cognizable injury-in-fact, asserting only generalized grievances about Defendants' supposed defiance of state law. Plaintiff also lacks prudential standing. He cannot step into the Georgia General Assembly's shoes to prosecute the Elections and Electors Clause claims, nor can he maintain a recount-related "due process" claim on behalf of the Georgia Republican Party or the monitors identified in the Amended Complaint.

#### 1.  Legal Standard

"The doctrine of standing asks whether a litigant is entitled to have a federal court resolve his grievance. This inquiry involves 'both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise.'" *Kowalski v. Tesmer*, 543 U.S. 125, 128-29 (2004) (quoting *Warth v. Seldin*, 422 U.S. 490, 498

(1975)). To have Article III standing, a party must have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Muransky v. Godiva Chocolatier, Inc.*, No. 16-16486, 16-16783, 2020 WL 6305084, at *4 (11th Cir. Oct. 28, 2020). Prudential considerations require "that a party '[]must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties.'" *Kowalski*, 543 U.S. at 129 (quoting *Warth*, 422 U.S. at 499).

### 2. Plaintiff lacks Article III standing because he has not suffered an injury in fact.

Plaintiff has not established that he has or will suffer an injury in fact. To establish injury in fact, "[a] plaintiff needs to plead (and later support) an injury that is concrete, particularized, and actual or imminent, rather than conjectural or hypothetical." *Muransky,* 2020 WL 6305084 at *5. In the voting context, the Supreme Court has made clear that "a person's right to vote is individual and personal in nature," "voters who allege facts showing disadvantage to themselves as individuals have standing to sue." *Gill v. Whitford*, 138 S. Ct. 1916, 1929 (2018). But when the injury alleged "is that the law . . . has not been followed[,]" this is "the kind of undifferentiated, generalized grievance about the conduct of government" that is not an injury for standing purposes. *Dillard v. Chilton Cty. Comm'n*, 495 F.3d 1324, 1332-33 (11th Cir. 2007) (citing *Lance v. Coffman*, 549 U.S. 437 (2007).

This is precisely the case here. Plaintiff asserts that "[a]s a qualified elector and registered voter, [he] has Article III standing to bring this action." *See* Am. Compl. ¶ 8 (relying on *Meek v. Metro. Dade Cty. Fla.*, 985 F.2d 1471, 1480 (11th Cir. 1993)). But he provides no allegations demonstrating how he is harmed in those roles. Rather, his recurring grievance is that Defendants allegedly did not follow the law regarding absentee ballot signature verification protocols. *See, e.g.*, Am. Compl. ¶ 28 (alleging Settlement Agreement changed handling of absentee ballots "in a manner that was not consistent with the laws promulgated by the Georgia Legislature"); *id.* ¶ 34 (same). "This injury is precisely the kind of undifferentiated, generalized grievance about the conduct of government that [courts] have refused to countenance in the past." *Lance*, 549 U.S. at 442; *see also Lujan,* 504 U.S. 555, 573–74 (1992) ("[R]aising only a generally available grievance about government . . . does not state an Article III case or controversy.").

The Eleventh Circuit has expressly rejected *Meek*, the principal standing case upon which Plaintiff relies, explaining that a plaintiff "who merely seek[s] to protect an asserted interest in being free of an allegedly illegal electoral system" does not have a cognizable injury for standing purposes. *See Dillard,* 495 F.3d at 1333; *see also id.* at 1331-32 ("We can no longer [uphold *Meek*'s reasoning] in light of the Supreme Court's most recent pronouncement on voter standing in *Lance*[.]"). Other

courts have followed *Dillard*'s lead, rejecting these types of generalized grievances in the voting context. *See Bognet v. Sec'y Commonwealth of Pennsylvania*, No. 20-3214, 2020 WL 6686120, at *14 (3d Cir. Nov. 13, 2020) (rejecting the "logical conclusion of the Voter Plaintiffs' theory [] that whenever an elections board counts any ballot that deviates in some way from the requirements of a state's legislatively enacted election code, there is a *particularized* injury in fact sufficient to confer Article III standing"); *Martel v. Condos*, No. 5:20-cv-131, 2020 WL 5755289, at *4 (D. Vt. Sept. 16, 2020) ("If every voter suffers the same incremental dilution of the franchise caused by some third-party's fraudulent vote, then these voters have experienced a generalized injury.").[4]

