# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

L. Lin Wood, Jr.,

        Plaintiff,

v.

Brad Raffensperger, in his official capacity
as Secretary of the State of Georgia, et al.,

        Defendants.

CIVIL ACTION FILE NO.
1:20-cv-04651-SDG

## [PROPOSED] INTERVENOR-DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFF'S EMERGENCY MOTION FOR INJUNCTIVE RELIEF

## I.    INTRODUCTION

Two days before the certification deadline for the 2020 general election, and on the last day of the statewide hand recount of the 2020 presidential results, Plaintiff seeks—among other unprecedented requests—to enjoin certification of *five million* Georgians' votes or, alternatively, to enjoin certification of the votes of the more than *one million* Georgians who lawfully voted absentee by mail, and to install Georgia Republican Party overseers for virtually every aspect of Georgia's signature-matching and ballot-counting election processes. But Plaintiff's emergency motion for injunctive relief ("Motion")—premised on an eight-month-

old settlement agreement and specious affidavits about the recount process that do nothing to advance his claims—is as baseless as it is unprecedented.

Indeed, as already set forth in the motion to dismiss filed by Proposed Intervenor-Defendants Democratic Party of Georgia ("DPG"), DSCC, and DCCC (together, "Political Party Committees"), ECF No. 8-1, Plaintiff's claims fail for want of jurisdiction, laches, and failure to state a claim. Plaintiff's Motion further fails for lack of proof. Plaintiff lacks standing to bring these claims, and his decision to wait eight months and challenge the settlement agreement after the election legally bars this lawsuit. Notwithstanding this inexplicable delay, Plaintiff provides no factual support that would support the lofty constitutional claims he raises.

All told, there is no emergency here. This is just the latest chapter in Plaintiff's effort to subvert the State of Georgia's democratic processes by disenfranchising millions of Georgia voters and to impose partisan control over the absentee voting process by judicial fiat. Plaintiff's claims are baseless, and his requested relief untenable. The Motion should be denied.

## II.    BACKGROUND

On November 6, 2019, the Political Party Committees sued the Secretary of State (the "Secretary") and members of the State Board of Elections (the "Board"), challenging Georgia's signature matching laws under the First and Fourteenth

Amendments to the U.S. Constitution. The Political Party Committees asserted that Georgia's arbitrary and unreliable procedures for comparing absentee ballot signatures and rejecting absentee ballots unconstitutionally deprived Georgians of their right to vote. *DPG v. Raffensperger*, No. 1:19-cv-5028 (N.D. Ga.), ECF Nos. 1, 30. After weeks of arms-length negotiations, the parties entered into a settlement agreement on March 6, 2020 ("Settlement Agreement"), which was publicly filed that day. *See id.*, ECF Nos. 56, 56-1.

In the Settlement Agreement, the Secretary and Board agreed to initiate rulemaking and issue guidance to the 159 counties to help ensure uniform and fair treatment of voters *within* the existing statutory framework. *See* ECF No. 6-1. Thus, the Secretary agreed to issue official guidance to increase uniformity in processing absentee ballot signatures, and the Board agreed to promulgate and enforce a more robust voter notification and cure process. *See id.* Neither step was unusual: The Secretary routinely offers such guidance, and one function of the Board is to promulgate and enforce rules regulating the conduct of Georgia elections. The Office of the Georgia Attorney General and private counsel (who regularly represents both the Georgia Republican Party and prominent Republican leaders) represented Defendants and personally signed the Settlement Agreement. *See id.* at 6.

The details of both procedures—the Secretary's issuance of an Official Election Bulletin ("OEB") (signature verification) and Board's issuance of a Rule that proceeded through a full notice and comment period (notice and cure)—are laid out in detail in the Political Party Committees' Motion to Intervene, ECF No. 8, and Motion to Dismiss, ECF Nos. 8-1, 8-2. Both procedures were widely publicized and in place for several subsequent elections, including the June 9 primary, the August 11 primary runoff, and the November 3 general election. *See* Ex. 13 to Attorney Declaration of Amanda R. Callais, filed contemporaneously herewith.

