**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| **L. LIN WOOD, JR.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Civil Action No.** |
| | ) | **1:20-cv-04651-SDG** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **BRAD RAFFENSPERGER,** *et al.*, | ) | |
| | ) | |
| | ) | |
| **Defendants.** | ) | |

**DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION**
**FOR PRELIMINARY INJUNCTION**

Defendants Brad Raffensperger, Georgia Secretary of State, and State Election Board members Rebecca N. Sullivan, David J. Worley, Matthew Mashburn, and Ahn Le (collectively, "State Defendants") submit the following response in opposition to Plaintiff's Motion for Preliminary Injunction:

**INTRODUCTION**

Plaintiff's motion makes the extraordinary and unprecedented request that the Court enjoin the certification of the 2020 general election in Georgia unless all absentee ballots are removed from the tabulation. Inexplicably, Plaintiff waited to move for this relief until *two days before* the November 20th deadline for the Secretary of State to certify the election results, even though his claim is based upon

1

rule-making by the State Defendants that was implemented in March and in full effect during the entirety of the 2020 primary and general election cycles. At this point, ballots have been cast, tabulated, and audited statewide. It is simply impossible for the Court to grant Plaintiff's requested relief, even if there were any merit to Plaintiff's constitutional claims—and there is not. Plaintiff fails to state a legally cognizable or even coherent constitutional claim. The Court should decline Plaintiff's legally unsupportable efforts to trigger a constitutional crisis and overturn the election results, based upon nothing more than Plaintiff's personal dissatisfaction with the outcome.

Plaintiff seeks to set aside the election results based upon two complaints: (1) that State Defendants and the Democratic Party of Georgia entered into a March 2020 settlement agreement that allegedly altered the process by which counties verify voter signatures on absentee ballots in a way that he asserts is contrary to the Georgia election code; and (2) that monitors for the Trump Campaign and the Republican Party were not permitted to observe the vote tabulations or post-election audit. Setting aside the lack of factual support for either of these claims, neither establish constitutional violations, and injunctive relief should be denied because Plaintiff will not succeed on the merits of his claims.

More importantly, however, the Court lacks subject-matter jurisdiction over the action because Plaintiff cannot demonstrate Article III standing. Plaintiff has not shown a concrete and particularized injury to his own, individual right to vote. Instead, Plaintiff asserts a generalized grievance against State Defendants on behalf of all Georgia voters, which courts repeatedly have held insufficient to establish standing.

Finally, Plaintiff's claims are barred by laches, as well as moot, because Plaintiff delayed in bringing this action until it was too late for the Court to grant any effectual, equitable relief. More than 1.3 million Georgians cast absentee ballots in the presidential election, which have been processed, tabulated, certified, and audited by the counties. Plaintiff's inexcusable delay is extremely prejudicial to the Secretary of State's timely certification of the election results, which is necessary to certify presidential electors, hold state and federal runoffs, and allow newly elected officials to take office. Accordingly, the Court should deny Plaintiff's motion.

## **FACTUAL BACKGROUND**

In 2019, the Georgia General Assembly enacted HB 316, a bipartisan effort to reform to the state's election code and implement a new electronic voting system. The reforms kept in place Georgia's policy of "no excuse" absentee voting, but modified the technical requirements for absentee ballots in an effort to prevent them

3

from being rejected, with no option to cure, for missing or mismatched signatures. Specifically, HB 316 modified the language of the oath on the absentee ballot envelope to remove requests for the elector's address and date of birth, which was deemed to potentially subject voters to increased risk of identity theft, while leaving the signature requirement. *See* O.C.G.A. § 21-2-384. While the election code already required that election officials "promptly notify" the voter of a rejected absentee ballot due to a missing or mismatched signature, HB 316 added a cure provision, whereby election officials must give a voter until three days after the date of the election to cure a signature before rejecting an absentee ballot for a missing or mismatched signature on the outer envelope. *See* O.C.G.A. § 21-2-386(a)(1)(C).