---

[4] This is particularly true in the Elections and Electors Clause context. As the Third Circuit recently explained, a plaintiff lacks standing when the only harm he claims is to his interest in proper application of the Elections Clause because "[t]heir relief would have no more directly benefitted them than the public at large." *Bognet*, 2020 WL 6686120, at *6. This is even more compelling here because "[Georgia's] 'election officials *support* the challenged [Settlement Agreement].'" *Id.* (quoting *Republican Nat'l Comm. v. Common Cause R.I.*, No. 20A28, 2020 WL 4680151 (Mem.), at *1 (Aug. 13, 2020) (quoting *Abbott v. Perez*, 138 S. Ct. 2305, 2324 n.17 (2018))). Given the functionally identical roles that the Elections and Electors Clauses serve, with the former setting the terms for congressional elections and the latter implicating presidential elections, *see Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 839 (2015) (Roberts, C.J., dissenting) (noting that Electors Clause is "a constitutional provision with considerable similarity to the Elections Clause"), this same logic applies equally to the Electors Clause.

Moreover, Plaintiff's allegation that he donated to Republican candidates and his "interests are aligned with those of the Georgia Republican Party," *see* Am. Compl. ¶ 8, does not help him. Plaintiff has not been personally injured and merely purports to represent the interests of the Georgia Republican Party and, presumably, the two monitors referenced in the Amended Complaint. Standing requires plaintiffs to "allege and show that they *personally* have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent." *Warth*, 422 U.S. at 502. As for his political donations, there is no authority, and Plaintiff cites none, for the proposition that donations to political candidates bestow Article III standing on the donor to assert legal claims on behalf of such candidates or the party as a whole.

### 3. Plaintiff lacks prudential standing.

Plaintiff also lacks prudential standing to bring his Elections, Electors, and Due Process Clause claims. "Even if an injury in fact is demonstrated, [] a party may assert only a violation of its own rights." *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 392 (1988). But Plaintiff's claims "rest . . . on the legal rights or interests of third parties.'" *See Kowalski*, 543 U.S. at 129 (quoting *Warth*, 422 U.S. at 499).

Plaintiff predicates his Electors and Elections Clause claims solely on *the Georgia General Assembly's* purported rights. He alleges that the Settlement

Agreement "is not consistent with the laws of the State of Georgia" and therefore violates Art. II, § 1 and Art. I, § 4, which vests authority in the state legislature to modify the manner and time of elections and electors. *See* Am. Compl. ¶¶ 73–78. The Amended Complaint is replete with references to the alleged usurpation of the General Assembly's authority. *See, e.g.*, Am. Compl. ¶ 28; ¶ 34; ¶ 50; ¶¶ 73-74, ¶¶ 90-91. Accordingly, "the Elections Clause claims asserted in the . . . verified complaint belong, if they belong to anyone, only to the [Georgia] General Assembly." *See Corman v. Torres,* 287 F. Supp. 3d 558, 573 (M.D. Pa. 2018), *appeal dismissed sub nom. Corman v. Sec'y Commonwealth of Penn.*, 751 F. App'x 157 (3d Cir. 2018). Of course, Plaintiff cannot assert the Georgia General Assembly's rights. He neither has a close relationship with the General Assembly nor has he identified a "'hindrance' to the [General Assembly's] ability to protect [its] own interests." *See Kowalski*, 543 U.S. at 130 (quoting *Powers v. Ohio*, 499 U.S. 400, 411 (1991)).

The same is true of Plaintiff's Due Process claim, which appears to assert the rights of the Georgia Republican Party or the monitors mentioned in the Amended Complaint, not Plaintiff's own rights. "Absent a hindrance to the third-party's ability to defend its own rights, this prudential limitation on standing cannot be excused." *Corman*, 287 F.Supp.3d at 572 (quotations omitted). Such is the case here.