On September 15, Georgia voters began casting absentee ballots for the general election. Election officials began reviewing signatures on absentee ballot envelopes as soon as the first absentee ballots were returned and concluded on November 6, when the deadline to cure absentee ballots passed. For envelopes where elections officials successfully matched signatures, they separated envelopes and ballots for counting to protect the secrecy of those ballots. *See* O.C.G.A. § 21-2-386(a)(2)–(3); *see also* S.E.B. Rule 183-1-14-0.9-15(4) (requiring absentee ballot envelopes to be processed "in a manner that ensures that the contents of the envelope cannot be matched back to the outer envelope"). This separation began on October 19 and continued throughout the initial counting period. *See* Ex. 13. Once a ballot is separated from its envelope, it is impossible to trace an absentee ballot to a specific

voter, and any attempt to do so would violate state law. *See* S.E.B. Rule 183-1-14-0.9-15(4).

On November 11, following unsubstantiated complaints from Republican leaders about the integrity of the elections, the Secretary announced that a statewide hand recount of the presidential election would take place. *See* Ex. 3; *see also* Exs. 1–2. On November 12, the Secretary distributed the rules governing the recount and held a statewide, public training on recount procedures for all election officials. *See* Ex. 4; *see also* Ex. 3. Notably, the rules provided that "Political Parties are allowed to designate a minimum of two monitors per county at a ratio of one monitor per party for every ten audit boards in the county." Ex. 3. The recount began that same day. After Republican Party complaints about access, the Secretary announced that counties could allow as many designated monitors from each party as their space could accommodate. Ex. 15. Both the Democratic and Republican Parties of Georgia had numerous, and often equivalent numbers, of observers on-site at recount locations throughout the duration of the recount. *See, e.g.*, Vailes Aff. ¶¶ 5–6, 10–11; Thomas Aff. ¶¶ 7–8; Brandon Aff. ¶ 17; Sumner Aff. ¶ 5–6; Lourie Aff. ¶ 7; Alston Aff. ¶ 7; Cason Aff. ¶¶ 5–6, 11; Young Aff. ¶ 6; Graham Aff. ¶¶ 5, 13; Short Aff. ¶¶ 7–9, 11, 13, 15; *see infra* Section C(3). Multiple recount locations also live-streamed the process, and several major state and national new outlets observed and

reported on the proceedings. *See e.g.*, Ex. 14. No major irregularities in the original counts or the recount have been reported. As of November 18, all counties had finished the recount.

Plaintiff filed his initial Complaint on November 13 and his Amended Complaint on November 16, more than *eight months* after the Settlement Agreement was finalized, 59 days after voters begin voting absentee, 32 days after elections officials started separating absentee envelopes from ballots, and 13 days after the general election. Just two days before the certification deadline, Plaintiff filed his "emergency" motion for temporary injunction, seeking to stop certification of the election results and to install Georgia Republican Party overseers for virtually every aspect of Georgia's signature-matching and ballot-counting election processes. In addition to his Motion, Plaintiff also filed several specious affidavits, including one redacted and unsigned affidavit from an unidentified individual in Venezuela, as well as a vague affidavit filed with speculation and opinions from an individual apparently intended as an expert report.[1]

---

[1] For his due process claim, Plaintiff relies on 16 affidavits from recount observers (primarily individuals from outside the State of Georgia) which describe run-of-the-mill election complaints, *see infra* Section C(3), and then purport to express speculative and conclusory opinions about voter fraud based on clear misunderstandings of Georgia election procedures and ballot styles. The Political Party Committees request that the Court strike the portions of these affidavits

The Political Party Committees filed their motion to intervene on November 18, ECF No. 8, and their motion to dismiss the same day, ECF No. 8-1, which is incorporated fully herein.