On November 6, 2019, the Democratic Party of Georgia, DSCC, and DCCC (collectively, "Political Party Organizations") filed a lawsuit against the State Defendants, alleging that the "promptly notify" language of O.C.G.A. § 21-2-386(a)(1)(C) was vague and ill-defined and left counties with a standard-less procedure for verifying signatures on absentee ballots. *See Democratic Party of Georgia v. Raffensperger*, Civil Action No. 1:19-cv-05028-WMR.

While this action was pending, the State Election Board ("SEB") approved a rule that established a uniform standard for counties to follow to "promptly notify" voters when their absentee ballot is rejected as required by O.C.G.A. § 21-2-

4

386(a)(1)(C). The rule provides that when a timely-submitted absentee ballot is rejected, the board of registrars or absentee ballot clerk must send the voter notice of the rejection and opportunity to cure within three business days, or by the next business day if within ten days of Election Day. Ga. Comp. R. & Regs. r. 183-1-14-.13 (the "Prompt Notification Rule").

The Prompt Notification Rule was adopted pursuant to the SEB's rule-making authority under O.C.G.A. § 21-2-31(2), and is in no respects inconsistent with O.C.G.A. § 21-2-386(a)(1)(C). It provides a uniform 3-day standard for "prompt" notification when an absentee ballot is rejected, so that all counties follow the procedures set forth in O.C.G.A. § 21-2-386(a)(1)(C) in a consistent manner. The Prompt Notification Rule was legally promulgated pursuant to the Georgia Administrative Procedure Act, published for public comment, and discussed at multiple public hearings before it became effective on March 22, 2020.[1]

Because the Prompt Notification Rule resolved the pending issues in the DPG Action, the parties agreed to resolve the matter in a settlement agreement along the following terms: (1) the State Election Board would promulgate and enforce the

---

[1] The rule was subsequently amended at the April 15, 2020, SEB meeting to further modify *only* the notification to a voter if their ballot was rejected.  Both the original rule as well as the modified rule were transmitted to the General Assembly for consideration of legislative rejection or modification, and no action was taken by the General Assembly as to either version of the rule.

Prompt Notification Rule (which had already been approved by the State Election Board prior to settlement); (2) the Secretary of State would issue guidance to county election officials regarding the signature matching process; and (3) the Secretary of State would consider sending to counties training materials prepared by the Political Party Organizations' handwriting expert (the "Settlement Agreement").[2] (Doc. 6-1.)

On May 1, 2020, the Secretary of State distributed an Official Election Bulletin ("OEB"), which advised county election officials of the Prompt Notification Rule and provided guidance on absentee ballot envelope signature review. (Declaration of Chris Harvey ¶ 5 & Ex. 1.) The OEB notified officials that after an election official makes an initial determination that the signature on the absentee ballot envelope does not match the signature on file for the voter pursuant to O.C.G.A. §21-2-386(a)(1)(B) and (C), two additional registrars, deputy registrars, or absentee ballot clerks should also review the signature, and the ballot would be rejected if at least two agree that the signature does not match. (*Id.*) The OEB in no way is contrary to or inconsistent with the procedures in O.C.G.A. § 21-2-386, and clearly instructs county officials to comply with the applicable law. (*Id.*)

---

[2] The Secretary did consider in good faith the training materials provided by the Political Party Organizations but ultimately decided *not* to distribute the Political Party Organizations' materials to county election officials.

Contrary to Plaintiff's claim that the Prompt Notification Rule and the OEB have significantly disrupted the signature verification process, there has been no detectable effect on the absentee ballot rejection rate since the last general election in 2018. An analysis was undertaken of the number of absentee ballot rejections for signature issues for 2020 as compared to 2018 which found that the rejection rate for absentee ballots with missing or non-matching signatures in the 2020 general election was 0.15%, which is the same rejection rate for signature issues in 2018. (Harvey Dec. ¶¶ 6, 7.)