**B. Plaintiffs' claims are barred by laches.**

Even if Plaintiff had standing, his extraordinary delay in filing suit is inexcusable and bars his claims. Laches bars a claim when "(1) there was a delay in asserting a right or a claim, (2) the delay was not excusable, and (3) the delay caused [the defendant] undue prejudice." *United States v. Barfield*, 396 F.3d 1144, 1150 (11th Cir. 2005). Federal courts routinely apply laches to bar untimely claims for injunctive relief in election cases.[5] "[T]he law imposes the duty on parties having grievances based on discriminatory practices to bring the grievances forward for pre-election adjudication." *Toney v. White*, 488 F.2d 310, 314 (5th Cir. 1973). This is because a failure to promptly bring a claim until after the election "may permit, if not encourage, parties who could raise a claim to lay by and gamble upon receiving a favorable decision of the electorate and then, upon losing, seek to undo the ballot results in a court action." *Id.* (quotations omitted).

This is precisely what Plaintiff seeks here. More than eight months after the Settlement Agreement was finalized, long after absentee ballots had been separated

---

[5] *See, e.g.*, *Sanders v. Dooly Cty.*, *GA*, 245 F.3d 1289, 1291 (11th Cir. 2001) (affirming finding that inexcusable delay prejudiced defendants and citizens); *Detroit Unity Fund v. Whitmer*, 819 F. App'x 421, 421-22 (6th Cir. 2020) (upholding district court's dismissal of a challenge to election procedures based on laches); *Perry v. Judd*, 471 F. App'x 219, 224 (4th Cir. 2012) (affirming holding of inexcusable delay for candidates who waited until after petition deadline to bring constitutional challenge).

from their envelopes, and after the general election had been completed and results were announced, Plaintiff brought this suit seeking the extraordinary remedy of an injunction to prevent the certification of all of Georgia's election results, or at least of results including all absentee ballots cast by more than one million voters. But this type of injunctive "[i]nterference with an election after voting has begun is unprecedented." *Short v. Brown*, No. 218CV00421TLNKJN, 2018 WL 1941762, at *8 (E.D. Cal. Apr. 25, 2018), *aff'd*, 893 F.3d 671 (9th Cir. 2018) (citations omitted). All of these voters relied upon the procedures that the Secretary and the Board duly promulgated, and Plaintiff has not provided even the barest of facts to undermine the validity of their votes.

Plaintiff can provide no credible excuse for his delay. The Settlement Agreement was finalized more than eight months ago, was well-publicized, and has been implemented in at least three elections since that time.[6] *See* ECF No. 5-1. The mailed ballots on which Plaintiff's allegations focus have been separated from their envelopes and mixed together with other ballots for weeks. And Plaintiff's Amended Complaint takes issue with clear provisions in this settlement, a far cry from "a gray

---

[6] *See, e.g.*, Mark Niesse, *Lawsuit settled, giving Georgia voters time to fix rejected ballots*, THE ATLANTA JOURNAL-CONSTITUTION (Mar. 7, 2020), https://www.ajc.com/news/state--regional-govt--politics/lawsuit-settled-giving-georgia-voters-time-fix-rejected-ballots/oJcZ4eCXf8J197AEdGfsSM/.

area [where] even if known before the election, was discovered at a late hour." *See Toney*, 488 F.2d at 314. The doctrine of laches bars Plaintiff's claims.

### C. Plaintiff has failed to state a claim for which relief can be granted.

Though the procedural hurdles discussed above are more than enough to dismiss Plaintiff's claims, dismissal is also appropriate under Federal Rule of Civil Procedure 12(b)(6), as Plaintiff has failed to set forth any facts that support even the inference of a cognizable claim.

### 1.  Legal Standard

When deciding a motion to dismiss, courts "accept the factual allegations in the complaint as true and construe them in the light most favorable to the plaintiff." *Cisneros v. Petland, Inc.*, 972 F.3d 1204, 1210 (11th Cir. 2020) (internal citations omitted). However, "a complaint must plead 'enough facts to state a claim to relief that is plausible on its face.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Allegations "must be enough to raise a right to relief above the speculative level." *Crowder v. Delta Air Lines, Inc.*, 963 F.3d 1197, 1202 (11th Cir. 2020) (quoting *Twombly*, 550 U.S. at 555).