### III.    ARGUMENT

#### A.    Legal Standard

A party seeking a preliminary injunction must establish "(1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered if the relief is not granted; (3) that the threatened injury outweighs the harm the relief would inflict on the non-movant; and (4) that entry of the relief would serve the public interest." *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1225–26 (11th Cir. 2005) (per curiam). "[A] preliminary injunction is an extraordinary and drastic

---

reflecting such opinions. *See United States v. Spellissy*, 374 F. App'x 898, 900 (11th Cir. 2010) (finding no abuse of discretion by district court that struck affidavits it found were "scandalous [in] nature" and lacked "probative value"); *Rogers v. Evans*, 792 F.2d 1052, 1062 n. 9 (11th Cir. 1986) (concluding that affidavits "phrased in conclusory terms without citing facts" were properly stricken). Further, though seemingly unconnected to any of his claims and not relied on in his brief, Plaintiff also includes a redacted anonymous declaration from someone in Venezuela discussing election machines, an article on election machines and security, and an unsupported "expert" affidavit that fails to meet even the basic reliability standards set out in *Daubert v. Merrell Dow Pharmaceuticals Inc.*, 509 U.S. 579 (1993). The Political Party Committees also request that the Court strike these as hearsay, and further request the so-called expert report be excluded under the *Daubert* standard. In support of this latter request, the Political Party Committees submit the Expert Report of Dr. Jonathan Rodden, which details the methodological and conceptual errors in the Plaintiff's purported expert's report. *See* Ex. 16.

remedy that should not be granted unless the movant clearly carries its burden of persuasion on each of these prerequisites." *Suntrust Bank v. Houghton Mifflin Co.*, 252 F.3d 1165, 1166 (11th Cir. 2001) (per curiam).

**B.      Plaintiff lacks standing.**

At the outset, Plaintiff's request for injunctive relief should be dismissed because Plaintiff does not have standing for the reasons extensively set forth in the Political Party Committees' motion to dismiss, *see* ECF No. 8-2 at 7–13, incorporated by reference here. In short, Plaintiff lacks standing because he has neither pleaded nor suffered a cognizable injury-in-fact, asserting only generalized grievances about Defendants' supposed defiance of state law. Plaintiff also lacks prudential standing to assert the claims of others; he cannot step into the Georgia General Assembly's shoes to prosecute the Elections and Electors Clause claims, nor can he maintain a recount-related "due process" claim on behalf of the Georgia Republican Party or the "non-party" monitors. *See* Prelim. Inj. Mot. at 11.[2]

---

[2] Plaintiff also relies on *Meek v. Metro. Dade Cty. Fla.*, 985 F.2d 1471, 1480 (11th Cir. 1993), which the Eleventh Circuit explicitly abrogated *thirteen years ago*. *See Dillard v. Chilton Cty. Comm'n*, 495 F.3d 1324, 1331-1332 (11th Cir. 2007). This fact is plain; for example, *Meek* is red-flagged on Westlaw.

**C.      Plaintiff is not likely to succeed on the merits of his claims.**

Even if Plaintiff had standing to invoke the jurisdiction of this Court, he in any event does not have the faintest likelihood of success on the merits of his claims, much less a "substantial" likelihood. This first factor is dispositive by itself.

**1.      Plaintiff is not likely to succeed on his Equal Protection claim.[3]**

Plaintiff is unlikely to succeed on the merits of his Equal Protection claim because he fails to demonstrate any burden on his or anyone else's right to vote or any disparate treatment of voters.[4]

Plaintiff asserts that there has been "disparate treatment" of voters. Prelim. Inj. Mot. at 18. To sustain a such an Equal Protection claim, a plaintiff must necessarily allege that similarly situated voters are treated differently. *See, e.g.*, *Obama for Am. v. Husted*, 697 F.3d 423, 428 (6th Cir. 2012) (Equal Protection Clause applies when state classifies voters in disparate ways). But Plaintiff does not allege that he or any other voter in Georgia is being treated differently from similarly

---

[3] For additional discussion, *see* ECF No. 8-2 at 15–17.