Following the November election, the Secretary of State ordered a statewide audit of all ballots cast in the presidential election, which was conducted by manual tabulation at the county level. (Harvey Dec. ¶ 8.) Political parties were permitted to have certified monitors present in every county, and the Secretary of State's office issued an OEB with instructions that political parties (Republicans and Democrats) were permitted to have one designated monitor for each ten audit teams, with a minimum of two designated monitors in each county per party per room. (*Id.*) The manual tabulation for the audit was conducted solely by the counties, and the State Defendants had no control or responsibility over how the counties instructed, placed, or interacted with party monitors.

## ARGUMENT AND CITATION OF AUTHORITY

**I.    The Court Lacks Jurisdiction over the Action Because Plaintiff Cannot Establish Article III Standing.**

Plaintiff raises three separate constitutional counts: (1) that the Litigation Settlement violates the Equal Protection Clause of the Fourteenth Amendment (Count I); (2) that the Litigation Settlement violates the Electors and Elections Clauses of Articles I and II (Count II); and (3) a Due Process claim based upon the allegation that the State Defendants denied Republican party monitors meaningful access to observe and monitor the tabulation of votes or the statewide audit (Count III). However, because Plaintiff cannot establish standing as to any of these causes of action, the Court lacks jurisdiction to consider the merits of Plaintiff's motion.

Federal courts have an independent obligation to ensure that subject-matter jurisdiction exists before reaching the merits of a dispute. *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1245 (11th Cir. 2020) (vacating and ordering dismissal of voting rights case due to lack of standing). "'For a court to pronounce upon . . . the constitutionality of a state or federal law when it has no jurisdiction to do so is, by very definition, for a court to act ultra vires.'" *Id.* (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101-02 (1998)). "If at any point a federal court discovers a lack of jurisdiction, it must dismiss the action." *Id.* (citation omitted).

Article III of the Constitution limits the subject-matter jurisdiction of federal courts to "Cases" and "Controversies." U.S. Const. art. III, § 2. A party invoking federal jurisdiction bears the burden of establishing standing at the commencement of the lawsuit. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). As an irreducible constitutional minimum, Plaintiff must show he has (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision. *Lujan*, 504 U.S. at 561. As the party invoking federal jurisdiction, Plaintiff bears the burden at the pleadings phase of "clearly alleg[ing] facts demonstrating each element." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016).

## A. Plaintiff lacks standing to assert an Equal Protection claim.

To establish injury-in-fact sufficient to establish standing, Plaintiff must show he suffered "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Id.* at 1548 (quoting *Lujan*, 504 U.S. at 560). Rather than allege a particularized or concrete injury, Plaintiff alleges that he has standing "as a qualified elector and registered voter." (Doc. 5 ¶ 8.) Plaintiff further alleges that he "made donations to various Republican candidates on the ballot for the November 3, 2020 general elections, and

his interests are aligned with those of the Georgia Republican Party for the purposes of the instant lawsuit." (*Id.*)

These facts, however, do not demonstrate that Plaintiff has "a personal stake in the outcome" that is "distinct from a generally available grievance about government." *Gill v. Whitford*, 138 S. Ct. 1916, 1923 (2018). When alleged injuries are undifferentiated and common to members of the public, courts routinely dismiss such cases as "generalized grievances" that cannot support standing. *United States v. Richardson*, 418 U.S. 166, 173–75 (1974). Plaintiff's factual allegations are the very definition of a generalized grievance, as Plaintiff fails to point to any injury that affects him "in a personal and individual way," rather than as part of a collective of voters. *Spokeo*, 136 S. Ct. at 1548.

The Eleventh Circuit's recent decision in *Jacobson* is instructive here, as it rejected both of Plaintiff's theories of standing. The plaintiffs in *Jacobson* included two individual voters who challenged the constitutionality of Florida's ballot order statute, arguing that Republican candidates reaped the benefit of a "primacy" effect due to their top placement on the ballot.  974 F.3d at 1246. The Court held that the individual voters lacked standing because they could not prove an injury in fact. *Id.* The Court rejected the argument that all voters have standing to bring claims involving voting rights, stating, "the Supreme Court has made clear that 'a person's

10

right to vote is individual and personal in nature,' so 'voters who allege facts showing disadvantage to themselves as individuals have standing to sue.'" *Id.* (quoting *Gill*, 138 S. Ct. at 1929).