### 2.  Plaintiff fails to state an Equal Protection claim.

To allege an Equal Protection violation a plaintiff must necessarily allege that similarly situated voters are treated differently. *See, e.g.*, *Obama for Am. v. Husted*,

697 F.3d 423, 428 (6th Cir. 2012) (Equal Protection Clause applies when state classifies voters in disparate ways). But that is not what Plaintiff asserts. Instead, he alleges precisely the *opposite* as he takes issue with the admittedly uniform *statewide* guidance issued by the Secretary, wholly defeating even the inference that a viable Equal Protection claim exists. *See* Am. Compl. ¶ 25 (the Settlement Agreement has the effect of "setting forth different standards to be followed by the clerks and registrars in processing absentee ballots *in the State of Georgia*" as a whole, not across different counties) (emphasis added).

Plaintiff does not allege that he or any other voter in Georgia is being treated differently from similarly situated voters because of the Settlement Agreement. Rather, he alleges that the disparate treatment is in processing absentee ballots *differently than the Election Code allegedly requires. See* Am. Compl. ¶¶ 74-75 ("By entering the Litigation Settlement and altering the process for handling defective absentee ballots in Georgia, Defendants unilaterally, and without authority, altered the Georgia Election Code. The result is that absentee ballots have been processed differently by County Officials than the process created by the Georgia Legislature and set forth in the Georgia Election Code.") But this is *not* an Equal Protection violation, nor could it be given Plaintiff's explicit recognition that this guidance was

issued uniformly statewide, *see* Am. Compl. ¶ 25. As the Third Circuit recently

concluded under similar circumstances:

> Plaintiffs advance an Equal Protection Clause argument based solely on state officials' alleged violation of state law that does not cause unequal treatment. And if dilution of lawfully cast ballots by the "unlawful" counting of invalidly cast ballots were a true equal-protection problem, then it would transform every violation of state election law (and, actually, every violation of every law) into a potential federal equal-protection claim requiring scrutiny of the government's 'interest' in failing to do more to stop the illegal activity. *That is not how the Equal Protection Clause works.*

*Bognet*, 2020 WL 6686120, at *11 (internal citations and quotations omitted;

emphasis added). The same reasoning applies here.

To the extent that Plaintiff bases his Equal Protection claim on the conclusory

assertion that defective absentee ballots were not identified (which is not at all clear),

*see* Am. Compl. ¶ 36, it also fails. The Complaint is devoid of any facts that would

support even the inference that defective absentee ballots were counted. And, as

noted in *Bognet*, even if it could support such an inference, "[t]hat is not how the

Equal Protection Clause works."[7] *Bognet*, 2020 WL 6686120, at *11.

---

[7] In paragraph 76 of his Amended Complaint, Plaintiff also appears to assert that he has an Equal Protection claim because a "single political party" wrote the rules for reviewing signatures. But the Settlement Agreement, which is incorporated into the Amended Complaint, negates such a claim as it makes clear that the Secretary and Board were also party to the agreement, and with respect to paragraph 4 specifically, that the Secretary was merely to "consider in good faith" guidance provided by the Political Party Committees' expert in the underlying case.

### D.    Plaintiff fails to state Elections and Electors Clause claims.

Plaintiff's Elections and Electors Clause claims are similarly unavailing. The Elections and Electors Clause vest authority in "the Legislature" of each state to regulate "[t]he Times, Places, and Manner of holding Elections for Senators and Representatives", U.S. Const. art. I, § 4, cl. 1., and to direct the selection of presidential electors, U.S. Const. art. II, § 1, cl. 2, respectively. The Supreme Court has held, however, that state legislatures can delegate this authority—including to state officials like the Secretary. *See, e.g.*, *Ariz. State Legislature*, 576 U.S. at 807 (noting that Elections Clause does not preclude "the State's choice to include" state officials in lawmaking functions so long as such involvement is "in accordance with the method which the State has prescribed for legislative enactments") (quoting *Smiley v. Holm*, 285 U.S. 355, 367 (1932)); *Corman*, 287 F.Supp.3d at 573 ("The Supreme Court interprets the words 'the Legislature thereof,' as used in that clause, to mean the lawmaking processes of a state.") (quoting *Ariz. State Legislature*, 576 U.S. at 816).[8] Accordingly, the actions of the Secretary could only constitute plausible violations of the Elections and Electors Clauses if such actions exceeded the authority granted to him by the Georgia General Assembly. They plainly did not.