[4] Though it is not entirely clear why, Plaintiff's Equal Protection claim includes extensive discussion of burdens on the right to vote. *See* Prelim. Inj. Mot. at 15–17. This is irrelevant, as he does not allege any such burden. Nor does Plaintiff offer any evidence that the Settlement Agreement disenfranchised any voter, created obstacles to voting, or resulted in any lawfully cast ballot not being counted. Rather, the Settlement Agreement helped *protect* the right to vote by occasioning the implementation of uniform signature match protocols. It logically could not impede Plaintiff's right to vote or anyone else's.

situated voters because of the Settlement Agreement; rather, he alleges that the disparate treatment is in purportedly processing absentee ballots according to the process set forth in the Settlement Agreement which, he complains, is different than the Election Code allegedly requires. *See* Prelim. Inj. Mot. at 18 ("The result [of the Settlement Agreement] is that absentee ballots have been processed differently by County Officials than the process created by the Georgia Legislature and set forth in the Georgia Election Code."). Different or not, the process about which Plaintiff complains was provided in uniform, statewide guidance—which Plaintiff concedes. *See* Am. Compl. ¶ 25 (complaining that Settlement Agreement "set[s] forth different standards" than statutes require for all authorities "in the State of Georgia"); Prelim. Inj. Mot. at 18. This is not an Equal Protection violation. *See Husted*, 697 F.3d at 428.

Further, even if it were, the Secretary has a strong interest in uniform application of state election laws that easily justifies the modest procedures in the Settlement Agreement. *See, e.g.*, *Brooks v. State Bd. of Elections*, 775 F. Supp. 1470, 1489 (S.D. Ga. 1989), *aff'd*, 498 U.S. 916 (1990) ("The state's overriding independent, legitimate interest in maintaining a uniform election procedure is clearly shown."); *Texas League of United Latin Am. Citizens v. Hughs*, 978 F.3d 136, 149 (5th Cir. 2020) ("[T]he Secretary has articulated important state interests

in ensuring election uniformity . . . .". The Settlement Agreement and resulting regulations merely require double-checking ballot rejection determinations made through the statutory process; this reduces the risk of accepting noncompliant ballots, while ensuring uniform and fair treatment of *all* voters *within* the existing statutory framework. As such, the Settlement Agreement lessens the likelihood that voters are disparately treated in violation of the Equal Protection Clause or that their right to vote is unduly burdened. Thus, Plaintiff is unlikely to succeed on this claim.

### 2. Plaintiff is not likely to succeed on his Elections and Electors Clause claims.[5]

As an individual voter, Plaintiff lacks standing to bring his Elections and Electors Clause claims, *see* ECF No. 8-2 at 10, but they lack merit in any event. The Elections and Electors Clause vest authority in "the Legislature" of each state to regulate "[t]he Times, Places, and Manner of holding Elections for Senators and Representatives," U.S. CONST. art. I, § 4, cl. 1., and to direct the selection of presidential electors, U.S. CONST. art. II, § 1, cl. 2, respectively. But innumerable courts to examine this issue have held that the use of the term "Legislature" does not preclude the delegation of such legislative authority. *See, e.g., Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 807 (2015) (noting that

---

[5] For additional discussion, *see* ECF No. 8-2 at 18–21.

Elections Clause does not preclude "the State's choice to include" state officials in lawmaking functions so long as such involvement is "in accordance with the method which the State has prescribed for legislative enactments") (internal quotations omitted).[6]

Accordingly, the actions of the Secretary could only constitute plausible violations of the Elections and Electors Clauses if such actions exceeded the authority granted to him by the Georgia General Assembly.[7] They plainly did not. Pursuant to Georgia law, the Secretary is the chief election official for the State, O.C.G.A § 21-2-50(b), and the General Assembly has granted him the power and authority to manage Georgia's election system, including the absentee voting system. *See Fair Fight Action, Inc. v. Raffensperger*, 413 F. Supp. 3d 1251 (N.D. Ga. 2019); Ga. Op. Att'y Gen. No. 2005-3 (Apr. 15, 2005) (recognizing the

---

[6] Given the functionally identical roles that the Elections and Electors Clauses serve, with the former setting the terms for congressional elections and the latter implicating presidential elections, *see id.* at 839 (2015) (Roberts, C.J., dissenting) (noting that Electors Clause is "a constitutional provision with considerable similarity to the Elections Clause"), this same logic applies equally to the Electors Clause.

[7] As explained in the Political Party Committees' motion to dismiss, it does not appear that Plaintiff is challenging the notice and cure procedures under the Electors and Elections Clauses, but even if he were, as discussed therein, *see* ECF No. 8-2 at 20, those rules were promulgated pursuant to state law and went through a full public notice and comment period, which is within the authority delegated to the Board by the Georgia General Assembly.