The Court similarly rejected the voters' self-identification as Democrat voters as a basis for standing, stating, "[a] candidate's electoral loss does not, by itself, injure those who voted for the candidate," as "[v]oters have no judicially enforceable interest in the outcome of the election." *Id.*

As in *Jacobson*, Plaintiff cannot show any particularized, concrete injury to his individual right to vote that is traceable to the State Defendants. He asserts a number of generalized grievances regarding the Litigation Settlement, such as speculating that it has "created an arbitrary, disparate, and ad hoc process for processing defective absentee ballots." (Doc. 6 at 18.) But he fails to make any cognizable allegation that he personally has been injured by this process.

## B. Plaintiff lacks standing under the Electors and Elections Clauses.

Federal courts are not venues for parties to assert a bare right "to have the Government act in accordance with law." *Allen v. Wright*, 468 U.S. 737, 754 (1984). The Third Circuit recently rejected a similar claim in *Bognet v. Secretary Commonwealth of Pennsylvania*, No. 20-3214, 2020 U.S. App. LEXIS 35639 (3d Cir. Nov. 13, 2020), holding that individual voters lacked standing to sue for alleged

injuries attributable to a state government's violations of the Elections Clause and Electors Clause. *Id.* at *19. The Court stated, "[b]ecause Plaintiffs are not the General Assembly, nor do they bear any conceivable relationship to state lawmaking processes, they lack standing to sue over the alleged usurpation of the General Assembly's rights under the Elections and Electors Clauses." *Id.* at *21; *see also Lance v. Coffman*, 549 U.S. 437, 442 (2007) ("The only injury plaintiffs allege is that the law—specifically the Elections Clause—has not been followed."); *Dillard v. Chilton Cty. Comm'n*, 495 F.3d 1324, 1332-33 (11th Cir. 2007) (holding that an allegation that the law has not been followed is "the kind of undifferentiated, generalized grievance about the conduct of government" that will not satisfy standing).

## C. Plaintiff lacks standing under the Due Process Clause.

Plaintiff's standing to assert a due process claim is even more tenuous because he attempts to assert claims on behalf of third-party Republican monitors. (*See* Doc. 6 at 21.) However, Plaintiff may only assert prudential standing based on the rights of another if he "has a 'close' relationship with the person who possesses the right" and "there is a 'hindrance' to the possessor's ability to protect his own interests." *Bognet*, 2020 U.S. App. LEXIS 35639, *21 (quoting *Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004)). Plaintiff makes no such allegations here.

Not only does Plaintiff lack an injury-in-fact sufficient to establish standing for his due process claim, the alleged injury is not traceable to any action by the State Defendants. "To satisfy the causation requirement of standing, a plaintiff's injury must be 'fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court.'" *Jacobson*, 974 F.3d at 1253 (citation omitted). As in *Jacobson*, Plaintiff's gripe is with county election officials, who are the ones who allegedly excluded party monitors from observing the audit. Plaintiff does not allege that any of the State Defendants controlled or even participated in this conduct. *See id.* (holding that there was no injury traceable to the Florida Secretary of State when the injury complained of was the responsibility of county officials not under the Secretary's control).

Accordingly, because Plaintiff cannot satisfy the threshold requirement of standing, the Court should deny Plaintiff's motion for injunctive relief.

## II.   Plaintiff's Claim is Moot.

Plaintiff's claims related to the validation of signatures on absentee ballots by local elections officials, or to any perceived irregularities during either the initial tabulation of votes by county officials or during Georgia's statewide risk-limiting audit have been mooted by the completion of those processes, and the case "no longer presents a live controversy with respect to which the court can give

meaningful relief." *Troiano v. Supervisor of Elections in Palm Beach Cty., Fla*., 382 F.3d 1276, 1282 (11th Cir. 2004). Mootness is jurisdictional—because a federal court may only adjudicate cases and controversies, and a ruling that cannot provide meaningful relief is an impermissible advisory opinion. *Id*.