---

[8] As discussed *supra*, the Electors and Election Clauses are textually and legally analogous.

Pursuant to Georgia law, the Secretary is the chief election official for the State, O.C.G.A § 21-2-50(b), and the General Assembly has granted him the power and authority to manage Georgia's election system, including the absentee voting system. *See Fair Fight Action, Inc. v. Raffensperger*, 413 F.Supp.3d 1251 (N.D. Ga. 2019); Ga. Op. Att'y Gen. No. 2005-3 (Apr. 15, 2005) (recognizing the Secretary's authority to manage Georgia's election system). Additionally, the Secretary is the Chair of the Board, which is the governmental body responsible for uniform election practice in Georgia. O.C.G.A. § 21-2-31; *see also Curling v. Raffensperger*, 403 F. Supp. 3d 1311, 1345 (N.D. Ga. 2019) ("[T]he [] Board is charged with enforcing Georgia's election code under state law."). In both roles, the Secretary has significant statutory authority to train local election superintendents and registrars and to set election standards. *See New Georgia Project v. Raffensperger*, No. 1:20-CV-01986-ELR, 2020 WL 5200930, at *8 (N.D. Ga. Aug. 31, 2020), *appeal filed* (Sept. 4, 2020), *stay granted*, 976 F.3d 1278 (2020). The Secretary was well within that authority in entering into the Settlement Agreement and ensuring the signature verification protocols were uniform across Georgia.

Specifically, on May 1, 2020, the Secretary issued an OEB outlining the procedures for the signature matching process.[9] OEBs are election guidance documents that provide technical guidance to local election administrators regarding new rules, court orders, and other binding law. The OEB in question accords with O.C.G.A. §§ 21-2-31 and 21-2-300(a), which empower the Secretary—as the chief elections official and Board Chair—to obtain uniformity in the practices of local elections officials in administering Georgia's Election Code and election equipment usage respectively. *See* O.C.G.A. § 21-2-50(a), (b); *see also Grizzle v. Kemp*, 634 F.3d 1314, 1319 (11th Cir. 2011). The OEB expressly required counties to continue to verify absentee voter identity by comparing signatures as Georgia law requires. ECF No. 5-1, at *3. The Secretary thus appropriately exercised the authority the

---

[9] Plaintiff's Elections and Electors Clause claims only reference the Secretary's actions regarding signature verification procedures. *See* Am. Compl. ⁋⁋ 87-92. They do not appear to engage the changes to Georgia's notice procedures for curing ballots. To the extent they are challenged, however, as discussed *supra*, they were implemented via S.E.B. Rule 183-1-14-.13, which was entered after completing the statutorily proscribed rulemaking proceedings that involved both public notice and comment. *See* O.C.G.A. § 50-13-4; *see also* Section II *supra*. The Board promulgated these standardized cure provisions to resolve and prevent inconsistent interpretations of the timing of the notice requirement. Issuing an administrative rule is part of the Board's statutory duty "to promulgate rules and regulations so as to obtain uniformity in the practices and proceedings of superintendents, registrars, deputy registrars, poll officers, and other officials, as well as the legality and purity in all primaries and elections," O.C.G.A. § 21-2-31(1), and it is well within their delegated authority.

General Assembly granted to him to ensure uniformity in elections practices—here, in the processes for handling absentee ballots and comparing signatures—and did so while upholding Georgia's statutory signature match requirement. His issuance of the OEB was entirely congruent with his delegated authority and does not violate either the Elections or Electors Clauses.