Secretary's authority to manage Georgia's election system). Additionally, the Secretary is the Chair of the Board, which is the governmental body responsible for uniform election practice in Georgia. O.C.G.A. § 21-2-31; *see also Curling v. Raffensperger*, 403 F. Supp. 3d 1311, 1345 (N.D. Ga. 2019) ("[T]he [] Board is charged with enforcing Georgia's election code under state law."). The Secretary was well within that authority in entering into the Settlement Agreement and ensuring the signature verification protocols were uniform across Georgia.

Plaintiff's Elections and Electors Clause claims are entirely premised on the notion that, by promulgating procedures to implement the Settlement Agreement, "Defendants altered the otherwise statutorily mandated procedure contrary to the Georgia Election Code." Prelim. Inj. Mot. at 19. Put simply, this is false. The Settlement Agreement and resulting procedures are in no way inconsistent with the Georgia Election Code. The Secretary's signature review guidance explicitly seeks to promote uniform application of the signature verification processes "required by Georgia law." Ex. 5 at 1. In order to "[e]nsur[e] that signatures match . . . in this time of increased absentee voting due to the COVID-19 crisis," the Secretary required election administrators to double check that the statutory procedures had been properly followed. *Id.* at 1-2. The OEB merely "strengthened signature match" procedures. Ex. 9. It defies logic to suggest that ensuring more rigorous compliance

with a law somehow violates that law. For all these reasons, Plaintiff's Elections and Electors Clause claims necessarily fail.

### 3.     Plaintiff is not likely to succeed on his Due Process claim.

Plaintiff's due process claim—which is premised on the purported denial of Republican observers' right to observe the hand recount—also fails. As a threshold matter, to succeed on a procedural due process claim, a plaintiff must demonstrate that he has a "private interest that will be affected by the official action." *Mathews v. Eldridge*, 424 U.S. 319, 334–47 (1976). But neither Georgia law nor the U.S. Constitution provides a private individual with an enforceable "private interest" in observing a recount. Rather, as Plaintiff recognizes, Georgia law provides that *candidates* and *political parties* may send "two representatives to be present" at a recount. *See* Prelim. Inj. Mot. at 20 (quoting O.C.G.A. § 21-2-495(a)). Thus, neither Plaintiff—who does not even allege much less present evidence that he even attempted to observe the recount—nor the individual monitors who submitted supporting affidavits are due any process as they have no right to monitor recounts in Georgia. *See supra* Section B; *see also* ECF No. 8-2 at 21–23 (explaining that Plaintiff has no vested interest in the recount observation process).

More fundamentally, even if an individual could hold such an interest (which they cannot), the process announced by the Secretary and memorialized in the very

affidavits upon which Plaintiff relies, demonstrates that far more than two observers per political party were allowed to observe the recount. *See* Prelim. Inj. Mot. at 11 (explaining that the Secretary permitted two monitors per political party and one per party for every ten tables); *see also* Ex. 4; Ex. 15. Indeed, virtually every affiant supporting Plaintiff's Motion testifies that they and others were able to freely observe or participate in the recount process. *See* ECF Nos. 6-5 at ¶ 5 and 6-13 at ¶ 5 ("I was permitted to roam throughout the facility to conduct observations."); ECF No. 6-7 at ¶ 21 (noting he was "a Voting Review Panel member"); ECF No. 6-9 at ¶ 6 (noting he could walk to counting table and observe); ECF Nos. 6-11 at ¶¶ 3–7, 6-18 at ¶ 3, and 6-19 at ¶ 2 (noting they were close enough to see how ballots were filled in); ECF Nos. 6-6, 6-8, 6-10, 6-12, and 6-17 (permitted to observe). And the Political Party Committees' affidavits confirm this. *See* Vailes Aff. ¶¶ 5–6 (noting equal number of Republican and Democratic monitors in Fulton County), 10-11; Thomas Aff. ¶¶ 7–8 (observing 20 monitors per party in Fulton County); Brandon Aff. ¶ 17 (observing at least ten monitors from each political party in Cobb County); Lourie Aff. ¶ 7 (observing numerous monitors from both parties in Fulton County); Sumner Aff. ¶¶ 3, 5 (observing more Republican monitors than Democratic monitors at Gwinnett County); Young Aff. ¶ 10 (observing equal numbers of monitors for each party in Fulton County); Graham Aff. ¶¶ 5–6, 10, 13 (equal numbers in Fulton