The Court "cannot prevent what has already occurred." *De La Fuente v. Kemp*, 679 F. App'x 932, 933 (11th Cir. 2017); *Yates v. GMAC Mortg. LLC*, No. 1:10-CV-02546-RWS, 2010 WL 5316550, at *2 (N.D. Ga. Dec. 17, 2010) ("The Court is powerless to enjoin what has already occurred."). While Plaintiff purportedly seeks re-counting and re-certification from counties that have already certified and audited their election returns, the Eleventh Circuit made clear in *Jacobson* that federal courts do not have the authority to exercise jurisdiction to order relief against county officials who have not been named as parties, especially where those county election officials have already completed their statutory obligations regarding the 2020 general election. 974 F.3d at 1253.

## III.   Plaintiff's Motion Fails to Satisfy the Preliminary Injunction Factors.

In order to prevail on a motion for preliminary injunction, the movant must show: (1) a substantial likelihood of prevailing on the merits; (2) that the plaintiff will suffer irreparable injury unless the injunction issues; (3) that the threatened injury to the movant outweighs whatever damages the proposed injunction may

cause the opposing party; and (4) the injunction would not be adverse to the public interest. *Duke v. Cleland*, 954 F.2d 1526, 1529 (11th Cir. 1992). A preliminary injunction is a drastic remedy "which should not be granted unless the movant clearly carries the burden of persuasion." *Canal Auth. of Fla. v. Callaway*, 489 F.2d 567, 573 (11th Cir. 1974). Because Plaintiff is seeking a mandatory injunction, which are particularly disfavored, the burden is further heightened, and Plaintiff must show that the facts and the law *clearly* favor him. *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 20 (2008).

### A. Plaintiff is not substantially likely to succeed on the merits.

*1. Plaintiff's equal protection claim fails because he cannot show arbitrary and disparate treatment among different classes of voters.*

In the voting rights context, equal protection means that "[h]aving once granted the right to vote on equal terms, the state may not, by later arbitrary and disparate treatment, value one person's vote over that of another." *Bush v. Gore,* 531 U.S. 98, 104 (2000) (citation omitted). Typically, when deciding a constitutional challenge to state election laws, federal courts apply the *Anderson-Burdick* framework that balances the burden on the voter with the state's interest in the voting regulation. *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 190 (2008); *Democratic Exec. Comm. of Fla. v. Lee,* 915 F.3d 1312, 1318-19 (11th Cir. 2019).

But Plaintiff's equal protection claim does not even implicate *Anderson-Burdick*, because he fails to articulate how the Litigation Settlement affects his right to vote in the first place. Both the Prompt Notification Rule and the OEB guidance are facially neutral, and Plaintiff does not explain how either values one person's vote over another or treats voters arbitrarily or disparately. Instead, he alleges (similar to his elections clause argument) that "Defendants are not part of the Georgia Legislature and cannot exercise legislative power to enact rules or regulations … that are contrary to the Georgia Election Code." (Doc. 6 at 17-18.) But erroneously alleging that the State Defendants have acted contrary to state law is not the same thing as alleging that a policy enforced by State Defendants treats *voters* differently.

The Supreme Court's decision in *Bush v. Gore* does not support Plaintiff's case (*see* Doc. 6 at 16-17), as that case found a violation of equal protection where certain counties were utilizing varying standards for what constituted a legal vote in the 2000 Florida recount. 531 U.S. at 105 ("The question before us … is whether the recount procedures … are consistent with its obligation to avoid arbitrary and disparate treatment of the members of its electorate"). Here, the Prompt Notification Rule and OEB guidance provide uniform and consistent standards *in complete harmony with the statutory framework* for each county to employ when verifying

16

signatures on absentee ballot envelopes, in order to avoid the kind of ad hoc standards that varied from county to county as found unconstitutional in *Bush*. They are the exact opposite of arbitrary and disparate treatment.