### 3.  Plaintiff fails to state a Due Process claim.

Finally, Plaintiff has failed to plead anything even approaching an adequate substantive or procedural Due Process claim. Plaintiff relies on two third-party affidavits from Republican volunteers who attended Fulton County's recount for approximately one hour on Sunday—one of whom arrived too late to participate as a credentialed observer, and one who fully participated and observed the recount—to make the bold claim that the electoral process was unfair statewide because Defendants denied the Trump Campaign access to the recount. This cannot possibly pass the plausibility threshold to state a claim. And in any event, this claim clearly fails under any iteration of the Due Process Clause.

As an initial matter, Plaintiff has failed to state a procedural due process claim. Courts engage in a three-step inquiry to analyze procedural due process claims, considering (1) "the nature of the interest that will be affected by the official action, and in particular, to the 'degree of potential deprivation that may be created,'"

(2) the "fairness and reliability" of the existing procedures and the "probable value, if any, of additional procedural safeguards," and (3) the public interest, which "includes the administrative burden and other societal costs that would be associated with" additional or substitute procedures. *Mathews v. Eldridge*, 424 U.S. 319, 334-47 (1976). Plaintiff ignores this framework and pleads no facts that would support its application.

Though Plaintiff alleges that he has a "vested interest in being present and having meaningful access to observe and monitor the electoral process," *see* Am. Compl. ¶ 101, he fails to plead—and this cannot be stated enough—that he even tried to observe the recount and that his interest, to the extent it is a recognizable one, was deprived. In fact, the facts pleaded on the face of the Amended Complaint indicate *just the opposite*: they establish that the Secretary allowed political monitors, press, and public observers (including, presumably, Plaintiff had he attempted to do so) to observe the recount process. *See* Am. Compl. ¶ 56. Indeed, Ms. Coleman admits that she was unable to be admitted as a monitor (not a public observer) because she arrived too late and there were already *too many other volunteers present and monitoring on the floor*. ECF No. 5-2 ¶¶ 2-4, 7. Ms. Diedrich was able to walk the counting floor, observe the count, and even complain to the elections superintendent about ostensible problems. ECF No. 5-3 ¶¶ 7, 8, 11. She

does not contend her access was any different or worse than that afforded to Democratic observers such that one cannot infer that it was unfair. *See generally id.* Accordingly, nothing in Plaintiff's Amended Complaint supports even the *inference* of a procedural Due Process claim.

Similarly, Plaintiff also fails to plead a substantive due process claim. It is well-settled that "[f]ederal courts should not 'involve themselves in garden variety election disputes.'" *Serpentfoot v. Rome City Comm'n*, No. 4:09-CV-0187-HLM, 2010 WL 11507239, at *16 (N.D. Ga. Mar. 3, 2010) (quoting *Curry v. Baker*, 802 F.2d 1302, 1315 (11th Cir. 1986) (noting "[o]nly in extraordinary circumstances will a challenge to a state election rise to the level of a constitutional deprivation"). For the substantive Due Process Clause to be implicated, the situation "*must go well beyond the ordinary dispute over the counting and marking of ballots.*" *Curry*, 802 F.2d at 1315 (emphasis added). To the extent that they set forth any dispute, Plaintiff's allegations describe at most only an "ordinary dispute over the counting and marking of ballots" that does not demonstrate any fundamental unfairness in the election as a whole or the recount process specifically, failing to give rise to a Due Process claim.[10]

---

[10] To support his Due Process claims, Plaintiff relies on *Griffin v. Burns*, 570 F.2d 1065 (1st Cir. 1978), which directly undermines his position. While *Griffin*

**D. Plaintiff is not entitled to the relief he seeks.**

While the lack of credible allegations supporting Plaintiff's Amended Complaint are astounding, it is Plaintiff's disproportionate, implausible, and unconstitutional requested relief that truly shocks the conscience. It is not tailored to the alleged violations in the Amended Complaint because instead of *remedying* a constitutional violation, it would in fact *violate* millions of Georgians' constitutional rights. *See Bognet*, 2020 WL 6686120, at *1, *8 ("[it is] indisputable in our democratic process: that the lawfully cast vote of every citizen must count"); *Stein v. Cortés*¸ 223 F.Supp.3d 423, 442 (E.D. Pa 2016) (granting relief that "could well ensure that no Pennsylvania vote counts . . . would be both outrageous and completely unnecessary"). Only the most egregious elections misconduct could even conceivably justify the mass disenfranchisement Plaintiff seeks. *See McMichael v.*