County); Short Aff. ¶¶ 7–10 (same); Alston Aff. ¶ 7 (same); Cason Aff. ¶ 8 (same); Ghazal Aff. ¶¶ 6–40 (observing Republican monitors in Cobb County); Zydney Aff. ¶ 9 (more Republican monitors inside the rope than allowed). Thus, while Plaintiff and the Republican affiants might complain about the level of access they were given, nothing in their affidavits indicates that they were deprived of access to the recount process or of the process they were due. *Cf.* Ga. Comp. R. & Regs. 183-1-12-.11(12) ("Accredited poll watchers shall be allowed to observe the process described in this rule; however, they must do so in a manner that does not interfere with poll officials or voters.").

To the extent Plaintiff attempts to show that he is likely to succeed on a substantive due process claim, his claim is equally unavailing. It is well-settled that "[f]ederal courts should not 'involve themselves in garden variety election disputes.'" *Serpentfoot v. Rome City Comm'n*, No. 4:09-CV-0187-HLM, 2010 WL 11507239, at *16 (N.D. Ga. Mar. 3, 2010) (quoting *Curry v. Baker*, 802 F.2d 1302, 1315 (11th Cir. 1986) (noting "[o]nly in extraordinary circumstances will a challenge to a state election rise to the level of a constitutional deprivation"). For the substantive due process clause to be implicated, the situation "*must go well beyond the ordinary dispute over the counting and marking of ballots*." *Curry*, 802 F.2d at 1315 (emphasis added). But that is not the case here.

The incidents Plaintiff complains of—not being close enough to hear poll worker conversations, ECF Nos. 6-5 at ¶, 11 and 6-13 at ¶ 11; not being able to speak to poll workers, ECF No. 6-9 at ¶ 15; differences in counting methods, ECF No. 6-6 at ¶ 5; and isolated discrepancies in ballot placements or ballot recounts, ECF No. 6-5 at ¶ 26—are nothing more than "garden variety" ordinary disputes that would plague any hand recount. To the extent that the affidavits go beyond that, insinuating that sightings of "pristine ballots" led affiants to believe that fraud occurred, *see* ECF No. 6-4 at ¶ 14, this is nothing more than mere speculation and uninformed opinions of individuals who are unfamiliar with Georgia elections and, as such, are not only improper, but also easily explained and refuted, *see* Ghazal Aff. ¶ 41; Brandon Aff. ¶ 15; *see also* Ex. 10 (the Secretary explaining that his office has found no evidence of widespread fraud or irregularities); Ex. 11 (the Secretary "expressed exasperation over a string of baseless allegations coming from Trump and his allies"); Ex. 12 ("Federal election infrastructure officials said in a joint statement . . . that the 2020 election was the 'most secure in American history'"). What is not a garden variety change and is fundamentally unfair, however, is the disenfranchisement of millions of Georgians and the subsequent imposition of a party-controlled signature verification and absentee review process, which is precisely what Plaintiff seeks. *See Griffin v. Burns*, 570 F.2d 1065 (1st Cir. 1978) (refusing to disenfranchise the

"[a]lmost ten percent of the qualified and voting electorate" who voted "in reliance on absentee . . . ballot procedures announced by state officials[,]" because doing so was a due process violation); *see also* ECF No. 8-2 at 23–24. Accordingly, Plaintiff's due process claim is unlikely to succeed.[8]