 2. *Plaintiff's claim under the Electors and Elections Clauses fails.*

The electors clause of the United States Constitution provides that "[e]ach State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors,"who, in turn, cast the State's votes for president. U.S. Const. art. II, § 1, cl. 2. The General Assembly established the manner for the appointment of presidential electors in O.C.G.A. § 21-2-10, which provides that electors are *selected by popular vote* in a general election. Plaintiff fails to show how any act of the State Defendants has altered this process.

Similarly, Plaintiff fails to show how State Defendants have violated the elections clause, which provides that "[t]he Times, Places, and Manner of holding elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof." U.S. Const. art. I, § 4, cl. 1. Plaintiff contends that the State Defendants have usurped the power of the legislature by "imposing a different procedure for handling defective absentee ballots" than the one specified by statute. (Doc. 4 ¶ 89.) Yet Plaintiff concedes that the State Election Board has the authority, delegated by the legislature, "[t]o formulate, adopt, and promulgate such rules and

17

regulations … as will be conducive to the fair, legal, and orderly conduct of primaries and elections" so long as those rules are "consistent with law." O.C.G.A. 21-2-31(2); *see* Doc. 4 ¶ 27. Thus, while no one disagrees that State Defendants are not members of the Georgia legislature, Plaintiff's claim depends on the assumption that the rules and guidance resulting from the Litigation Settlement are inconsistent with Georgia's election code. They are not.

When an absentee ballot is defective because of a signature mismatch, the statute provides that "[t]he board of registrars or absentee ballot clerk shall promptly notify the elector of such rejection, [and] a copy of [that] notification shall be retained in the files of the board of registrars or absentee ballot clerk." O.C.G.A. § 21-2-386(a)(1)(C). Once notified, the elector has the opportunity to "cure" any defects so the ballot may be counted. *See id.* The Litigation Settlement (and subsequent OEB guidance to county officials) merely elaborates on that procedure. If the clerk determines that a signature does not match, the clerk "must seek review from two other … absentee ballot clerks," and a ballot will only be rejected if a majority of the consulted clerks agree that the signatures do not match. (*See* Doc. 4 ¶ 33.) If the ballot is rejected, the clerk writes the names of the reviewing officials on the face of the ballot, along with the reason for the rejection. *Id.* These types of

procedures might add detail to the statutory scheme, but they do not supplant or contradict the text of the statute.

The Georgia Administrative Procedure Act, O.C.G.A. §§ 50-13-1 through 50-13-44, specifically provides a framework for the General Assembly to review and acquiesce in the rules promulgated by regulatory bodies such as the State Election Board. O.C.G.A. § 50-13-4. The Prompt Notification Rule received final approval on February 28, 2020, and the General Assembly signaled its favorable acceptance of said rule by making *no* efforts to legislatively reject said rule prior to its final adjournment on June 26, 2020. The General Assembly took *no* action to reverse or modify the State Election Board's rule prior to the commencement, or during the pendency, of the 2020 election cycle, and Plaintiff fails to make any cognizable claim that the State Election Board's actions violate state law.

### 3. *Plaintiff's due process claim fails.*

Plaintiff's motion fails to articulate a discernable claim under the due process clause. It is unclear whether Plaintiff asserts a substantive or procedural due process claim, but neither is supported by the facts. First, Plaintiff fails to cite to any statutory process he claims party monitors were denied. Second, Plaintiff fails to show how State Defendants participated in any alleged denial of access by monitors to observe a process that was taking place at the county level. While the Secretary issued OEB

guidance instructing counties to allow party monitors to observe the audit process, to the extent any county failed to comply with this guidance, any legal claim should have been brought by the monitors or the affected political party against the county at the time of the alleged violation.