_____

recognizes that there may be a Due Process violation if "the election process itself reaches the point of patent and fundamental unfairness," *id.* at 1077, it characterized this situation as "exceptional" and appropriate only if "broad-gauged unfairness permeates an election." *See id.* at 1077-79. This is manifestly not the case here. Moreover, the *Griffin* court only found such a violation because a state court, after the election, *entered the precise relief that Plaintiff seeks*: the exclusion of absentee votes when the losing candidate waits until after losing the election to challenge the secretary of state's statutory authority to issue and process absentee ballots. *Id.* at 1078-79. The *Griffin* court refused to disenfranchise the "[a]lmost ten percent of the qualified and voting electorate" who voted "in reliance on absentee . . . ballot procedures announced by state officials[,]" *id.* at 1068, 1079, because doing so was a due process violation. *Id.* at 1078.

*Napa Cty.*, 709 F.2d 1268, 1273–74 (9th Cir. 1983) (Kennedy, J., concurring) (invalidation of election results "has been reserved for instances of willful or severe violations of established constitutional norms"). This is particularly so in Georgia where the Georgia Supreme Court has held that disenfranchisement is inappropriate to remedy statutory violations where voters themselves acted in good faith. *See, e.g.*, *Holton v. Hollingsworth*, 270 Ga. 591, 514 S.E.2d 6, 8-9 (1999); *Malone v. Tison*, 248 Ga. 209, 282 S.E.2d 84, 89 (1981).

Plaintiff's requested relief with respect to the recount fares no better, as it seeks statewide recourse for purported infringements in only one county and, most egregiously, Republican-only surveillance of every step of Georgia's processing of individual votes in a manner violating multiple provisions of state law both backward looking and in future elections. *See* Am. Compl. ¶¶ 106-107. No provision of Georgia law contemplates the type of court interference in the orderly elections process that Plaintiff's broad-sweeping relief boldly requests. Such relief is unprecedented in scope and plainly impermissible.

## CONCLUSION

The Political Party Committees respectfully request that the Court dismiss Plaintiff's Amended Complaint in its entirety and with prejudice.

Dated: November 18, 2020.       Respectfully submitted,

**<u>Adam M. Sparks</u>**
Halsey G. Knapp, Jr.
Georgia Bar No. 425320
Joyce Gist Lewis
Georgia Bar No. 296261
Susan P. Coppedge
Georgia Bar No. 187251
Adam M. Sparks
Georgia Bar No. 341578
**KREVOLIN AND HORST, LLC**
One Atlantic Center
1201 W. Peachtree Street, NW, Ste. 3250
Atlanta, GA 30309
Telephone: (404) 888-9700
Facsimile: (404) 888-9577
hknapp@khlawfirm.com
jlewis@khlawfirm.com
coppedge@khlawfirm.com
sparks@khlawfirm.com

Marc E. Elias*
Amanda R. Callais*
Alexi M. Velez*
Emily R. Brailey*
PERKINS COIE LLP
700 Thirteenth Street NW, Suite 800
Washington, DC 20005
Telephone: (202) 654-6200
melias@perkinscoie.com
acallais@perkinscoie.com
avelez@perkinscoie.com
ebrailey@perkinscoie.com

Kevin J. Hamilton*
Amanda J. Beane*

PERKINS COIE LLP
1201 Third Avenue, Suite 4900
Seattle, Washington 98101
Telephone: (206) 359-8000
khamilton@perkinscoie.com
abeane@perkinscoie.com

Gillian C. Kuhlmann*
PERKINS COIE LLP
1888 Century Park East, Suite 1700
Los Angeles, California 90067
Telephone: (310) 788-3900
gkuhlmann@perkinscoie.com

Matthew J. Mertens*
Georgia Bar No: 870320
PERKINS COIE LLP
1120 NW Couch Street, 10th Floor
Portland, Oregon 97209
Telephone: (503) 727-2000

*Counsel for Proposed Intervenors-Defendants*

***Pro Hac Vice Application Pending***