### D.    Plaintiff does not establish irreparable harm.

Plaintiff has failed to establish that he will suffer *any* harm, much less irreparable harm if his requested relief is not granted. As discussed *supra* Section B, Plaintiff brings, at most, generalized grievances or third-party claims. As such, he cannot demonstrate that he will suffer any harm at all. In contrast, Plaintiff's requested relief would in fact cause irreparable injury by depriving between one and five million Georgians of their votes. *See Gonzalez v. Governor of Georgia*, 978 F.3d 1266 (11th Cir. 2020) (noting that depriving even a single individual of his right to vote would cause irreparable harm). As a court in this district recently explained "[i]t is well-settled that an infringement on the fundamental right to vote amounts [to] an irreparable injury." *New Georgia Project v. Raffensperger*, No. 1:20-CV-

---

[8] The only case Plaintiff cites to support his due process claim is *Marks v. Stinson*, 19 F.3d 873 (3rd Cir. 1994), but that case does not support his claim. Indeed, in *Marks*, even where there was clear evidence of fraud (not speculation and insinuations, as here), the court refused to permit all absentee ballots to be discarded. *Id.* at 887.

01986-ELR, 2020 WL 5200930, at \*26 (N.D. Ga. Aug. 31, 2020). Thus, Plaintiff

has failed to establish this element of his request for preliminary relief.

> **E.    The balance of the equities and public interest weigh against a preliminary injunction.**

There is no question that the balance of the equities and the public interest

weigh against Plaintiff's requested relief. Plaintiff asks this Court to disenfranchise

between one and five million voters who dutifully cast their votes after the election

is over. Such relief is unprecedented. *See Short v. Brown*, No. 2:18-CV-00421 TLN-

KJN, 2018 WL 1941762, at \*8 (E.D. Cal. Apr. 25, 2018), *aff'd*, 893 F.3d 671 (9th

Cir. 2018) (quoting *Sw. Voter Registration Educ. Project v. Shelley*, 344 F.3d 914,

919 (9th Cir. 2003) (en banc) ("[I]nterference with an election after voting has begun

is unprecedented."). And it is certainly not in the public interest. *See Democratic*

*Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1327 (11th Cir. 2019) ("[T]he public

interest is served when constitutional rights are protected."); *Jones v. Governor of*

*Fla.*, 950 F.3d 795, 831 (11th Cir. 2020) ("The public, of course, has every interest

in ensuring that their peers who are eligible to vote are able to do so in every

election."); *Scott v. Roberts*, 612 F.3d 1279, 1296 (11th Cir. 2010) (indicating these

factors weigh against preliminary relief when it "would require the state to . . .

discard ballots already cast").

Indeed, instead of *remedying* a constitutional violation, granting Plaintiff's requested relief would *violate* millions of Georgians' constitutional rights. *See Bognet v. Sec'y Commonwealth of Pennsylvania*, No. 20-3214, 2020 WL 6686120, at *1, *8 (3d Cir. Nov. 13, 2020) ("[It is] indisputable in our democratic process: that the lawfully cast vote of every citizen must count"); *Stein v. Cortés¸* 223 F. Supp. 3d 423, 442 (E.D. Pa 2016) (granting relief that "could well ensure that no Pennsylvania vote counts . . . would be both outrageous and completely unnecessary"). Moreover, the harm would not stop there. In addition to disenfranchising voters, "knowledge that otherwise-eligible voters were not counted would be harmful to the public's perception of the election's legitimacy," and therefore weighs even further against the public interest. *Jones*, 950 F.3d at 830 (internal quotation marks omitted).

In contrast, Plaintiff, who unjustifiably waited over eight months and three election cycles to bring his claim challenging the Settlement Agreement, has articulated no injuries whatsoever and as such would suffer no harm if this Court were to withhold relief.[9]

---

[9] It is equally appropriate to consider Plaintiff's delay in bringing his claims as part of a laches argument, like the one the Political Party Committees set forth in their Motion to Dismiss. *See* ECF No. 8-2, at *13–15. Thus, Plaintiff's delay should either bar consideration of his claims entirely (laches) or alternatively warrant denial of his TRO on the merits (balancing of the equities / public interest).

The same is true of Plaintiff's requested relief with respect to the recount, which seeks statewide recourse for purported infringements in only a handful of counties and, most egregiously, asks for Republican-only surveillance of every step of Georgia's processing of individual votes in a manner likely violating multiple provisions of state law both backward looking and in future elections. *See* Prelim. Inj. Mot. at 23–25. Such relief is unprecedented in scope and plainly not justified by Plaintiff's paltry alleged harms.