Moreover, Plaintiff's factual assertion that monitors were denied access is not supported by his evidence. For example, one would-be monitor appears to have simply misunderstood when she should arrive, and the other had good enough access to identify various perceived problems. (Doc 6-3 ¶¶ 6-11; 12 (noting that at one point "there were too many party monitors" such that county officials had to "[ask] the Republican watchers to gather and decide which 17 would be on the floor").)

The most that can be gleaned from Plaintiff's motion is that he believes *not enough* monitors were granted access. But a plaintiff challenging the constitutionality of a state election law must show that "the character and magnitude of the burden" imposed on the right to vote is greater than "the interests the State contends justify that burden." *Timmons v. Twin Cities Area New Party,* 520 U.S. 351, 358 (1997). Plaintiff fails to explain how limiting each party to 17 poll watchers is so burdensome that it outweighs a state's interest in an orderly environment for conducting a statewide audit.

**B. Plaintiff will suffer no irreparable harm if the Court denies his motion.**

Plaintiff's claim of irreparable harm borders on the delusional: if the Court denies his request to exclude all absentee ballots, "then Georgia's election results are improper and suspect, resulting in Georgia's electoral college votes going to Joseph R. Biden contrary to the votes of the majority of Georgia['s] qualified electors." (Doc. 6 at 22.) Of course, if a sufficient number of votes for the winning candidate are improperly excluded, the losing candidate will have a higher vote total. Such exclusion, however, frustrates the will of the electorate expressed through their lawfully cast ballot and is patently unconstitutional. Certifying the expressed will of the electorate is not irreparable harm, but rather inevitable and legally required within our constitutional framework. To the extent that the losing candidate—rather than a dissatisfied supporter—seeks post-certification remedies, both a recount and election contest are available under Georgia law. *See* O.C.G.A. §§ 21-2-495; 21-2-522.

**C. The Balance of Equities Weighs Heavily against Injunctive Relief.**

Courts in this district have considered the remaining two factors, balancing the equities and public interest, together in election cases. *See Curling v. Kemp*, 334 F. Supp. 3d 1303, 1326 (N.D. Ga. 2018). Both of these factors clearly weigh in favor of the State Defendants.

The State Defendants have a "strong interest in their ability to enforce state election law requirements." *Hunter v. Hamilton Cty. Bd. of Elections*, 635 F.3d 219, 244 (6th Cir. 2011). For this reason, the Supreme Court "has repeatedly emphasized that lower federal courts should ordinarily not alter the election rules on the eve of an election." *Republican Nat'l Comm. v. Democratic Nat'l Comm*., 140 S.Ct. 1205, 1207 (April 6, 2020) (per curiam) (citing *Purcell v. Gonzalez*, 549 U. S. 1 (2006)).

The Supreme Court and Eleventh Circuit have repeatedly stayed lower court injunctions that altered election rules once the 2020 general election cycle commenced. *See, e.g.*, *Andino v. Middleton*, No. 20A55, 592 U.S. __, 2020 WL 5887393, at *1 (Oct. 5, 2020) (Kavanaugh, J., concurring) ("By enjoining South Carolina's witness requirement shortly before the election, the District Court defied [the *Purcell*] principle and this Court's precedents." (citations omitted)); *Merrill v. People First of Ala.*, No. 19A1063, 591 U.S. __, 2020 WL 3604049, at *1 (July 2, 2020); *New Ga. Project v. Raffensperger*, No. 20-13360, 2020 U.S. App. LEXIS 31405, at *11-12 (11th Cir. Oct. 2, 2020) ("[W]e are not on the eve of the election— we are in the middle of it, with absentee ballots already printed and mailed. An injunction here would thus violate *Purcell*'s well-known caution against federal courts mandating new election rules—especially at the last minute.").

Here, an election *has already been conducted*, and Plaintiff seeks relief that, if fully granted, would result in wide-spread disenfranchisement. Any personal dissatisfaction by Plaintiff pales in comparison to the risk that the over 1.3 million Georgia voters who lawfully cast their absentee ballots in the general election would be disenfranchised if Plaintiff's requested relief were granted.