Ultimately, "[t]he chief function of a preliminary injunction is to preserve the status quo until the merits of the controversy can be fully and fairly adjudicated." *Robinson v. Attorney Gen.*, 957 F.3d 1171, 1178–79 (11th Cir. 2020) (quoting *Ne. Fla. Ch. of Ass'n of Gen. Contractors v. City of Jacksonville*, 896 F.2d 1283, 1284 (11th Cir. 1990)). Here, the status quo is that the widely publicized, well-accepted procedures of the Settlement Agreement were used to conduct an election in which President-Elect Joseph Biden won more Georgians' votes. The results of that election have been announced and now confirmed by a rigorous hand recount of all ballots cast which both parties were able to observe. The Court should not grant an injunction that would upend the status quo and wreak havoc on the state's election apparatus, especially in light of the weakness of Plaintiff's claims.

## IV.   CONCLUSION

For these reasons, the Political Party Committees respectfully request that the

Court deny Plaintiff's Emergency Motion for Injunctive Relief.

Dated: November 19, 2020.                 Respectfully submitted,

**Adam M. Sparks**
Halsey G. Knapp, Jr.
Georgia Bar No. 425320
Joyce Gist Lewis
Georgia Bar No. 296261
Susan P. Coppedge
Georgia Bar No. 187251
Adam M. Sparks
Georgia Bar No. 341578
**KREVOLIN AND HORST, LLC**
One Atlantic Center
1201 W. Peachtree Street, NW, Ste. 3250
Atlanta, GA 30309
Telephone: (404) 888-9700
Facsimile: (404) 888-9577
hknapp@khlawfirm.com
jlewis@khlawfirm.com
coppedge@khlawfirm.com
sparks@khlawfirm.com

Marc E. Elias*
Amanda R. Callais*
Alexi M. Velez*
Emily R. Brailey*
PERKINS COIE LLP
700 Thirteenth Street NW, Suite 800
Washington, DC 20005

Telephone: (202) 654-6200
melias@perkinscoie.com
acallais@perkinscoie.com
avelez@perkinscoie.com
ebrailey@perkinscoie.com

Kevin J. Hamilton*
Amanda J. Beane*
PERKINS COIE LLP
1201 Third Avenue, Suite 4900
Seattle, Washington 98101
Telephone: (206) 359-8000
khamilton@perkinscoie.com
abeane@perkinscoie.com

Gillian C. Kuhlmann*
PERKINS COIE LLP
1888 Century Park East, Suite 1700
Los Angeles, California 90067
Telephone: (310) 788-3900
gkuhlmann@perkinscoie.com

Matthew J. Mertens*
Georgia Bar No: 870320
PERKINS COIE LLP
1120 NW Couch Street, 10th Floor
Portland, Oregon 97209
Telephone: (503) 727-2000

*Counsel for Proposed Intervenor-
Defendants*

*Pro Hac Vice Application Pending*

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

L. Lin Wood, Jr.,

       Plaintiff,

v.

Brad Raffensperger, in his official capacity
as Secretary of the State of Georgia, et al.,

       Defendants.

CIVIL ACTION FILE NO.
1:20-cv-04651-SDG

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing document has been prepared in accordance with the font type and margin requirements of L.R. 5.1, using font type of Times New Roman and a point size of 14.

Dated: November 19, 2020.

**Adam M. Sparks**
*Counsel for Proposed Intervenor-Defendants*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

L. Lin Wood, Jr.,

       Plaintiff,

v.

Brad Raffensperger, in his official capacity
as Secretary of the State of Georgia, et al.,

       Defendants.

CIVIL ACTION FILE NO.
1:20-cv-04651-SDG

## CERTIFICATE OF SERVICE

I hereby certify that on November 19, 2020, I electronically filed the foregoing

with the Clerk of the Court using the CM/ECF system, which will send a notice of

electronic filing to all counsel of record.

Dated: November 19, 2020.

**Adam M. Sparks**
*Counsel for Proposed Intervenor-*
*Defendants*