## IV. Laches Bars Plaintiff's Request for Post-Election Equitable Relief.

Plaintiff's inexcusable delay in bringing his claim also warrants denial of his motion. Laches bars a request for equitable relief when (1) the plaintiff delays in asserting the claim; (2) the delay is not excusable; and (3) the delay causes the non-moving party undue prejudice. *United States v. Barfield*, 396 F.3d 1144, 1150 (11th Cir. 2005). In the context of elections, "any claim against a state electoral procedure must be expressed expeditiously." *Fulani v. Hogsett*, 917 F.2d 1028, 1031 (7th Cir. 1990) (*citing Williams v. Rhodes*, 393 U.S. 23, 34-35 (1968)). As time passes, the state's interest in proceeding with the election increases in importance as resources are committed and irrevocable decisions are made. *Id.*

Where, as here, the challenge to an election procedure is not filed until *after* an election has already been conducted, the prejudice to the state and to the voters that have cast their votes in the election becomes particularly severe. Once the election has been conducted, any harm that might arise from a purported

constitutional violation must be weighed against "such countervailing equitable factors as the extremely disruptive effect of election invalidation and the havoc it wreaks upon local political continuity." *Soules v. Kauaians for Nukolii Campaign Committee*, 849 F.2d 1176, 1177 (9th Cir. 1988). For this reason, "if aggrieved parties, without adequate explanation, do not come forward before the election, they will be barred from the equitable relief of overturning the results of the election." *Id*. at 1180-81 (*citing Hendon v. North Carolina State Bd. of Elections*, 710 F.2d 177, 182-83 (4th Cir. 1983); *see also Curtin v. Va. State Bd. of Elections*, No. 1:20-cv-0546, 2020 U.S. Dist. LEXIS 98627, *16-17 (E.D. Va. May 29, 2020) (rejecting a similar challenge to state official guidance as barred by laches due to plaintiffs' failure to raise the challenge prior to the election).

Plaintiff offers no justification for his failure to bring his challenge to the Litigation Settlement prior to the election, so that a court could decide the validity of his claims in ample time to make any changes to the signature match validation process *before* elections officials began validating signatures on absentee ballot envelopes for the general election. Plaintiff's delay now poses the risk of substantial prejudice to the State and the members of the public who have cast *lawful* ballots in exercise of their constitutional rights. Election officials processed ballots in compliance with Georgia law, and voters who submitted those ballots did so with

the reasonable and legitimate expectation that their validly cast votes would be counted. Plaintiff's failure to raise this issue in a timely fashion therefore "created expectation interests that cannot lightly be discounted." *Lopez v. Hale County*, 797 F. Supp. 547, 550 (N.D. Tx. 1992).

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiff's emergency motion for injunctive relief must be denied.

Respectfully submitted, this 19th day of November, 2020.

CHRISTOPHER M. CARR    112505
Attorney General

BRYAN K. WEBB    743580
Deputy Attorney General

Russell D. Willard    760280
Senior Assistant Attorney General

/s/ *Charlene S. McGowan*
Charlene S. McGowan    697316
Assistant Attorney General
40 Capitol Square SW
Atlanta, GA 30334
cmcgowan@law.ga.gov
404-458-3658 (tel)

*Attorneys for State Defendants*

25

## **CERTIFICATE OF COMPLIANCE**

I hereby certify that the foregoing has been formatted using Times New Roman font in 14-point type in compliance with Local Rule 7.1(D).

/s/ *Charlene S. McGowan*
Charlene S. McGowan
Assistant Attorney General

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have this day electronically filed the foregoing **STATE DEFENDANTS' RESPONSE TO PLAINTIFF'S EMERGENCY MOTION FOR INJUNCTIVE RELIEF AND MEMORANDUM IN SUPPORT** with the Clerk of Court using the CM/ECF system, which will send notification of such filing to counsel for all parties of record via electronic notification.

Dated: November 19, 2020.

/s/ *Charlene S. McGowan*
Charlene S. McGowan
Assistant Attorney General

27