```
 1                    UNITED STATES DISTRICT COURT
               FOR THE NORTHERN DISTRICT OF GEORGIA
 2                        ATLANTA DIVISION

 3
      L. LIN WOOD, JR.                    )
 4                                        )    Docket Number
                          Plaintiff,      )    1:20-CV-4651-SDG
 5                                        )
                     v.                   )
 6                                        )    Atlanta, Georgia
      BRAD RAFFENSPERGER, in his          )    November 19, 2020
 7    Official Capacity as Secretary of   )
      State of the State of Georgia;      )
 8    REBECCA N. SULLIVAN, in her         )
      Capacity as Vice Chair of the       )
 9    Georgia State Election Board;       )
      DAVID J. WORLEY, in his Capacity    )
10    as a Member of the Georgia State    )
      Election Board; MATTHEW MASHBURN,   )
11    in his Official Capacity as a       )
      Member of the Georgia State         )
12    Election Board; ANH LE, in her      )
      Official Capacity as a Member of    )
13    the Georgia Election Board          )
                                          )
14                                        )
                          Defendants      )
15                                        )
                     v.                   )
16                                        )
      DEMOCRATIC PARTY OF GEORGIA, INC.,  )
17    Democratic Party of Georgia; DSCC;  )
      DCCC; GEORGIA STATE CONFERENCE OF   )
18    THE NAACP; GEORGIA COALITION FOR    )
      THE PEOPLES' AGENDA, INC.; HELEN    )
19    BUTLER; JAMES WOODALL; and MELVIN   )
      IVEY                                )
20                                        )
                  Intervenor Defendants   )
21

22

            TRANSCRIPT OF PLAINTIFF'S EMERGENCY MOTION FOR
23                   TEMPORARY RESTRAINING ORDER
             BEFORE THE HONORABLE STEVEN D. GRIMBERG
24                  UNITED STATES DISTRICT JUDGE

25
```

```
 1   APPEARANCES OF COUNSEL:

 2

     FOR PLAINTIFF:              MR. RAY STALLINGS SMITH, III
 3                               MS. EMILIE O. DENMARK
                                 SMITH & LISS
 4                               Suite 2600
                                 Five Concourse Parkway
 5                               Atlanta, Georgia 30328

 6

     FOR STATE DEFENDANTS:       MS. CHARLENE S. McGOWAN
 7                               MR. RUSSELL D. WILLARD
                                 GEORGIA ATTORNEY GENERAL'S OFFICE
 8                               40 Capitol Square Southwest
                                 Atlanta, Georgia 30334
 9


10

     FOR INTERVENOR DEMOCRATIC   MS. SUSAN P. COPPEDGE
11   PARTY OF GEORGIA:           MS. JOYCE GIST LEWIS
                                 MR. ADAM M. SPARKS
12                               MR. HALSEY G. KNAPP, JR.
                                 KREVOLIN & HORST
13                               One Atlantic Center
                                 1201 West Peachtree Street, NW
14                               Suite 3250
                                 Atlanta, Georgia 30309
15
                                 MR. KEVIN J. HAMILTON
16                               PERKINS COIE, LLP
                                 1201 Third Avenue
17                               Suite 4900
                                 Seattle, Washington 98101-3099
18
                                 MS. AMANDA R. CALLAIS
19                               PERKINS COIE - DC
                                 Suite 600
20                               700 Thirteenth Street, NW
                                 Washington, DC 20005-2011
21

22

23

24

25
```

```
 1

 2
      FOR INTERVENOR GEORGIA          MR. BRYAN L. SELLS
 3    STATE CONFERENCE OF THE         THE LAW OFFICE OF BRYAN L. SELLS
      NAACP; GEORGIA COALITION        P.O. Box 5493
 4    FOR THE PEOPLES' AGENDA,        1226 Springdale Road, NE
      INC.; HELEN BUTLER; JAMES       Atlanta, Georgia 31107-0493
 5    WOODALL; MELVIN IVEY:
                                      MR. JON M. GREENBAUM
 6                                    MS. JULIE M. HOUCK
                                      MR. JOHN M. POWERS
 7                                    MS. SUSAN BAKER MANNING
                                      LAWYERS' COMMITTEE FOR CIVIL
 8                                    RIGHTS UNDER LAW
                                      Suite 900
 9                                    1500 K Street, NW
                                      Washington, DC 20005
10
                                      MS. SUSAN BAKER MANNING
11                                    MORGAN, LEWIS & BROCKIUS
                                      1111 Pennsylvania Avenue, SW
12                                    Washington, DC 20004

13

14    OFFICIAL COURT REPORTER:       ALICIA B. BAGLEY, RMR, CRR

15
       Proceedings recorded by mechanical stenography, transcript
16                        produced by computer

17

18

19

20

21

22

23

24

25
```

1                          I   N   D   E   X

2

FOR THE PLAINTIFF:

3

4   SUSAN VOYLES

5           Direct Examination by Mr. Smith          26
            Cross-Examination by Ms. McGowan         36
6           Cross-Examination by Mr. Hamilton        42
            Redirect Examination by Mr. Smith        45

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>P R O C E E D I N G S</u>

1

2          (in Atlanta, Fulton County, Georgia; November 19, 2020;

3                    all parties appearing by Zoom)

4          THE COURT:  Let me call the case.  This is Lin Wood

5     v. Raffensperger.  Case Number 20-CV-4651.  If we can have

6     appearances of counsel beginning with the plaintiff.

7          MR. SMITH:  Yes, Your Honor.  Good afternoon.  Ray

8     Smith for plaintiff, Your Honor, along with Emilie Denmark, my

9     associate.

10          THE COURT:  Good afternoon.

11          And for Defendant Raffensperger.

12          MR. WILLARD:  Yes, Your Honor.  This is Russ Willard

13     from the Attorney General's Office.  I also have Charlene McGowan

14     from the Attorney General's Office on the call.

15          THE COURT:  All right.

16          MS. McGOWAN:  Good afternoon, Your Honor.

17          THE COURT:  Good afternoon.

18          I understand we also have counsel for Intervenor

19     Democratic Party of Georgia?

20          MS. COPPEDGE:  Yes, Judge.  Good afternoon.  This is

21     Susan Coppedge with Krevolin & Horst.  I have from my team Joyce

22     Gist Lewis, Adam Sparks, Halsey Knapp, and we also have with us

23     counsel from Perkins Coie, Kevin J. Hamilton and Amanda Callais.

24          THE COURT:  Good afternoon everyone.

25          MS. COPPEDGE:  Good afternoon, Judge.

1          THE COURT:  And finally we have, I believe, NAACP; is

2    that right?

3          MR. SELLS:  Yes, Your Honor.  This is Bryan Sells for

4    the NAACP defendant intervenors.  With me at counsel table are

5    Jon Greenbaum, Julie Houck, and John Powers from the Lawyers'

6    Committee for Civil Rights in the Law and Susan Baker Manning

7    from Morgan, Lewis.

8          THE COURT:  All right.  Good afternoon everyone.

9          We are here on plaintiff's emergency motion for a

10   temporary restraining order.  I have reviewed the motion and the

11   briefing on it, as well as the response from the Secretary of

12   State as well as the intervenors.

13         Mr. Smith, I will start with you.  How do you propose

14   to proceed?

15         MR. SMITH:  Your Honor, I have an opening argument

16   and I have one live witness and then a closing argument, Your

17   Honor.

18         THE COURT:  All right.  Okay.  Go ahead.

19         MR. SMITH:  Okay.  Good afternoon, Your Honor.  May

20   it please the Court.  My name is Ray Smith.  I represent the

21   plaintiff, L. Lin Wood, Junior, who is before this Court, as you

22   know, seeking a temporary restraining order to prohibit the

23   Georgia Secretary of State from certifying Georgia's November 3rd

24   election results.  The defendants include the Georgia Secretary

25   of State Brad Raffensperger and members of the Georgia State

1    Election Board in their official capacity.

2            My client alleges a violation of the equal protection

3    and due process clauses in the election of the presidency and

4    then the subsequent full hand recount.  As a result of these

5    constitutional violations, the results of the election are

6    tainted with impropriety, unfairness, and fraud.  This Court

7    should prohibit the defendants from certifying the election

8    results and should require a full hand recount of the ballots

9    where monitors have full and complete and meaningful access to

10   observe the entire process, including signature-match checking of

11   absentee ballots.  This will ensure that Georgia's reported and

12   certified election results are actually consistent with how the

13   citizen voters of the state voted so that the Georgia electoral

14   college votes are cast for the proper candidate, whether it be

15   President Donald J. Trump or Vice President Joe Biden.

16           We're seeking, Your Honor, a transparent, fair, and

17   open process.  We do not believe, from the evidence that we've

18   presented to the Court and will present today, that that process

19   has been fair and open.  As Your Honor's probably aware, there

20   were, in fact, four counties that we believe that did do the

21   right process - Walton, Douglas, Floyd, and Fayette County - but

22   there were a number of counties that did not do it the correct

23   way.

24           Very briefly let me summarize where the case

25   currently stands.  We filed this complaint on the 13th of this

1    month and it was amended on the 16th.  The complaint alleges

2    violations of the equal protection and due process clauses of the

3    Constitution of the United States, as well as violations of the

4    elector and election clauses of the United States Constitution.

5            As I mentioned, the plaintiff seeks declaratory

6    injunctive relief to ensure that Georgia's general election is

7    fair and unbiased.  We filed this emergency motion on Tuesday

8    which was amended twice to correct the exhibits to the motion.

9    Thus far three motions to intervene have been filed by the

10   Democratic Party of Georgia, its affiliated entities, the Georgia

11   NAACP and the Georgia Coalition for Peoples' Agenda.

12           The Georgia Election Code establishes a clear and

13   efficient process for counties to use in the handling of absentee

14   ballots in this state.  O.C.G.A. Section 21-2-386, Subsection

15   (a)(1)(B), as in boy, requires county officials to write on the

16   envelope of an absentee ballot when that ballot was received,

17   compare the identifying information on the ballot with the

18   voter's information on file, compare the voter's signature on the

19   ballot envelope with the signature on file, and if the signature

20   appears to match and the identifying information appears correct,

21   certify that absentee ballot.

22           Further, O.C.G.A. 21-2-386, Subsection (a)(1)(C), as

23   in cat, establishes how defective absentee ballots must be

24   handled.  If, one, the voter's oath on the ballot envelope wasn't

25   signed or, two, the signature on the ballot doesn't appear to be

1    valid or if there's a problem with the voter's identifying

2    information the election worker is required to write "rejected"

3    on the ballot envelope and the reason for the rejection.  Then

4    the county official has to notify the voter of that rejection.

5    These are statutory mandates, Your Honor, required by the Georgia

6    General Assembly to be followed in processing defective absentee

7    ballots.

8              In 2019, the democratic party in the state sued the

9    Secretary of State in this court and as a result of that suit the

10   democratic party and Secretary Raffensperger, who's a defendant

11   here, and the State Election Board entered a compromised

12   settlement agreement and relief which I'll refer to as the

13   litigation settlement.  The litigation settlement is short, it's

14   only six pages, Your Honor, and a copy is attached to our

15   complaint, amended complaint and TRO motion as Exhibit A.

16             The implications of the litigation settlement are

17   really what is at issue in this case.  Under Paragraph 3

18   Secretary Raffensperger changed the statutory procedure for

19   handling defective absentee ballots set out in 21-2-386(a)(1)(C).

20   Under that settlement in processing absentee ballots if a county

21   official or election worker determines that the voter's signature

22   on the ballot envelope doesn't match the voter's signature on

23   file the election worker then must form a three-person committee

24   to do a triple check of the ballot prior to rejecting.  If two of

25   the three election workers agree that the signature on the ballot

1   envelope doesn't match the signature on file, only then can the

2   ballot be rejected.  That procedure is obviously inconsistent

3   with the procedure prescribed by the Georgia General Assembly in

4   21-2-386.

5        Under Paragraph 4 of the litigation settlement

6   Secretary Raffensperger and the State Election Board agreed to,

7   quote, "Consider in good faith providing county registrars and

8   absentee-ballot clerks with additional guidance and training

9   materials to follow when comparing voters' signatures that will

10  be drafted by the Political Party Committees' handwriting and

11  signature review expert."  Well, Your Honor, that's a problem

12  because allowing a single political party to write the rules and

13  guidance of signature reviews isn't conducive to a fair election

14  and violates the Constitution of the United States.

15       The Constitution requires each state legislature

16  prescribe a manner of holding elections for federal office in

17  Article I, Section 4, Clause 1.  So regulations of presidential

18  elections, quote, "Must be in accordance with the method which

19  the State's prescribed for legislative enactments," and that's

20  the *Smiley vs. Holm* case, it's a U.S. Supreme Court case, 285 US

21  355, which is cited in our brief.

22       Although the defendants are authorized to promulgate

23  rules and regulations that are, quote, "conducive to the fair,

24  legal, and orderly conduct of primaries and elections," all of

25  those rules and regulations must be, quote, "consistent with

1   law," end of quote under 21-2-31, Subsection 2 of the Georgia

2   Code.

3           By entering into this litigation settlement, Your

4   Honor, defendants agreed to change the statutorily prescribed

5   manner of handling defective absentee ballots in a way that's

6   inconsistent with and contrary to the Georgia Election Code

7   enacted by the Georgia General Assembly, Your Honor.  The

8   defendants acted outside of their authority and contrary to

9   Georgia law and the United States Constitution by entering into

10  the litigation settlement and requiring county officials to

11  comply with its terms.  The implications of the litigation

12  settlement and the change in handling defective absentee ballots

13  have become very evident with the November 3rd general election

14  votes.

15          Georgia, like every state in this country, had an

16  unprecedented number of mail-in absentee ballots as a result of

17  the Covid-19 pandemic.  The Secretary of State launched a

18  BallotTrax program to allow electors to track the progress of the

19  processing of these ballots.  On top of having to process a

20  massive number of absentee ballots, county officials were under

21  further pressure to process these absentee ballots quickly so

22  they wouldn't be perceived as, quote, "falling behind as the

23  public views BallotTrax."  So the county officials were under

24  tremendous pressure in processing these absentee ballots.

25          Then with the requirements of this litigation

1    settlement the county officials were to form a three-person

2    committee to review every defective absentee ballot before it

3    could be rejected.  But there was no incentive for election

4    workers to spend additional time to conduct this triple check

5    that they had come up with for each defective ballot which

6    lengthened the time spent to review each defective ballot and

7    make the review more complex.  The result, Your Honor, was that

8    signature matching for absentee ballots simply wasn't done or

9    done improperly creating the opportunity for improper absentee

10   ballots to be passed in the presidential election.

11            It's no secret, Your Honor, that the possibility of

12   voter fraud increases with the rise in use of absentee-ballot

13   voting.  Back in October of 2012, Your Honor, the *New York Times*

14   published an article by Adam Liptak reporting the problems with

15   absentee-ballot voting, including the increase risk of fraud.

16   Quote, "There is a bipartisan consensus that voting by mail,

17   whatever its impact, is more easily abused than other forms," end

18   of quote.

19            In 2005, Your Honor, a report issued by the

20   Commission on Federal Election Reforms and signed by President

21   Jimmy Carter of this state, Your Honor, and James A. Baker, a

22   distinguished statesman, Your Honor, concluded, quote, "Absentee

23   ballots remain the largest source of potential voter fraud," end

24   of quote.

25            As Justin Levitt, a professor at Loyola Law School,

1   told the Senate Judiciary Committee of the United States,

2   "Efforts to prevent fraud at polling places ironically," quote,

3   "drive more voters into the absentee system, where fraud and

4   coercion have been documented to be a real and legitimate

5   concern," end of quote.  "That is, a law ostensibly designed to

6   reduce the incidence of fraud is likely to increase the rate at

7   which voters utilizing a system known to succumb to fraud more

8   frequently."  That quote is precisely, Your Honor, the concern at

9   issue here.

10         The litigation settlement entered by the defendants -

11  without authority, Your Honor - create a more cumbersome and

12  complex system for defective absentee ballots making it less

13  likely that county officials properly conduct signature matching

14  and making it easier for fraudulent or improper absentee ballots

15  to be included in the election results.

16         Even the democratic party of the state, Your Honor,

17  acknowledged that absentee ballot voting by mail is a, quote,

18  "area in which fraud is known to exist," and they quoted that in

19  the *Democratic Party of Georgia, Inc. v. Perdue* case back in

20  2009.

21         I'll get into the proof that supports the conclusion

22  that Georgia's also defective absentee-ballot procedure is

23  impacting Georgia's presidential election results later as

24  there's another major issue essential to my client's claim for

25  redress.  The so-called hand recount, Your Honor.

1    THE COURT:  Mr. Smith, before we turn to the recount

2  issue, let's tackle a few obstacles with regard to your challenge

3  to the settlement agreement.  First, what is your client's

4  standing to bring this claim?

5    MR. SMITH:  Your Honor, courts have recognized

6  standing to ensure an accurate count and only lawful ballots are

7  counted.  In the *Roe vs. Alabama* case, Your Honor, which is an

8  Eleventh Circuit case, 43 F.3d 574, at issue was a TRO entered by

9  a state trial court that altered -- that changed the practice for

10  when absentee ballots were to be rejected.  Under the Alabama

11  code absentee ballots were rejected if they weren't notarized or

12  signed by two witnesses.  The trial court's TRO stated the

13  ballots could not be excluded from the count because of the lack

14  of notarization and lack of witnesses.

15    The plaintiffs were individual voters like my client

16  and the State argued that these individuals failed to allege the

17  violation of the rights secured by the Constitution as required

18  by 42 USC 1983.  The Eleventh Circuit stated, quote, "If the

19  election process itself reaches the point of patent and

20  fundamental unfairness, a violation of the due process clause may

21  be indicated and relief under 1983."  Therefore, to address,

22  then, whether the plaintiffs have demonstrated fundamental

23  unfairness in the November 8th election, we conclude that they

24  have.

25    The test for Article II standing, Your Honor, is

1   whether the plaintiff has shown an injury-in-fact causation to

2   redressability.  Here my client is directly impacted as a

3   qualified elector in the state of Georgia by the manner in which

4   the votes count and how the count was conducted.  Failing to

5   conduct identification checks throughout signature matches on the

6   absentee ballots, or votes, dilutes Mr. Wood's vote that he cast

7   in person, just as failing to properly count the vote correctly

8   in a monitored hand count dilutes Mr. Wood's vote cast in this

9   election.

10          Further, Your Honor, in *Arcia*, A-R-C-I-A, *vs. Florida*

11  *Secretary of State*, that's another Eleventh Circuit case in 2014,

12  Your Honor, that's 772 F.3d 1334.  The Court noted that anyone

13  directly injured by the administration of the election has

14  standing.

15          Also, Your Honor, Secretary Raffensperger and the

16  State Election Board responsible for uniform election practice in

17  Georgia under 21-2-31 under the Georgia Code the defendants have

18  significant authority to train election officials and set

19  election standards.  Under 21-2-50, Subsection D, thus, the

20  defendants have the ability to fully redress plaintiff's injuries

21  statewide.  Accordingly, Your Honor, the individual voter

22  plaintiffs have standing.  And that was in the *New Georgia*

23  *Project vs. Raffensperger* case which was in this court, a 2020 US

24  District Lexis case, Northern District of Georgia, which was

25  plead August 31st of this year.

```
1              THE COURT:  So your position is that any individual
2    voter could bring this claim?
3              MR. SMITH:  Yes, Your Honor.
4              THE COURT:  Under a voter-dilution theory?
5              MR. SMITH:  That's correct.
6              THE COURT:  All right.  And what is the emergency
7    nature of this challenge to the settlement agreement?
8              MR. SMITH:  The emergency nature, Your Honor, is
9    because the count is about to be certified and we have a -- you
10   know, we have a deadline coming up of a -- they need to redo the
11   count the right way, Your Honor, the hand count the right way and
12   so that at the minimum they can get it to the safe harbor on
13   December 8th for the electoral college.
14             THE COURT:  If this settlement agreement was entered
15   over eight months ago there's been, I believe, at least three
16   elections that have occurred pursuant to the terms of this
17   settlement agreement.  What caused this emergency on behalf of
18   your client to bring this motion this week?
19             MR. SMITH:  Well, Your Honor, because we've got the--
20   again, the hand -- we amended our complaint to add the hand
21   recount which was done improperly on top of the --
22             THE COURT:  I understand, Mr. Smith.  That's a
23   different issue, we'll get to that.  I'm asking with regard to
24   the challenge to the settlement agreement, why wasn't this claim
25   brought -- excuse me.  Why wasn't this claim brought sooner?
```

1          MR. SMITH:  It wasn't ripe until after the election.

2     We didn't see the full effect of what happened.  It was not ripe

3     until after the election, Your Honor, after we saw the direct

4     effect of it and the direct impact of this.

5          THE COURT:  Maybe I misunderstand the nature of the

6     challenge.  I thought the challenge was to the authority of the

7     Secretary of State to promulgate a rule that in your view is one

8     that can only be passed by the legislature which seems to be a

9     procedural challenge that has nothing to do with the actual

10    impact or effect it has on a particular election.  It seems to be

11    one of whether the Secretary of State had the authority.  So it

12    seems to me that that challenge could have been brought the day

13    after the settlement agreement was entered over eight months ago.

14         MR. SMITH:  Well, Your Honor, again, I think that the

15    impact of -- I don't think anybody could see the full impact of

16    it because we're in a situation with Covid of seeing the direct

17    impact of these, you know, 1.3 million absentee ballots.  No one

18    foresaw what sort of an impact that would have on it.

19         THE COURT:  What evidence do you have that this

20    settlement agreement has had an impact on the election?

21         MR. SMITH:  Well, Your Honor, it was -- it has

22    impacted the fact that they have not been able to properly - they

23    have not been able to properly and timely review the absentee

24    ballots.  We had a - we had a real procedure prior to this that

25    seemed to work and then the democrats challenged it, they came up

```
1   with this consent order, but I don't think anybody foresaw the
2   number -- the total number of ballots that were going to be
3   overwhelming in this election and it caused extreme -- the
4   numbers in the declaration, Your Honor, it went -- there was a
5   huge, huge increase in the number of absentee ballots.  It went
6   from, you know, several hundred thousand to 1.3 million -- almost
7   1.3 million.
8              THE COURT:  I understand that there's an increase in
9   the number of absentee ballots, but that's not what the
10  settlement --  Mr. Smith.  Mr. Smith.  Mr. Smith, hold on.
11             MR. SMITH:  I'm sorry.
12             THE COURT:  My question is:  The settlement agreement
13  relates to a process for reviewing signature matching.
14             MR. SMITH:  Right.
15             THE COURT:  So what evidence do you have that that
16  process was overwhelmed by the number of absentee ballots?
17             MR. SMITH:  Well, they were trying -- instead of
18  doing the -- they came up with a three-person committee, Your
19  Honor, and there was no way they could do this three-person
20  committee and get through all these ballots in a timely fashion
21  and so essentially these large counties just rushed through and
22  just rammed through the ballots in an improper way, Your Honor.
23             THE COURT:  I understand that that's your argument,
24  sir.  What is your evidence?
25             MR. SMITH:  Our evidence, Your Honor, is the
```

1   affidavits that we presented to the Court.

2          THE COURT:  Which affidavit demonstrates that this

3   three-person signature-matching process was overwhelmed?

4          MR. SMITH:  Well, we have Ms. Voyles here live and in

5   person, for one.

6          THE COURT:  Okay.  All right.  Let's turn to the hand

7   recount.

8          MR. SMITH:  Okay.  Your Honor, we all know that

9   Georgia tallies for the president are incredibly close.

10  Secretary Raffensperger reported on the Secretary website that at

11  the time that we filed our lawsuit that there was a difference of

12  about 14,000 votes between President Trump and Vice President

13  Biden.

14          Secretary Raffensperger announced there would be a

15  full hand recount of the election results with the recount having

16  concluded yesterday.  The Georgia Election Code provides for a

17  recount, allows both political parties to have monitors present

18  during the recount.  Secretary Raffensperger announced, quote,

19  "The designated monitors will be given complete access to the

20  entire process from the beginning."  He stated that designated

21  monitors will be able to watch the recount while standing close

22  to the election workers conducting the recount.  The reason, of

23  course, is to keep the recount open to the public, Your Honor,

24  and the media and to ensure that this recount is conducted fairly

25  and securely.

1           However, he knew while the recount was occurring that

2    monitors were being denied meaningful access to observe the

3    entire recount process.  Attached to our motion, Your Honor, are

4    numerous affidavits of election workers and volunteer monitors

5    reporting that they were denied the ability to be present for the

6    entire process.  And when they were allowed to be present they

7    frequently were denied the ability to observe the recount up

8    close.

9           When these -- in fact, I would even say that there

10   was one county, Your Honor, where the observer stood up.  He saw

11   a lot of cars in the parking lot.  Asked where the recount was

12   going on.  Was told there was nothing going on.  He heard people

13   down the hall.  He asked again.  They said nothing is going on

14   here.  He barged on down the hall, opened the door, and they're

15   in there recounting.

16          When these individuals saw irregularities in the

17   recount process and tried to draw attention to these problems,

18   they were ignored or even ejected from the recount, Your Honor.

19   They observed inconsistencies in the security of the ballots and

20   voting equipment that caused real concern about the validity of

21   the recount.

22          Your Honor, the International Institute of Democracy

23   and Electoral Systems issued a publication in 2002 called the

24   "International Electoral Standards:  Guidelines for Reviewing the

25   Legal Framework of Elections."  The purpose of the international

1    IDEA standard system uses benchmarks to asses whether or not an
2    election is free and fair.  Internationally universally
3    recognized election integrity standards require the presence of
4    observers in the processing of ballots as, quote, "A necessary
5    safeguard of the integrity and transparency of the election," end
6    quote.  Indeed, "The legal framework must contain a provision for
7    representatives nominated by parties and candidates contesting
8    the election to observe all voting processes," end of quote.
9    "Critically, any recount must employ a consistency of methodology
10   of all ballots recounted," end of quote, and must provide, quote,
11   "for participation of opposing parties to observe and challenge
12   the interpretation of a voter's intent," end of quote.  Neither
13   occurred here in this manual recount, Your Honor.
14            What's more, Secretary Raffensperger stated that this
15   would be a full hand recount, Your Honor, as well as an audit of
16   the vote and recount.  That wasn't done.  The Georgia Election
17   Code, Your Honor, sets forth procedures for a recount, an audit
18   and re-canvassing in 21-2-493 and 495.  But the sworn statements
19   of these election workers, Your Honor, that we presented and
20   volunteer monitors evidence that those procedures weren't
21   followed, that's obviously a problem because when a state
22   election uses an election procedure it is bound by its own laws
23   governing the procedure, Your Honor.
24            Secretary Raffensperger really only conducted a,
25   quote, "risk-limiting audit," Your Honor, that is governed by

1    21-2-498 under the Georgia Code.  It appears that the scope of

2    the audit was simply a test of the tabulation system which does

3    not constitute a specifically accurate estimate, Your Honor.  An

4    audit also should take into consideration other facts related to

5    absentee ballots, including a full reconciliation of the number

6    of ballots printed and received by mail, as well as a full count

7    of the signature envelopes of the ballots received.

8            Also, to conduct a full audit, Your Honor, absentee

9    ballots and envelopes should be examined as to the weight of the

10   ballots, envelopes, brightness of the ballots and envelopes, and

11   the fold marks on the ballots, Your Honor.  These are all means

12   of verifying absentee ballots are not fraudulent and would help

13   ensure that a risk-limiting audit is sufficient to ensure that

14   statistical probability described in 21-2-498(d) is met.

15           When Secretary Raffensperger decided to use the

16   D-Suite system, Your Honor, for Georgia's new voting system he

17   stated, quote, "The State can make scanned images of all ballots

18   cast in statewide elections available allowing anyone to do a

19   ballot count to check the accuracy of the results."  In other

20   words, Your Honor, you can take pictures of these ballots and put

21   them on the internet and anyone in the whole world could look at

22   this and we'd have a totally transparent system.

23           But the defendants haven't published their scanned

24   images of the ballots so the recount has been done improperly and

25   the defendants haven't provided another means for the public to

1    confirm that Georgia votes were tabulated correctly.  The outcome

2    of the defendants' failure to properly conduct a hand recount and

3    the unauthorized changes to the process for handling defective

4    absentee ballots is an election result that is tainted with

5    fraud, irregularities, and constitutional violations.

6              I'll discuss our constitutional arguments later, Your

7    Honor, but I'd like to call my first witness, our one live

8    witness, Your Honor, here to testify, Ms. Susan Voyles.

9              MS. McGOWAN:  Your Honor --

10             THE COURT:  Hold on.

11             Before we do that, Mr. Smith, is the standing

12   argument with regard to the recount essentially the same, that

13   Mr. Wood as an individual voter has standing?

14             MR. SMITH:  That's correct, Your Honor.  That's

15   correct, Your Honor.

16             THE COURT:  And that is based on, you said, *Roe v.*

17   *Alabama?*

18             MR. SMITH:  That's correct.  *Roe v. Alabama* and *Arcia*

19   *vs. Florida Secretary of State* case.

20             THE COURT:  Okay.  And what is the constitutional

21   claim that he's bringing based on the recount?

22             MR. SMITH:  Due process, Your Honor.

23             THE COURT:  Procedural due process or substantive due

24   process?

25             MR. SMITH:  Both, Your Honor.

```
 1                THE COURT:  Both?

 2                MR. SMITH:  Yes, Your Honor.

 3                THE COURT:  Okay.  Can you explain what due process

 4    violation has occurred?  Does he have a constitutional right to

 5    have an election monitored -- or a recount monitored?

 6                MR. SMITH:  A transparent election, Your Honor, and a

 7    right to recount.

 8                THE COURT:  He has a constitutional right to a

 9    recount?

10                MR. SMITH:  He has a right to a fair and open

11    election, yes, Your Honor.

12                THE COURT:  And what authority is there for that?

13                MR. SMITH:  Excuse me?

14                THE COURT:  What authority are you relying on for

15    that?

16                MR. SMITH:  *Baker vs. Carr*, Your Honor.

17                THE COURT:  Okay.  All right.  I'll hear from the

18    Secretary of State's counsel.  Do you wish to make an opening

19    statement?

20                MS. McGOWAN:  Your Honor, I believe we'll reserve our

21    argument.  I just wanted to raise a housekeeping issue that we

22    have evidentiary objections to Ms. Voyles' testimony to the

23    extent that it goes beyond the scope of the complaint.  I want to

24    know how Your Honor wants to handle those objections.

25                THE COURT:  All right.  Obviously, if you have an
```

```
 1   objection to the testimony, I'll hear that now.  If it is an

 2   objection to the declarations or other evidence that's been

 3   submitted, we can take that up later.

 4           MS. McGOWAN:  Okay.  We do have an objection to her

 5   testimony to the extent it goes beyond the scope of the

 6   complaint.  The complaint is limited to two central factual

 7   allegations with regard to the absentee ballot

 8   signature-verification process and as to the party monitors and

 9   whether or not they were improperly denied access to the audit.

10   Ms. Voyles' affidavit that was submitted in support of their

11   motion does not address either one of these issues and so to the

12   extent that she's going to testify about those topics here today,

13   we would object to that as being irrelevant and outside the

14   scope.

15           THE COURT:  All right.  Well, that sounds like an

16   objection to the declaration and perhaps we can take that up

17   later in conjunction with the others.  Let's hear the testimony

18   and object -- you should object on a question-by-question or

19   subtopic-by-topic basis; all right?

20           MS. McGOWAN:  All right.  Thank you.

21           THE COURT:  Mr. Smith, go ahead.

22           Ms. Holland, if you can please swear in the witness.

23           THE CLERK:  Ma'am, could you please raise your right

24   hand.

25                   (the witness was sworn)
```

1                          DIRECT EXAMINATION

2    BY MR. SMITH:

3    Q.    Ms. Voyles, would you state your name for the record,

4    please.

5    A.    My full name is Susan Foster Voyles and I live in Sandy

6    Springs, Georgia.

7    Q.    And what county is that?

8    A.    It is in Fulton County.

9    Q.    And what do you do for a living?

10   A.    I'm a policy analyst and I also have many volunteer things

11   that I do.

12   Q.    Tell me about your role as an election worker in

13   Georgia.

14   A.    I have been a poll manager for over 20 years in Georgia

15   ordinarily at the location of (inaudible).  In the last six

16   years we've moved around a little bit.

17                    (off-the-record discussion)

18              THE COURT:  Mr. Smith, we're having trouble hearing

19   her.  Can you place a microphone closer to the witness?

20              MR. SMITH:  Okay.  Can you hear her now, Your Honor?

21   BY MR. SMITH:

22   Q.    Where do you live?

23   A.    Sandy Springs, Georgia.  Fulton County.

24              THE WITNESS:  Is that better?

25              THE COURT:  That's much better, yes.  Thank you.

SUSAN VOYLES - DIRECT EXAMINATION BY MR. SMITH          27

1   BY MR. SMITH:

2   Q.   Would you tell the Court where your precinct is where

3   you've been a poll manager.

4   A.   The location is SSO2 A and B in Sandy Springs.

5   Q.   And how are you aware of the recount that was performed

6   in Georgia?

7   A.   On Friday afternoon approximately 1:30 I received an email

8   from my supervisor from Fulton election.  Her name's Marie

9   Wright.  I've known her as a supervisor probably at least a

10  decade.  She was sending out an alert to see if poll managers

11  and their assistants could come in and do a hand recount.

12  Q.   Okay.  And so tell me about the procedure.  What

13  happened?

14  A.   I emailed her that I could.  We were notified that we

15  needed to be there Saturday through Wednesday.  We need to

16  commit to all days from 7:00 a.m. until 5:00 p.m.  If we could

17  not commit to the entire time, we were asked not to come at all.

18  So I committed to that.  We went down early Saturday morning and

19  we were there prior to 7:00 o'clock.  We signed in.  When we

20  signed in, there was a corresponding number next to our name and

21  that was to be the table at which we were going to sit.

22  Q.   Okay.  Where did this recount take place?

23  A.   It took place at the Georgia World Congress Center.

24  Q.   All right.  And did you receive training for the

25  recount?

1    A.    Somewhat.  There was a small video about 5 minutes long.

2    There was no audio.  There were some captions to the video.  I

3    had plenty of time so I watched it three times and it just gave

4    a visual as to how we were to count the ballots and

5    instructions, of course, that were in the closed caption gave us

6    that procedure.  There were no procedures if we saw any

7    irregularities or had serious concerns.

8              MS. McGOWAN:  Your Honor, this is where the State

9    would object.  This testimony is outside the scope of plaintiff's

10   pleadings.  There were no allegations in the amended complaint

11   regarding the process by which the audit was conducted.  It was

12   solely related to whether party observers had access.

13             THE COURT:  All right.  I'll overrule the objection

14   for now.

15   BY MR. SMITH:

16   Q.    All right.  Did you receive any information or standards

17   on how to interpret spoiled ballots or other ballot

18   discrepancies?

19   A.    No.

20   Q.    Okay.  Describe what you did after watching the training

21   video.

22   A.    They were still putting tables into the room and it was

23   about 9:45 before I received my table so I was talking to

24   another poll worker that I had known from -- I don't know the

25   poll number, but it was a Fulton County poll center.

SUSAN VOYLES - DIRECT EXAMINATION BY MR. SMITH        29

1    Q.    Tell me what was the further process of what happened.

2    A.    Once we got to our table?

3    Q.    Yes.

4    A.    When we were finally given our table -- it was three

5    conference-type tables put together, the same ones that you

6    would have for -- you know, if you were in a meeting and you

7    needed to write.  At the table -- the third table that was up

8    above had "Trump," "Biden," "Jorgensen," "write-in," and then

9    "blank," and they were just large, computer-generated pieces of

10   paper.  There was a corrugated box already sitting on our table.

11   The corrugated box did have the Secretary of State's seal

12   (inaudible).

13                THE REPORTER:  I'm sorry.  I can't hear.

14                THE COURT:  Mr. Smith, we need to repeat that last

15   answer, we couldn't hear that.

16   BY MR. SMITH:

17   Q.    Okay.  Can you repeat that answer, please.

18   A.    I'd be happy to.

19                Once we got to our table we had an additional table

20   in front of us where it had the names of "Trump," "Biden,"

21   "Jorgensen," "blank," and -- I'm sorry, "write-in" and then

22   "blank" ballots and that's where -- after we'd done our count,

23   that's where we would put the ballots.

24                The corrugated box that I received was taped shut and

25   it had the Secretary seal on top of the box.  The seal was

1    unsigned and very lightly attached.  It's typical whenever we

2    open something that has been resealed in our poll work that we do

3    reseal it with the Secretary's seal and sign our name to the

4    seal, but this had no signature on it.

5            We opened our box.  We had the help of somebody with

6    box cutters because it was taped rather securely.  Inside our box

7    were absentee-style ballots and we had approximately 700 to 800

8    ballots that were stored in batches.

9    Q.   All right.  Then what happened?  Walk me through what

10   happened after that.

11   A.   We would check out batch after batch and we would begin the

12   counting process and what we would do is -- the woman with me,

13   her name was Barbara, she would pick up a ballot -- well, first

14   I would take them all out and I would hand her the entire batch

15   and I'd take the white sheet of paper off that was the tally

16   that came with those ballots.  We were then given an orange

17   sheet to put our tally to make sure they corresponded.

18           Barbara would take from the stack the entire ballots.

19   She would pick up one ballot, she'd bring it to me - we were only

20   doing the president and that was our only assignment - and she

21   would say, for example, "Joseph R. Biden."  She would hand me

22   that same ballot.  I would make sure that I looked at it

23   carefully and saw that it said "Joseph R. Biden" and if that was

24   indeed the case I would place that up above and we'd continue

25   with the other candidates (inaudible) until we started through

1    that smaller batch within the big box.

2    Q.   How long did that continue?

3    A.   I think our first batch probably took us about -- probably

4    about two and a half hours, the complete entire batch.  Box, I'm

5    sorry.  The batch did not take that long.

6    Q.   What did the ballots look like?

7    A.   They look like the ballots -- they're the long white

8    ballots that we get that have separate computer marking on the

9    side.  They have -- it started out with the candidate's name at

10   the top.  Well, at the very top it has the purpose of the ballot

11   which was absentee and provisional.

12            Then underneath that it had every office that there

13   was.  On the left-hand side it was the president and then the

14   senate candidates for David Perdue's seat.  There was a very long

15   column that had all the senate candidates for Johnny Isakson's

16   seat currently held by Kelly Loeffler and then it had -- if I

17   recall, it had the (inaudible) next on the right-hand side.  The

18   other side also continued with other officers and --

19   Q.   What was the texture about?  Was there anything unusual

20   about any of the ballots?

21   A.   Most of the ballots looked like typical absentee ballots

22   that I had seen before where the edges were kind of worn.

23   Paper, you could tell people had put their hands on the paper.

24   It maybe even had a little tear.  You could tell if they had

25   been folded and put into an envelope.  But there was a

1   particular batch that stood out to me.

2   Q.   And why did they stand out to you?

3   A.   This particular batch was very pristine, very white.  All

4   the bubble marks looked uniform like -- I was just amazed.  And

5   even the feel -- I remember rubbing my hands going up and down

6   on this because the feel of the paper was different.  When

7   you've handled absentee or provisional ballots for over 20 years

8   you have -- it would just be like, you know, anything else that

9   you're accustomed to handling and these felt very different.

10  But it was stark white ballots, it was the consistent markings

11  of the ballots.  I remember everything about that batch.  I even

12  remember one that looked as though it had been put in a copy

13  machine too fast, to be honest with you, or a scanner because it

14  was kind of -- it was not perfectly printed.  It was a little

15  bit askew.

16  Q.   Was there anything else different about that batch of

17  ballots?

18  A.   That batch of ballots contained 97 votes -- there was 100

19  ballots, 97 votes for Joseph R. Biden, 1 vote for Jorgensen, and

20  2 votes for Trump.  That was very unusual.

21  Q.   And when did the counting end on Saturday?

22  A.   On Saturday we were done somewhere between 4:30 and 4:45.

23  Q.   Okay.  And were you told to come back?

24  A.   We were told to see us first thing in the morning so we did

25  come back Sunday morning.  We arrived about 6:45.

1    Q.    Okay.  And then what happened?

2    A.    We were amazed when we first walked in in the morning

3    because the previous morning there had been a line through the

4    halls at the World Congress Center.  This morning we walked in,

5    we didn't even sign in.  One person just sort of waved at us and

6    said you can go to your previous table, but this time there were

7    no ballots at the table.  We had been told the previous day that

8    we would be there until at least Monday afternoon or evening

9    because there were so many ballots -- there were so many ballots

10   in the warehouse.  So on Sunday when we walked in and saw so few

11   people there that was rather surprising to us.

12           We went to our table, held up our little card before

13   7:00 o'clock so that we could indicate that we would like to have

14   some ballots and there was a table in front of us with two

15   counters and a table behind us with two counters.  By "counters"

16   I mean two people counting, I'm sorry.  They were there and they

17   got their ballot boxes prior to us.  Their ballot boxes, the

18   girls behind us had at least 3,000 ballots in their box.  Seeing

19   what they received and it appearing that they had 3,000

20   (inaudible) there was an accounting of how many ballots were in

21   there, that's how (inaudible).

22           THE REPORTER:  I can't hear her.  She's too soft.

23           THE COURT:  Mr. Smith, I need her to repeat that

24   again.  Is there any way to improve the mic?  It keeps going in

25   and out.

1          THE WITNESS:  How about this?  Is that better?

2          THE COURT:  About the same.  All right.  Just speak

3  as loud as you can, ma'am.

4          MR. SMITH:  Speak as loud as you can.

5          THE WITNESS:  All right.

6          MR. SMITH:  Your voice kind of falls off at times.

7          THE WITNESS:  From what part?

8  BY MR. SMITH:

9  Q.   Talk about the ballots and how many ballots you had

10  versus how many ballots the people behind you had.

11  A.   The counters in front of us and the counters behind us had

12  at least 3,000 ballots in their ballot boxes.  We were still

13  waiting on ours even though we arrived about 15, 20 minutes

14  before the other counters got there.  They received their ballot

15  boxes before we got ours.  We were still waiting on ours.

16  Finally 45 minutes later we got our ballot box.

17          I had the gentleman who brought me the box break the

18  seal.  And we had told numerous people, we weren't just holding

19  up our checkmark, because there really wasn't anything -- there

20  were very few counters in there.  Anyway, I had him break the

21  seal on my ballot box.  I went to look inside and was amazed we

22  had one batch and that batch included 60 ballots from the Quality

23  Living Center in southwest Atlanta, I believe.

24  Q.   Okay.  And after that box what happened?

25  A.   Well, that box -- those were all from the DMV so they were

1    all pretty much the same.  However, there again, we were very

2    amazed at the fact that those were -- there were 2 ballots for

3    Trump and 58 ballots for Biden.

4    Q.   Were you then told to go home after that?

5    A.   We waited probably about another 30 minutes for another box

6    and when one never came, then an election official came by and

7    she told us "Thank you very much for your service.  You can go

8    home."  It was shortly after 10:00 o'clock.

9    Q.   10:00 o'clock in the morning?

10   A.   In the morning, yes.

11   Q.   But you weren't finished; were you?  Or they weren't

12   finished; were they?

13   A.   They were not finished.  They had other ballots.  They had

14   other boxes.  We also had offered to help either of the other

15   two candidates -- you see, these ballots were separated by the

16   batches within the box which would make it easily able for

17   somebody to go and assist with the counting if you took one of

18   the batches out of there and then return that to the counting

19   file.

20   Q.   Were the other people counting as teams or were they

21   counting individually?

22   A.   Well, I will say that the gals behind us were counting as a

23   team.  However, the gals in front of us were not.  They were

24   counting individually and were not even in close proximity to

25   each other at the table.

1          MR. SMITH:  No further questions of her at this time,

2    Your Honor.

3          THE COURT:  All right.  Thank you.

4          Any cross-examination by the Secretary of State?

5          MS. McGOWAN:  Yes, Your Honor.  And before I begin, I

6    would like to renew our objection to her testimony.  Pretty much

7    all of her testimony is outside the scope of the amended

8    complaint, but I would like to question the witness.

9          THE COURT:  All right.  That objection's overruled.

10   Go ahead.

11                      CROSS-EXAMINATION

12   BY MS. MCGOWAN:

13   Q.   Good afternoon, Ms. Voyles.

14   A.   Good afternoon.

15   Q.   The batch of ballots that you described as pristine, you

16   described them as absentee-styled ballots.  Can you elaborate

17   on what you mean by that?  Typically the absentee ballot is

18   the same as the provisional ballot; correct?

19   A.   That's correct.  And in manager lingo, it really is an

20   absentee-style, it's given a code number, it's given a ballot

21   number, and that's why I called it a "style," I'm sorry.

22   Q.   And as a poll worker at your polling location at

23   election day you would have a supply of paper -- provisional

24   ballots that were used as backup ballots, right, if a voter

25   needed to vote provisionally?

1  A.   Yes.  And we have to account for every single one of those

2  that we have.

3  Q.   Exactly.  And did these ballots that you described as

4  "pristine" when you were conducting the audit, did they look

5  identical to the paper ballots that you would keep on hand at

6  your polling location, just that you felt that the paper felt

7  different?

8  A.   The paper felt different and the fact that it was not

9  creased at all.  Whether it was an absentee ballot or whether it

10  was a provisional ballot, it would have been put into an inner

11  envelope and then an outer envelope and both of those envelopes

12  would have been sealed which would have further creased that

13  ballot.  These ballots were not creased.  And we were given no

14  envelopes for those ballots so it would have been impossible for

15  us to verify any signatures.

16  Q.   So on election day when a voter votes provisionally do

17  you place that provisional ballot in an envelope?

18  A.   Pardon me?

19  Q.   You just testified that you don't have envelopes for the

20  provisional ballots.

21  A.   No, on election day I do have envelopes.  I have a white

22  inner envelope and you, the voter, I would hand you a

23  provisional ballot, I would hand to you a marking device, a pen,

24  and then I would hand you the white envelope.  I am writing on

25  the outside of the salmon-colored envelope which is the outer

1    envelope.  By the time you bring me your white envelope I have

2    your name, your voter ID on it, why you're voting provisional

3    and, of course, our poll number.  You put it into -- you put

4    your inner envelope into the outer envelope.  You're listed on a

5    numbered list of voters for provisional voters and then I have a

6    large orange sack with a very tight lip on it that you would

7    slip your ballot into that.  It's sealed on the bottom so I have

8    no access to it and I would not touch the ballot once you have

9    sealed your own ballot.

10   Q.   And you would put those in a box at the end of the day

11   on election day and seal that?

12   A.   No.  I would carry that bag with me to -- this big, sort of

13   orange canvas bag is actually the provisional ballot box, so to

14   speak.

15   Q.   The box of ballots, the batch that you looked at, you

16   said that the box that they we were in had been sealed;

17   correct?

18   A.   It had been sealed, but not signed properly.

19   Q.   Did you report any of these issues to any of the county

20   election officials?

21   A.   We did.

22   Q.   Did you get a response?

23   A.   "It's in there.  It's okay," that was the response.

24   Q.   Did you report any of these issues to the Secretary of

25   State's office?

SUSAN VOYLES - CROSS-EXAMINATION BY MS. McGOWAN          39

```
 1   A.    No, I did not.

 2   Q.    If this was suspicious to you and you didn't feel like

 3   the county was treating it with the appropriate amount of

 4   attention, why didn't you report it to the Secretary of

 5   State's office?

 6   A.    I did report some things to the Secretary's office and I

 7   did fill out -- and I did not -- there were some anomalies that

 8   I needed satisfaction to.  I was very disturbed at the way the

 9   count went.  I believe that that was -- and the style of the

10   ballots, I really was amazed at that.

11   Q.    This particular batch of ballots that you were concerned

12   about, did you say it was about 100?

13   A.    I said there were about 700 to 800 in the box.  About 100

14   of them caused me concern.

15   Q.    And you saw no other ballots that caused you concern?

16   A.    Yes.  I saw the ballots the next day that caused me grave

17   concern.

18   Q.    And that was from the -- I believe it was a rehab

19   center, you said?

20   A.    It was called Quality Living and it's a recovery facility.

21   Q.    And those were about 60, I believe?

22   A.    They were exactly 60.

23   Q.    Did you personally observe any monitors that were not

24   permitted by county officials to observe the audit process?

25   A.    Yes, I did.  I did observe two parties that were not able
```

SUSAN VOYLES - CROSS-EXAMINATION BY MS. McGOWAN        40

```
 1   to even get in in the beginning and once they were able to get

 2   in -- first we were told there would be one monitor for every 10

 3   tables, that is impossible, and I was not a monitor so I cannot

 4   precisely say as to their -- but there was no -- these monitors

 5   first stood kind of - kind of loosely between 10 tables.

 6   There's no way they could observe what was going on.  And then

 7   later on when they would come over to observe closely, which the

 8   law says they're allowed to be, they were chastised and told to

 9   get away by Fulton County officials.

10   Q.   Did you personally witness any ballot not being

11   tabulated correctly during the audit process?

12   A.   When you say "tabulated" -- I mean, they were tabulated so

13   many times.  At what point are you talking about?  The kind of

14   tabulations that I was doing or prior to me?

15   Q.   The tabulation that you were doing.

16   A.   Our ballots are tabulated correctly.  From what we got, we

17   were able to tabulate those and go through them.  We actually

18   were looking at ours to make sure we did not have ballots

19   sticking together.

20   Q.   Have you ever served in any leadership capacity in a

21   republican organization?

22   A.   Yes, I have.

23   Q.   Can you describe what you -- how active you've been in

24   the republican party.

25   A.   I've been very active, yes, for years.
```

1          MR. SMITH:  Objection, Your Honor; not relevant.

2          THE COURT:  Overruled.

3          MS. McGOWAN:  I have no further questions.  Thank

4    you, Ms. Voyles.

5          THE COURT:  Any redirect, Mr. Smith?

6          MR. HAMILTON:  Your Honor, on behalf of the

7    intervenor defendants may I ask a handful of questions?

8          MR. SMITH:  Your Honor, the intervenor has not been

9    moved in.  We object to them asking any questions at this point.

10   They can observe, but they've not been moved in yet.

11         THE COURT:  Mr. Hamilton, you represent the

12   democratic party?

13         MR. HAMILTON:  That's correct, Your Honor.

14         THE COURT:  All right.  Mr. Smith, are you objecting

15   to their intervention?

16         MR. SMITH:  Yes, Your Honor.  At this point we are,

17   yes.

18         THE COURT:  On what basis?

19         MR. SMITH:  Well, we don't believe at this point

20   they're a relevant party.

21         THE COURT:  Well, they were a party to the settlement

22   agreement that you're challenging; were they not?

23         MR. SMITH:  Yes, yes, they were.  Yes, Your Honor,

24   they were.  But they're not the ones enforcing it, Your Honor.

25         THE COURT:  All right.  The motion's granted and I'll

1    allow Mr. Hamilton to ask questions on behalf of his client.  Go

2    ahead.

3              MR. HAMILTON:  Thank you, Your Honor.  And I'll be

4    brief.

5                    CROSS-EXAMINATION

6    BY MR. HAMILTON:

7    Q.   Good afternoon, Ms. Voyles.  I'd just like to ask you a

8    couple of questions and I'm looking at your affidavit that

9    you signed and submitted to the Court.  Do you recall signing

10   that affidavit?

11   A.   Yes, sir, I do.

12   Q.   Is it true, everything that's in there?

13   A.   Yes, it is true.

14   Q.   Okay.  In the declaration you indicate that you watched

15   a short training video, I think you mentioned that a little

16   bit earlier in your testimony here, is that accurate, that

17   you watched a training video when you showed up to assist

18   with the recount?

19   A.   Yes.  I watched it about three times.  It was two children

20   demonstrating how to move the ballots from one person to

21   another, it was about 5 minutes long, there was no audio and it

22   was only close captioned.

23   Q.   So the answer is, yes, you watched that video?

24   A.   Yes, I did.

25   Q.   And you watched it three times?

1    A.   I did, because I didn't have anything else to do so...

2    Q.   And you did the best you could to follow the

3    instructions provided in that video produced by the Secretary

4    of State's office; is that correct?

5    A.   Yes, sir.  (Inaudible) but, yes, I did.

6    Q.   And then you indicated in your declaration that you were

7    required to sign an oath saying that you would conduct the

8    audit impartially and fairly to the best of your ability and

9    you were told that if you did anything wrong you'd have to go

10   before the State Board of Elections.  Do you recall saying

11   that in your declaration, ma'am?

12   A.   Yes, sir, I do.

13   Q.   And did you comply with that oath?

14   A.   Yes, sir, I did.

15   Q.   Did you do your best to administer the recount fairly

16   and impartially?

17   A.   Yes, I did.

18   Q.   Okay.  And then in Paragraph 10 of your declaration you

19   indicated that you were given instructions on how to pick up

20   certain piles and count ballots in piles.  Do you recall

21   saying that in your affidavit?

22   A.   Yes, sir.

23   Q.   And did you follow those instructions?

24   A.   To the letter.

25   Q.   You did the best of your ability to conduct the audit in

1    compliance with those instructions?

2    A.    We did, sir.

3    Q.    Okay.  And then with respect -- you've been an election

4    worker for 20 years, I think.  In connection with this

5    recount process or the canvass, were you involved in

6    duplicating damaged ballots at all?

7    A.    No, sir, that was not my role.

8    Q.    That was not your role?

9    A.    No.  We were given either ballot boxes or this corrugated

10   box.  Our sole purpose was to take what was in the box, take one

11   batch out at a time and count them, that was all we were told to

12   do.

13   Q.    So you can't testify here today and you're not

14   testifying here today about anything about the duplication

15   process or how it was conducted; correct?

16   A.    That is correct.

17              MR. HAMILTON:  Thank you.

18              No further questions, Your Honor.  Thank you.

19              THE COURT:  All right.  Does counsel for the proposed

20   intervenor NAACP and the Georgia Coalition for the Peoples'

21   Agenda, do they wish to ask any questions?

22              MR. GREENBAUM:  We don't have any questions for this

23   witness, Your Honor.

24              THE COURT:  All right.  Any redirect, Mr. Smith?

25              MR. SMITH:  No, no redirect.  Wait a minute.  Hold

1    on.  Hold on.

2                    REDIRECT EXAMINATION

3    BY MR. SMITH:

4    Q.    Do you have to fold provisional ballots?

5    A.    Are you talking about in my capacity as a poll manager or

6    did I have to fold them that day?

7    Q.    Both.

8    A.    In my capacity as a poll manager, I do not actually fold

9    the ballot.  The voter would fold the ballot.  But, yes, they do

10   have to be folded.  They have to be put in the inner white

11   envelope and then the outer salmon-colored envelope and into the

12   ballot box.

13   Q.    So those pristine ballots that you described that were

14   perfectly marked, they couldn't have been provisional

15   ballots; could they?

16   A.    No, sir.

17   Q.    All right.  Did you see any absentee ballots when you

18   were doing the count when you were down at the World Congress

19   Center?

20   A.    This box of about 700, I did that at least -- well, 700 to

21   800.  So I did have a quantity of other ballots and they were

22   all worn, they were all dirty and one of the other ballots, yes,

23   they are provisional and absentee.  So I did see them, yes, and

24   they were well-worn whereas this particular batch was not.

25   Q.    Did you see envelopes?

1  A.   We were never given envelopes.  We never had them.  Those

2  were already separated before we got the batch.

3  Q.   You never saw any envelopes?

4  A.   We never saw any envelopes.

5  Q.   So you don't know if those pristine ballots were

6  provisional?

7            MR. HAMILTON:  Objection; leading.

8            THE COURT:  Overruled.

9            THE WITNESS:  I do not know whether they were

10  provisionals or absentees.  But either way, they would have been

11  folded, whether they were provisional or absentee, because the

12  absentee ballots have a white inner envelope and a yellow inner

13  envelope.

14            MR. SMITH:  Nothing further, Your Honor.

15            THE COURT:  All right.  Mr. Smith, is that your only

16  witness?

17            MR. SMITH:  Yes, Your Honor.  Our only live witness,

18  Your Honor.

19            THE COURT:  All right.  And what other declarations

20  are you submitting or you propose to submit in support of your

21  motion or is it all of them?

22            MR. SMITH:  I have a declaration that I submitted for

23  myself, Your Honor, and I'll read that.  I filed it with the

24  Court earlier today.  This is my analysis based on information

25  from the Secretary of State's website.  It's publicly available

1     so anyone could replicate my analysis.  This information I

2     reviewed was State-compiled mail-in ballot data from 2016, 2018,

3     and 2020.

4            My analysis shows that Georgia's rate of rejection

5     for mail-in ballots average 3.06 percent and 3.58 percent for the

6     2016 and 2018 general elections, Your Honor.  For the 2020

7     primary elections, however, this rejection rate dropped from

8     1.02 percent and for the 2020 general election that rate dropped

9     to .32 percent, .0.32 percent.  Your Honor, that's a 90-percent

10    decrease in the rate of mail-in-ballot rejections compared to the

11    2016 and 2018 elections.  And that's with a huge increase in the

12    number of absentee ballots going from several hundred thousand to

13    1.2, 1.3 million.

14            The number of mail-in ballots cast in Georgia, on the

15    other hand, has increased nearly 500 percent from the 2016 and

16    2018 elections to the 2020 general election.  We would expect to

17    see between 40,000 and 45,000 ballots rejected based on the

18    Georgia historical average rejection rate, but instead only 4,196

19    votes were rejected.  Given how close the number of votes are

20    separating President Trump and Vice President Joe Biden, the

21    historical rejection rates were improper and illegal ballots

22    could have changed the outcome of the race here in Georgia.

23            I would also add, Your Honor -- and then I'll save

24    the rest for my closing -- Your Honor had asked about due

25    process.  The *Baker vs. Carr* case, 369 US 186, "A citizen's right

1   to vote free of arbitrary impairment by State action has been

2   judicially recognized as a right secured by the Constitution of

3   the United States, when such impairment resulted from dilution by

4   a false tally."  The plaintiffs there were voters who sued on

5   behalf of themselves, as Mr. Wood has here, Your Honor.

6           THE COURT:  All right.  Anything further?

7           MR. SMITH:  Yes.

8           And Mr. Wood didn't vote in the other two elections.

9   Only in the 11-3 election.  So as to why this is an emergency,

10  the plaintiff's rights as an individual voter, they weren't ripe

11  until 11-3, Your Honor, November 3rd election.  So his vote

12  wasn't diluted before then.  I'll save the rest of my -- but

13  that's our case, Your Honor.  I'll save the rest of my argument

14  until my closing.

15          THE COURT:  That information that you just gave about

16  Mr. Wood, is that in a declaration or in any sworn testimony?

17          MR. SMITH:  No.  No, Your Honor.

18          THE COURT:  All right.  Ms. McGowan.

19          MS. McGOWAN:  Your Honor, Mr. Willard from our office

20  is going to do the argument but the State would first like to

21  object to Mr. Smith's affidavit.  Mr. Smith is serving as counsel

22  for plaintiff and it's improper for him to act also in the

23  capacity as a fact witness and much of his testimony involves

24  statistical analysis, providing factual evidence, and I believe

25  the last part of his affidavit is even highly argumentative so we

1  object to the admissibility of that evidence.

2           THE COURT:  Well, I don't have the declaration in

3  front of me.  Those percentages that you read off, Mr. Smith, are

4  those straight from the Secretary of State's website or did you

5  have to run calculations?

6           MR. SMITH:  No.  That was just a calculation from --

7  it was like an advanced spreadsheet, Your Honor.

8           MS. McGOWAN:  The issue, though, Your Honor, is that

9  the reason for rejection --

10          MR. SMITH:  Anybody can do that with a calculation

11  based on the information at the Secretary of State website.

12          THE COURT:  Ms. McGowan, go ahead.

13          MS. McGOWAN:  The rejection rates vary from

14  year-to-year because there were different requirements for the

15  absentee ballots verified that had changed over time and so it's

16  sort of an apples-to-oranges comparison, but I believe my

17  co-counsel is going to address that in our argument.

18          THE COURT:  Okay.  I'll allow the admission of the

19  declaration, but I'm happy to hear argument as to its weight.

20  Mr. Willard.

21          MR. WILLARD:  Thank you, Your Honor.

22          As Ms. McGowan said -- and just a couple of

23  housekeeping matters before we get started to really clear up

24  some of the confusing and leading terms that plaintiff has

25  bandied about, just to bring the Court back to what we actually

1    have in front of us.

2         First, he continually interchanges a hand recount

3    with the manual tabulation and the audit process.  Just to be

4    clear, and as our response that we filed today sets out, what has

5    just been conducted is the audit that is called for as part of

6    the State's move to this new election system.  It is not a hand

7    recount or a recount of the race as the Georgia Code set out.

8    That is not a process that is triggered until after the

9    certification and Mr. Smith and his client, Mr. Wood, have no

10   role in that process.  The only people who can request a recount

11   in a particular race is a losing candidate for that particular

12   office and we haven't gotten to that point yet because the

13   Secretary is not scheduled to certify the election results until

14   tomorrow at which point a recount does not become ripe until

15   after that fact.

16        He has also thrown out today - it is not briefed in

17   either his emergency motion or any of his pleadings - a

18   vote-dilution claim.  He has failed to sufficiently allege that.

19   If the Court would like us to go into that despite the fact that

20   he has not pled it, we will be happy to do that post-hearing, but

21   I won't be getting into that today because he has not established

22   the elements of a vote-dilution claim.

23        Further, he threw out today for really the first time

24   an allegation that the signature-match process was either not

25   done or was done improperly, but he has provided no evidence to

1  the Court supporting that, nor any cognizable argument that that

2  has happened.

3           And, finally, as Ms. McGowan said, in terms of the

4  plaintiff's apples-to-oranges comparison, he's comparing the

5  totality of the absentee-ballot rejections from 2018.  As our

6  brief response makes clear, the General Assembly made a policy

7  decision following the 2018 election to change the evaluation of

8  absentee ballots partially due to identity theft concerns and the

9  fact that voters felt uncomfortable putting their date of birth

10 on the outside of the envelope.  The General Assembly took that

11 off the outer envelope where it was no longer visible to anyone

12 during the mail transmission.  That resulted in a significant

13 decrease in the percentage of absentee ballots that were rejected

14 at the outset.  There were quite a number in 2018 that were

15 rejected for that missing information.

16          In terms of when you actually do an apples-to-apples

17 comparison - and it is referenced in Chris Harvey's affidavit

18 that we will be moving into evidence, it's an exhibit in our

19 brief response - when you actually look at ballots from 2018 that

20 were rejected signature match and you look at ballots from 2020,

21 after the cure period, those numbers are identical in terms of --

22          MR. SMITH:  Your Honor, if he continues on he's going

23 to become a fact witness.

24          MR. WILLARD:  I am referencing what is in our

25 affidavit, Your Honor.  It is in our brief response, as well.  I

1   will point the Court to both of those and, like I said, we'll be

2   moving Mr. Harvey's affidavit into evidence at the conclusion of

3   our argument in chief.

4            THE COURT:  Now, you said that the numbers of

5   absentee ballots that were rejected in this election as compared

6   to 2018 was the result of the change in the requirement of the

7   date of birth being placed on the outside of the envelope.  Did I

8   understand that correctly?

9            MR. WILLARD:  Your Honor, when you look at the 2018

10  numbers that were rejected for signature mismatch and compare

11  them with the rejected numbers of absentee ballots in 2020 that

12  were rejected for signature mismatch, the percentage of rejection

13  is identical to what it was in 2018.  And that is after you take

14  out the oranges that Mr. Smith was talking about because the

15  numbers that he's using from 2018 to arrive at the percentage of

16  rejection incorporates the date-of-birth rejections from 2018,

17  the missing information.  In addition, at the outset the initial

18  rate of rejection in 2020 was higher than it was in 2018.

19            MR. SMITH:  Excuse me, Your Honor.

20            MR. WILLARD:  But the General Assembly had made the

21  policy argument --

22            THE COURT:  Mr. Smith, let him finish.  I'll give you

23  an opportunity to respond.

24            MR. SMITH:  Okay.

25            MR. WILLARD:  The General Assembly had made the

1   policy determination to allow voters the opportunity to cure a

2   signature mismatch or missing signature.  And so it's only after

3   that cure process reduced the number of rejected ballots down

4   that you arrive at the final number for 2020 and even with that

5   reduced number the rejection rate for signature mismatch in 2020

6   is practically identical to what it was in 2018 as a percentage

7   of the rejected ballots.

8               THE COURT:  How do you know and what evidence have

9   you submitted that tethers the difference to be because of the

10  date-of-birth requirement?

11              MR. WILLARD:  We have the 2018 numbers based on --

12  they had a registrar -- the county officials have to note in the

13  system the reason for an absentee-ballot rejection and what

14  Mr. Smith is apparently relying on is the totality, all the

15  little codes that county election officials put in in 2018 for

16  rejecting the ballot.  The Secretary of State's office did an

17  analysis of only the 2018 ballots that were rejected for

18  signature mismatch based on the coding that county officials put

19  in, compared that with the 2020 rejection rate, and determined

20  that the percentages were practically identical between the 2018

21  general election rejection for signature mismatch and the 2020

22  rejection rates for signature mismatch.

23              THE COURT:  All right.  Anything more you want to

24  say, Mr. Willard?

25              MR. WILLARD:  Yes, Your Honor.  That was just the

1   opening trying to clear up some of the things that plaintiff had

2   raised today, but we still have our argument in chief.

3            THE COURT:  Okay.  Go ahead.

4            MR. SMITH:  Your Honor, may I make a statement,

5   please, about that?

6            THE COURT:  All right, go ahead.  Mr. Smith, why

7   don't you address that and then we'll hear the rest of the

8   Secretary of State's argument.

9            MR. SMITH:  He's testifying -- Your Honor, the

10  deadline for submitting evidence was at noon today and he

11  submitted no affidavit or declaration before noon today on those

12  points and he's testifying -- if he's going to testify, then I

13  have a right to cross-examine him.  If he's become a witness,

14  then he can't be counsel and a witness at the same time and so we

15  would object to that testimony and we'd move to strike it.

16           MR. WILLARD:  Your Honor, the declaration of Chris

17  Harvey was submitted at 11:55 a.m. this morning and is Item 34 on

18  the docket.

19           THE COURT:  Okay.  Mr. Smith, it sounds like it was

20  submitted by noon so do you maintain your objection?

21           MR. SMITH:  If he submitted that in his declaration

22  at or before noon, then we'll withdraw our objection on that

23  point.  But if he's testifying as to things that were not -- he

24  just said he was going to submit an affidavit later today, then

25  we would object to that information coming in at this point.

1          THE COURT:  All right.  Mr. Willard, I'll hear the

2     remainder of your argument now.

3          MR. WILLARD:  Thank you, Your Honor.  Thank you.

4          The plaintiff has failed to allege, much less

5     establish, a claim for judicial relief in this case.  He lacks

6     standing to bring the claims that he has brought.  His claims are

7     moot.  He fails to establish any of the required elements for

8     injunctive relief and his claims should further be barred by

9     laches.

10          As I mentioned at the outset, the plaintiffs are

11    conflating the manual audit under 21-2-498, which doesn't even

12    have to be a statewide audit, but the Secretary elected to

13    conduct a statewide audit of the presidential race.  It is an

14    end-of-the-cycle reassurance that the General Assembly has asked

15    the Secretary and the State Election Board to undertake with the

16    new election system to reassure the public that the system

17    accurately reflects the will of the electorate.

18          As I said, there is a separate provision of Georgia

19    law that actually establishes the procedure for a recount

20    certification and, once again, neither Mr. Wood nor Mr. Smith can

21    bring that claim.  That is limited to a losing candidate in a

22    particular race.

23          The establishment of standing is a threshold issue,

24    as this Court has acknowledged in pressing the plaintiffs on the

25    issue of standing, and as the Eleventh Circuit in *Jacobson* said,

1   "Federal courts have an obligatory duty at the front end of

2   litigation to ensure that plaintiffs have standing before they

3   proceed with the claim."  In this case plaintiff has adopted a

4   scattershot approach, including today's argument, to try to

5   clothes hook as many potential constitutional violations or

6   alleged constitutional violations as possible in an effort to try

7   to get the Court to grant relief.

8          In terms of the equal protection arguments that

9   plaintiffs have made, the plaintiff has solely made generalized

10   allegations of being a voter and a republican party donor.  He

11   has not made the particularized claims that would establish an

12   equal-protection violation that he can litigate before the Court

13   today.  As the *Jacobson* court instructed, "A generalized

14   grievance or frustration about an electoral loss is not

15   sufficient to establish standing."

16          Plaintiff further lacks the standing of the electors

17   and election clause because, as the Third Circuit recently found,

18   an individual voter or group of voters has no standing under that

19   particular clause because they cannot stand in for the General

20   Assembly in asserting a violation or alleged usurpation for

21   legislative authority.

22          Plaintiff further lacks standing for a due process

23   claim.  Plaintiff has suffered no personal denial of due process.

24   The affidavit submitted failed to establish any violation of due

25   process factually.  There is no cognizable right to be a poll

observer or an audit recount observer which is, in part, what

plaintiffs are attempting to complain about.

            *Jacobson* also has admonitions to the Court as to

plaintiff's real lack of redressability that he's established

here today.  His complaint is really against county election

workers, none of whom -- no county election official is named in

this litigation and *Jacobson* basically said you can't plant a

flag on the State and let the relief flow down to the parties

with whom your beef is really against.  So plaintiff has failed

to establish standing under the *Jacobson* paradigm.

            In addition, as the Court pointed out, plaintiff's

claims are moot in actually bringing these claims.  Plaintiff

failed to serve any of the State defendants notice of his motion

for TRO until yesterday.  This is despite the fact that the

settlement agreement was adopted early this calendar year.  The

rules were promulgated in March of this year, they were amended

in April of this year, and it wasn't until his preferred

candidate lost the election that plaintiff decided to allege that

there had been some usurpation of legislative authority in

bringing these claims challenging the settlement agreement and

the promulgated rules by the State Election Board.

            In this case the electorate has voted.  The counties

have all certified their election results to the Secretary of

State.  The Secretary of State's duty at this point is simply to

tally up the 159 certifications from Georgia's respective

1   counties and certify those results so that we can move forward

2   with the election process, including the federally mandated

3   mailing out of new cards which must take place by this Saturday

4   for the upcoming runoff elections.

5           He cannot use injunctive relief to undo the completed

6   acts of the unnamed county officials who have already certified

7   the election results.  In order to even claim injunctive relief,

8   he has to establish a substantial likelihood of success on the

9   merits, the likelihood of irreparable injury, you have to balance

10  the harm to the plaintiff against the harm to the defendant, and

11  you have to consider the public interest.

12          Plaintiff has not pled, much less established, a

13  constitutional violation on the part of the State defendants.

14  The State defendants have acted pursuant to Georgia law at all

15  times in the conduct of this election.  Here, unlike the

16  situation in *Bush vs. Gore,* the State defendants have actually

17  attempted and have successfully imposed a framework that ensures

18  a uniform process throughout the state in conducting this

19  election.

20          Further, there is no violation of the electors and

21  election clause and plaintiff cannot establish a substantial

22  likelihood of success.  The State Election Board promulgated a

23  rule that is completely in harmony with 21-2-386.  Signature

24  match was designed to prevent improper voting with necessary

25  safeguards in place to ensure that individual electors were not

1    disenfranchised.  The safe harbor provision cure provision

2    contemplated within the absentee ballot verification process is a

3    legislative creation and, thus, the cure process is clearly

4    within constitutional norms.

5           Further, O.C.G.A. 21-2-31(7) - that's 31, paren 7 -

6    is an express legislative delegation to the State Election Board

7    of the authority to promulgate rules and regulations to define

8    uniform and nondiscriminatory standards concerning:  One, what is

9    a vote and, two, what will be counted as a vote, and the rules

10   promulgated in March of this year and as amended in April of this

11   year clearly fall within that express legislative delegation.

12          What the State Election Board did was nothing more

13   than put the mechanics in place for what the General Assembly

14   passed in enacting 21-2-386 and the plaintiffs have not

15   established that there is any deviation from the legislative

16   expression in terms of what the State Election Board actually did

17   in promulgating its rules.

18          Plaintiff fails to make any argument that is

19   cognizable for a due process claim supported by any actual facts.

20   His claim centers on the manual tabulation for the audit process.

21   There is no factual basis that plaintiff has established for

22   finding a denial of due process.  There are no due process rights

23   to be a monitor of the manual tabulation as part of the audit

24   process.  If you look at the state statute, it talks about the

25   fact that the public shall have the right to observe, but there

1    is no statutorily or administratively created right that has been

2    violated in terms of any of the affidavits that have come in from

3    the plaintiff and there is a lack of redressability under

4    *Jacobson* for any alleged violations by county officials and the

5    only named defendants are State defendants.  He cannot

6    extrapolate any alleged county violations onto the State

7    defendants any longer in the Eleventh Circuit after the *Jacobson*

8    decision.

9            The final two factors of the test for determining

10   whether injunctive relief is proper is a balancing of the

11   equities and consideration of the public interest and in the

12   election context they're typically considered together.  The

13   State has a strong interest in enforcing the state election law

14   requirements that have been in place during the entirety of this

15   election cycle.  The election is over and rather than accept that

16   his preferred candidate has lost plaintiff seeks the largest

17   disenfranchisement of eligible electors since the abolition of

18   the poll tax and other vestiges of Jim Crow in the State of

19   Georgia.

20           Finally, Your Honor, laches serves to bar any claim

21   that plaintiff might have asserted for relief.  As mentioned

22   earlier, these rules were originally promulgated and adopted in

23   March of this year.  They were subsequently substantively amended

24   in terms of the notification procedure in April of this year.

25   The general primary was held in June, there was an August runoff,

1   and the general election was held on November 3rd.  Plaintiff

2   failed to serve his TRO seeking injunctive relief on any of the

3   State defendants until November 18th.

4           Courts must be, as they should be, reluctant to

5   change the electoral rules postelection.  Circuit courts around

6   the country have disfavored and refused to alter the rules of the

7   game after voters have cast their ballots assuming, rightly so,

8   that the votes are going to be cast within a specific framework

9   as the State has promulgated it at the outset of the election

10  cycle.  Plaintiff attempts to change the rules at the end of the

11  game to alter the score.

12          If the Court has no questions for me at this time,

13  I'll sum up my argument with one final point.

14          THE COURT:  Go ahead, sir.

15          MR. WILLARD:  There has been a great deal of angst,

16  anger, frustration, concern from all sides in the period

17  preceding the election as well as the period following the

18  general election.  I understand the plaintiff's frustration at

19  his favored candidate's loss.  However, that does not justify the

20  attempted manufacture of specious and unsupported constitutional

21  violations in an attempt to undo the will of the electorate.

22          In every contested election there is one winning

23  candidate and at least one losing candidate.  Our system is

24  designed to encourage candidates to make their pitch to voters

25  and to have voters cast their ballots within the framework that

1    the State has set up at the outset of the cycle.  The votes have

2    all been cast and Georgia counties have tabulated the results.

3    We ask this Court to deny any relief or further attempts to

4    certify the express will of the voters and we would ask you deny

5    plaintiff's requested relief.

6              THE COURT:  Thank you.

7              Mr. Hamilton.

8              MR. HAMILTON:  Thank you, Your Honor.

9              This lawsuit and the pending motion seeks

10   unprecedented, truly astonishing relief, an order invalidating

11   literally millions of ballots cast by lawful Georgia voters on

12   the flimsiest of evidentiary records.  There's no basis in the

13   law for such an order.  No court has ever entered such sweeping

14   relief and there's no foundation in the record before the Court

15   for doing so here.  The evidence before the Court is little more

16   than hearsay, conclusory statements, speculation, and improper

17   opinion testimony and, Your Honor, for that reason, I would

18   submit that the preliminary injunction motion should be denied

19   and the case should be promptly dismissed.

20             First, and perhaps most obviously, as Your Honor's

21   questions have suggested, plaintiff lacks standing to assert the

22   claims presented in the complaint.  Standing is essential for the

23   Court's jurisdiction under Article III.  But plaintiff has

24   neither pleaded nor proved a cognizable injury in fact and

25   instead asserts only generalized grievances about defendant's

1  supposed defiance of state law and that is simply insufficient to

2  establish standing.  To establish an injury in fact under Article

3  III, a plaintiff needs to plead and then prove that the injury is

4  concrete, particularized and actual or imminent rather than

5  hypothetical.

6          In the voting context, the Supreme Court has made it

7  clear that a person's right to vote is individual and personal in

8  nature.  Voters who allege facts showing disadvantage to

9  themselves might have standing to sue.  But where the alleged

10  injury is that the law has not been followed, that's the kind of

11  undifferentiated, generalized grievance about the conduct of

12  government that does not establish injury in fact for standing

13  purposes, but that's what the plaintiffs have here in this

14  courtroom today.

15          THE COURT:  Sir, how do you distinguish the Eleventh

16  Circuit authority that plaintiff cited, *Roe v. Alabama*, and the

17  others?

18          MR. HAMILTON:  That theory -- the vote-dilution

19  theory has been repeatedly rejected by federal courts across the

20  country, including the United States Court of Appeals by the

21  Third Circuit in an order just this week.  Each of those courts

22  have explained that any purported vote dilution somehow caused by

23  the counting of illegal votes would affect all Georgia voters,

24  not merely the plaintiffs and their voters.  So it's a

25  generalized grievance rather than a particularized harm and can't

1   support standing.  That's been recognized by numerous courts

2   across the country and just in the last week this theory has been

3   rejected over and over and over again and this case is no

4   different.

5          *Baker vs. Carr*, which you didn't ask about, Your

6   Honor, but it's been cited a couple of times, is an apportionment

7   case.  That was a case in which congressional apportionment

8   hadn't been done for 60 years so the voters in one congressional

9   district, their votes were diluted as compared to voters in

10  another congressional district.  That's dramatically different

11  than here.  Whatever harm might have befallen these plaintiffs is

12  uniform across the board and that's a non-particularized,

13  generalized grievance that does not establish standing for

14  Article III purposes.

15         The plaintiff asserts that the standing allegation

16  is, quote, "The qualified elector and a registered voter," closed

17  quote, it therefore has Article III standing.  That's just not

18  enough.  He hasn't shown how he is specifically injured.  It's

19  that defendants supposedly didn't follow the law regarding

20  absentee ballot signature-verification protocols, but that's the

21  same kind of undifferentiated, generalized grievance about the

22  conduct of government that has been rejected over and over.

23         In fact, the main case that he relies on in his

24  papers is *Meek* and the Eleventh Circuit specifically rejected

25  that case explaining that, quote, "A plaintiff who merely seeks

1    to protect an asserted interest in being free of an allegedly

2    illegal electoral system," closed quote, "does not have a

3    cognizable injury for standing purposes."  That was the *Dillard*

4    *vs. Chilton County Commission* case from the Eleventh Circuit in

5    2007, we've cited it in the papers.

6           THE COURT:  So in your view, who would have standing,

7    if anyone, to challenge the settlement agreement?  Would the

8    republican party?  Would the candidate?  Is there anyone who

9    could challenge it?

10          MR. HAMILTON:  Who can challenge the settlement

11   agreement?  You know, I don't know the answer to the question, to

12   be candid, Your Honor.  It's certainly not a member of the

13   general public.  The Attorney General might have standing to

14   assert a claim against -- or challenge that settlement agreement.

15         But here no one -- here it's a generalized grievance.

16   This individual hasn't been injured specifically by that.  He's

17   not even -- he's simply alleged his standing as a voter.  Not as

18   a candidate, not as a party, and not as an election official and

19   so I don't think -- whoever else might have standing to challenge

20   such an agreement, it certainly isn't just an individual voter.

21   Nor is it a donor.  The other theory that is advanced by

22   plaintiff that he claims he donated to republican candidates, his

23   interests are aligned with those of the Georgia republican party

24   and that may well be true, but it doesn't help him here.  Again,

25   he hasn't been injured and he can't represent the interests of

1    the Georgia republican party or the two monitors referred to in

2    the amended complaint.  Standing requires a showing that he

3    individually has been injured, not somebody else that isn't

4    before the Court, because those individuals, if they want to

5    bring a claim, can bring a claim themselves or those

6    organizations can bring a claim themselves and they have not.

7          There's no authority for the proposition that merely

8    making a political contribution allows the donor -- or creates

9    the donor standing for Article III purposes and plaintiff cites

10   no cases for that proposition.  And I don't blame him because

11   there are none that would support that.  So plaintiff has not

12   established injury in fact and, as a result, has no standing and

13   as a result of that this Court has no jurisdiction under Article

14   III.

15         He also lacks prudential standing to bring the

16   elections and electors clauses or the due process clause claim.

17   The election and electors -- the elector and elections clause

18   claims rely solely on the General Assembly's purported rights,

19   but he, at the risk of stating the obvious, is not the General

20   Assembly and can't step into their shoes, as counsel just said.

21         He alleges that the settlement agreement is not

22   consistent with the laws of the State of Georgia and, therefore,

23   violates Article II, Section 1 and Article I, Section 4 of the

24   elections and electors clause respectively.  He has no ability to

25   assert that claim on behalf of the general election -- sorry, the

1    General Assembly -- nor has he identified any hindrance to the

2    General Assembly from bringing a claim if they wanted to

3    themselves.  So to answer Your Honor's question, I suppose the

4    General Assembly might have standing to challenge the settlement

5    agreement should they choose to, but they're not in court here

6    before you today.

7            And the same is really true of the due process claim

8    which appears to assert the rights of the Georgia republican

9    party or maybe it's the rights of the individual monitors that

10   are cited in the amended complaint, but he doesn't have

11   prudential standing to raise claims on behalf of those others

12   himself.  As an individual voter as an individual citizen he can

13   raise only the claims that he himself has.  So for all those

14   reasons, we have a big standing problem here which is a

15   jurisdictional problem for the case before you, Your Honor, and

16   for that reason the case should be dismissed.

17           As counsel's indicated and I believe Your Honor has

18   indicated as well in some of the questions, even if he had --

19   even if Mr. Wood had standing to bring these claims, they're

20   barred by laches as a result of this inexplicable 8-month delay.

21   I won't go through the elements of laches, I know the Court is

22   familiar with it and we've cited it in our cases.  Federal courts

23   routinely apply the laches defense in election cases against

24   claims for injunctive relief which, of course, are an equitable

25   claim.

1              More than 8 months ago that settlement agreement was

2    finalized, long after absentee ballots had been separated from

3    their envelopes and after no less than three elections had been

4    conducted pursuant to the procedures adopted by the Secretary,

5    this lawsuit landed on your doorstep just a couple of days ago.

6    Millions of Georgia voters have relied on the procedures adopted

7    by the Secretary and duly promulgated by the Board of Elections.

8    Plaintiff has not provided even the barest of facts to undermine

9    the validity of those voters who relied on those procedures to

10   cast their ballots.

11             This complaint was filed on November 3rd.  I'm sorry,

12   November 13th.  The amended complaint was filed on November 16th,

13   more than 8 months after the settlement agreement was finalized,

14   59 days after voters began voting by absentee ballot, 32 days

15   after election officials started separating those ballots from

16   their envelopes, and 13 days, almost two full weeks, after the

17   general election.  I listened closely for any explanation for

18   that delay and there was none.

19             THE COURT:  He said it's because he did not --

20   there's no evidence in this regard, but there was a proffer from

21   Mr. Smith that the plaintiff did not vote in those prior

22   elections.

23             MR. HAMILTON:  Right.  Well, so the first problem is

24   that's argument by counsel.  That's not evidence in the record

25   and, of course, to establish a claim you have to have evidence.

1    We're here today on an emergency motion, Your Honor, the motion

2    plaintiffs request accommodating his claim and allowing him to

3    come forward with evidence and he has none to support that

4    contention.

5            But even if he had, there's no -- I mean, it doesn't

6    line up with the claim.  The claim is a challenge that the

7    Secretary acted improperly in entering into that settlement

8    agreement, that the Secretary acted improperly in adopting those

9    regulations and issuing that guidance.  That was a claim that

10   doesn't depend on whether Mr. Wood voted or didn't vote.  That

11   was a claim that doesn't depend on which candidate wins or which

12   candidate doesn't win or how many absentee ballots were cast or

13   how many were rejected.  That claim was ripe 8 months ago.  So

14   for all those reasons, Your Honor, I won't belabor the point, the

15   laches defense, I believe, precludes this claim and certainly

16   precludes this motion.

17           So let me turn to the motion briefly, the motion for

18   preliminary injunction.  Counsel's already identified the

19   standards and the factors to be considered by the Court.  I would

20   submit that the plaintiff cannot begin to meet those factors on

21   the record before the Court and has failed to do so.

22           The first one is, of course, likelihood of success on

23   the merits.  That is by far the most important and yet plaintiff

24   cannot meet that standard.  First on the equal protection claim.

25   Plaintiff asserts that there's been disparate treatment of

1    voters.  To sustain such an equal protection claim a plaintiff

2    must necessarily allege that similarly situated voters have been

3    treated differently.  But he doesn't actually allege that he or

4    any other voter in Georgia is being treated differently from any

5    other similarly situated voter because of the settlement

6    agreement.

7           Instead, he argues that the disparate treatment is

8    because the absentee-ballot processing, according to the process

9    set forth in the settlement agreement, is somehow, he claims,

10   different or inconsistent with what the law of Georgia requires.

11   But that, plaintiff concedes, is a uniform guidance across the

12   state.  The procedures, by definition, were adopted not for this

13   county or that county, not for this voter or for that voter, but

14   for the State of Georgia so that is not an equal protection

15   claim, it can't be.  It's incoherent.  It's not an equal

16   protection claim by definition.  And even if it were, under the

17   Anderson/Burdick analysis the Secretary has a strong interest in

18   uniform application of state election law that easily justifies

19   the modest procedures adopted pursuant to the settlement

20   agreement.

21          Those regulations merely require double checking the

22   ballot-rejection determinations through the statutory process.

23   It ensures uniform and fair treatment of all voters within the

24   existing statutory framework.  As counsel just said, it is

25   entirely consistent and harmonious with the statutory framework

1    and so plaintiff is unlikely to succeed on that claim and it

2    should be dismissed.

3            The election and electors clause claim fares no

4    better.  Those clauses of the United States Constitution vest

5    authority in the legislature of each state to regulate the time,

6    place and manner of elections and to direct election of

7    presidential electors.  But innumerable courts examining the

8    issue have held that the term "legislature" does not preclude the

9    delegation of such legislative authority.  So the claim can only

10   exist if the actions of the Secretary, in adopting that rule in

11   providing that guidance, somehow exceed the authority granted to

12   him by the Georgia General Assembly and they plainly didn't.

13           Under Georgia law the Secretary of Georgia is the

14   chief elections officer and the General Assembly has granted him

15   the power and authority to manage Georgia's election system,

16   including the absentee-voting system.  He's also the Chair of the

17   Board of Elections which is the governmental body responsible for

18   uniform election practice in Georgia.  The Secretary was well

19   within that authority in entering into the settlement agreement

20   and ensuring that the signature-verification protocols were

21   uniform across Georgia in every one of its 159 counties.

22           This claim, the elections and electors claim, is

23   entirely premised on the notion that by promulgating these

24   regulations that the defendant somehow altered the statutorily

25   mandated procedure contrary to the election code, and that's just

1    simply wrong as a matter of fact.

2            As counsel indicated, the signature-review guidance

3    explicitly promotes uniform application of the verification

4    process as required by local law and that OEB issued by the

5    Secretary simply strengthens those procedures.  It's simply

6    incoherent to suggest that ensuring a more rigorous compliance

7    with the law is somehow a violation of the law.  So the elections

8    and electors clause claim fail as well, he's unlikely to succeed

9    on them.  He certainly hasn't shown a substantial likelihood of

10   success on the merits.

11           The only remaining claim is the due process claim

12   which is premised on the purported denial of republican

13   observers' right to observe the hand recount or, technically, the

14   risk-limiting audit that Georgia has been conducting over the

15   past few days.  But that claim claims precious little support in

16   either the law or the factual record before the Court.

17           To succeed on a procedural due process claim -- the

18   Court asked is this a procedural due process or a substantive due

19   process and I believe the answer of counsel was "both," so let's

20   talk about procedural due process.  The plaintiff must

21   demonstrate that he has a private interest that will be affected

22   by the official action.  But neither Georgia law nor the US

23   Constitution provides a private individual with an enforceable

24   private right in observing a risk-limiting audit conducted under

25   Georgia law, much less a recount.

1          Rather, as plaintiff recognizes, Georgia law provides

2     that a candidate or political parties may send two

3     representatives to be present at a recount.  It doesn't say

4     anything about a risk-limiting audit.  Thus, plaintiff, who

5     doesn't even allege that he tried to observe the recount, it

6     wasn't him, nor the individual monitors who submitted supporting

7     affidavits on behalf of plaintiff are due any process as they

8     have no right to monitor this risk-limiting audit that's

9     underway.

10          And more fundamentally, even if an individual could

11    hold such an interest, which they can't, the process announced by

12    the Secretary and memorialized in the very affidavits on which

13    plaintiff relies demonstrates that they were provided more

14    observation rights than they're entitled to.  Far more than the

15    two per political party that are allowed to observe an actual

16    recount.

17          Virtually every affiant supporting plaintiff's

18    motions testified that they and others were able to freely

19    observe and participate in this process.  Even Ms. Voyles today

20    testified that she was freely able to observe.  So while

21    plaintiff and the various affiants may not have liked the access

22    they were given nothing in their affidavits indicate that they

23    were deprived of access to the recount process, to the audit

24    process, that they were due.

25          Then as to substantive due process, that claim fails

1    at the outset.  It's well-established that federal courts do not

2    involve themselves in garden-variety election disputes.  For a

3    substantive due process claim to be implicated the situation must

4    go well beyond the ordinary dispute over the counting and marking

5    of ballots, but that is obviously what's at issue here.  So the

6    substantive due process claim and the procedural due process

7    claim are both unlikely to succeed.

8            The remaining factors are easy to address and I'll do

9    this quickly.  Irreparable harm.  Plaintiff has failed to

10   establish that he will suffer any harm, much less irreparable

11   harm, if the requested injunction is denied.  At most, he brings

12   generalized grievances or third-party claims.  He hasn't been

13   harmed.  He won't be harmed tomorrow or the next day or the next

14   day.

15           In sharp contrast, plaintiff's requested relief would

16   cause deep and lasting irreparable harm to millions of Georgian

17   voters.  Voters who did nothing wrong.  Voters who were fully

18   qualified to vote in this election as American citizens.  That,

19   Your Honor, is the definition of "irreparable harm," but it would

20   be inflicted on innocent voters by the millions, not on Mr. Wood.

21           The last factor is balancing equities and the public

22   interest and this is, perhaps, the easiest to address.  Plaintiff

23   asks this Court to disenfranchise after the fact a multitude of

24   voters who dutifully cast their ballots.  The very request is

25   breathtaking and wildly unsupported by the law or the record

1    before the Court.  Instead of remedying a constitutional

2    violation, granting relief would literally strip millions of

3    Georgians of their constitutional rights.  In contrast,

4    plaintiff, who unjustifiably waited 8 months and three election

5    cycles to bring this claim, has articulated no injuries

6    whatsoever and as such would suffer no harm for the Court to deny

7    the motion.

8              The same is true of plaintiff's requested relief with

9    respect to recount which seeks statewide recourse for purported

10   infringement in only a handful of counties and republican-only

11   surveillance of every step of Georgia's processing of individual

12   votes in a manner likely violating multiple provisions of Georgia

13   law.  So the relief is unprecedented in scope and not justified

14   by the record before the Court.

15             Your Honor, plaintiff literally seeks to strip

16   millions of Georgians, each one an American citizen, of their

17   vote by wholesale invalidation of ballots by judicial order and

18   that's just simply an astonishing request.  One would imagine

19   that a plaintiff approaching any court with a request for such

20   relief would do so cautiously and armed with well-reasoned brief,

21   ample legal authority and perhaps, most importantly, a powerful

22   factual record supporting such a request.  But the plaintiff

23   stands before you empty handed, bereft of legal authority even

24   remotely justifying such relief and, even more dramatically,

25   without a factual record on which to stand.  For that reason,

1    Your Honor, intervenor defendants would request that the Court

2    deny the motion out of hand and dismiss this case in its

3    entirety.

4              THE COURT:  All right.  Thank you.

5              Mr. Greenbaum, we have not yet ruled on your client's

6    motion to intervene.  Is there anything you're seeking to add to

7    this argument or can we defer that motion to another day?

8              MR. GREENBAUM:  Your Honor, we would like to have the

9    opportunity to have a few minutes of argument here to supplement

10   some points -- some additional points related to this motion.

11             THE COURT:  Mr. Smith, I presume you're objecting to

12   the intervention; is that right?

13             MR. SMITH:  Yes, Your Honor.  I don't think the NAACP

14   has any standing in this case.  They don't have any -- they

15   weren't involved in the consent order and I don't see what

16   relevance they have to the case.

17             THE COURT:  All right.  Well, I think this is a

18   closer call, frankly, than the intervention of the democratic

19   party, one that I'd like to resolve on the briefings, which I

20   know that the motion of intervention was just filed, I believe,

21   yesterday.  But if there's something you want to add for the

22   record, Mr. Greenbaum, I'll allow you to do it, but if you would

23   please be brief and only address things that have not already

24   been covered.

25             MR. GREENBAUM:  All right.  Thank you, Your Honor.  I

1   appreciate the opportunity to briefly address the Court on behalf

2   of the two organizations that have about 15,000 voters, as well

3   as the three individuals whose right to vote is at risk here.  So

4   a few things.

5          With respect to the standing issue, one of the things

6   that hasn't been talked about as much is the lack of harm to the

7   plaintiff here.  Plaintiff was able to vote in this election and

8   if you look at one of the cases that plaintiff has cited in terms

9   of their argument for standing is the *Arcia* case, it's 772 F.3d

10  1335, and you'll find a significant contrast between that case

11  and the one at hand, Your Honor.  That case involved voters who

12  were going to be denied the right to vote because they were

13  citizens but through some matching procedure were identified as

14  noncitizens.  So they brought a case forward saying this violates

15  my fundamental right to vote.  Actually, in that case the Court

16  found standing here.  You don't have this situation here where

17  the plaintiff was able to vote in this election.

18         I would also -- and really quickly with respect to

19  the first two claims, the equal protection claim -- equal

20  protection clause claim and the elections clause claim only go to

21  the settlement agreement.  One of the things about the elections

22  clause claim is that only the legislature or somebody who stands

23  in the shoes of the entire legislature can bring that claim.  So

24  the plaintiff doesn't have standing at all to bring that claim.

25         Then there's been some discussion that I want to

1    supplement a little bit in terms of the timing of things.  Yes,

2    plaintiff did not vote in the two prior elections (inaudible)

3    apply equally to everybody in the state the time to have brought

4    it would have been at the time the district court signed off on

5    that settlement agreement and ended that case, not months later.

6    I don't even think the plaintiff would have had a legitimate

7    argument to have brought the case before the election, but at

8    least there it would have been handled at a point prior to votes

9    being commingled.  At this point it's frankly too late to do it.

10        And then also with respect to substantive due

11   process, I'd like to call your attention, Your Honor, to a case

12   that we cited at Page 12 in our brief.  It's *Curry vs. Baker*, 802

13   F.2d 1302, and it really differentiates -- it really shows you

14   how high the standard is to make a substantive due process claim

15   and there the facts were, frankly, a lot stronger than the

16   relatively weak facts in this case and the Court said you haven't

17   made out substantive due process.  So it's a very, very high

18   standard.

19        I'll just say briefly with procedural due process,

20   the courts have not at all been open to procedural due process

21   claims in this environment.  I can say that as a voting rights

22   lawyer having had a couple cases in this election cycle where

23   courts have denied procedural due process claims -- and those

24   were instances in which our vote -- the voters that we

25   represented, had specific harms.  There were harms to themselves.

1    Which is not something that you have in this case, again, because

2    the plaintiff in this case was able to vote.  Let me see if

3    there's anything else I forgot to mention.

4            There was a lot of back and forth regarding the

5    statistics earlier and I believe that the proper paragraph to

6    look at in Mr. Harvey's declaration's Paragraph 7 which discusses

7    the statistics and, in fact, the percentage of ballots that were

8    rejected on signature mismatch was the same in 2018 as it was in

9    this election.

10           You know, I'll just close by saying that with respect

11   to the factors of balance of harm and the public interest in

12   particular, even if there were a legitimate claim here, when

13   you're talking about effectively throwing out 5 million votes, an

14   unprecedented number of votes in this Georgia election, the

15   balance of harms and the public interest are clearly on the

16   defendants' side in this case.  Thank you, Your Honor.

17           THE COURT:  Thank you.

18           All right.  Mr. Smith, I'll let you have the last

19   word.

20           MR. SMITH:  Yes, Your Honor.  Thank you.  Thank you

21   for your patience.

22           Your Honor, we're here to seek a fair, as I stated in

23   my opening, transparent and open process.  As far as counsel for

24   the AG's office said, they talked about hearsay and other

25   evidence and that kind of thing, as Your Honor is well aware

1    under the Federal Rules, we're here for a temporary restraining

2    order.  Evidentiary rules under the Federal Rules are somewhat

3    lax and allows for affidavits.  Even hearsay is allowed in these

4    types of proceedings.  But we believe we've got lots of evidence.

5    In fact, some of the counsel have stated there was no evidence.

6    Well, we've provided live testimony as well as almost 15

7    affidavits so there's plenty of evidence before Your Honor to

8    sustain our motion for a temporary restraining order.

9            As far as standing is concerned, it's interesting,

10   for instance, the NAACP is here wanting to become a party to this

11   lawsuit but yet -- and they're saying they're representing voters

12   but yet they're trying to argue we have no standing.  They also

13   state that --

14           THE COURT:  Which is why I haven't granted their

15   motion to intervene.

16           MR. SMITH:  Well, yes, a motion to intervene.  Let me

17   also state that I have been retained by the Donald J. Trump

18   campaign and if standing is an issue, we're happy to move to add

19   them as well as a party, if Your Honor thinks that's necessary to

20   move forward with this case.  But we believe that my client alone

21   stands alone and the case law that was cited is that he alone has

22   sufficient standing to move forward.

23           THE COURT:  Well, Mr. Smith, let me just address that

24   right off the cuff.  I'm not giving advisory opinions.  What's

25   before me is one client, one plaintiff, and that's Mr. Wood.  I

```
1    think it is extremely significant that the candidate is not a

2    party to this case when it comes to the standing issue.

3              MR. SMITH:  Well, Your Honor, we're prepared to add

4    him as a party, if necessary, Your Honor.

5              THE COURT:  Well, that's not before us today.

6              MR. SMITH:  All right.  So anyway, we believe that,

7    Your Honor, we do have sufficient standing under the Eleventh

8    Circuit arguments that we made earlier.  The case law is clear

9    that my client does in fact have standing to bring this suit and

10   to bring these motions, Your Honor, as I've stated earlier.

11             We're asking the Court to require Secretary

12   Raffensperger to do what he said he was going to do in a press

13   release and that was to have an open recount, hand recount,

14   re-canvass, and audit.  We're asking the Court to prohibit the

15   certification of the Georgia election results for the

16   presidential election until after the full hand recount is

17   properly done.  Our filing states that the deadline to certify

18   these results is November 20th, but under the federal safe harbor

19   provisions Secretary Raffensperger has until December 8th to

20   certify the results.

21             The four-prong test for emergency injunctive relief

22   is well-known, Your Honor, that there's likely success on the

23   merits; number two, irreparable harm; three, balance of equities

24   favors my client; and number four, an injunction's in the public

25   interest.
```

1              The preliminary injunction is customarily granted on

2    the basis of procedures that are less formal and that evidence is

3    less complete than at a trial on the merits, as Your Honor is

4    well aware.  At the preliminary injunction stage the district

5    court may rely on affidavits and hearsay, as I stated earlier,

6    that would not ordinarily be admissible in a permanent

7    injunction.

8              As to irreparable harm, the Court recently stated,

9    quote, "It is well settled that an infringement on the

10   fundamental right to vote amounts to irreparable injury," and we

11   believe that my client has been irreparably injured, Your Honor.

12   If the Georgia vote count, including defective absentee ballots

13   not processed according to the Georgia Election Code, is

14   certified Georgia's election results are improper, suspect and

15   create a chance of the state's electoral college votes to be

16   awarded to the wrong candidate.  There is no way to remedy that

17   so clearly we have irreparable harm.  Why should we sit here and

18   wait and find out later that these were done wrong?  Your Honor

19   has the opportunity to make sure that everything is done the

20   right way.

21             As we balance the harm factor and public interest

22   factor emerge when the government is the opposing party.  The

23   defendants will suffer little harm as long as they certify

24   Georgia's election results before the federal safe harbor

25   deadline on December the 8th.  If the defendants prevail by or

before that date, the same electors will be appointed with ample
time to vote in the electoral college, Your Honor.  If my client
prevails, however, that can only be because the defendants had no
legitimate right in certifying constitutionally flawed election
results.  Either way, the defendants will not suffer harm from a
slight delay.  By contrast, if the vote total is certified
without conducting a proper recount -- that is, if Secretary
Raffensperger never does what he said he would do -- my client
would lose his opportunity for meaningful relief entirely as to
it's not clear what remedies would remain after certification.

          Of course, the public at large has an interest in
ensuring that Georgia's election results are meaningful and fair.
The public has a strong interest in exercising the fundamental
political right to vote.  That answer is best served by favoring
enfranchisement and ensuring that qualified voters exercise of
their right to vote is successful.  The public interest,
therefore, favors permitting as many qualified voters to vote as
possible.  We've cited the *Obama for America vs. Husted* case,
Your Honor.  My client's easily satisfied those factors for
injunctive relief.

          So the only remaining analysis is whether he has a
substantial likelihood of success on the merits, which he clearly
does.  The Anderson/Burdick standard applies here under which the
courts must, quote, "Weigh the character and magnitude of the
burden the State's rule imposes on those rights against the

1    interests the State contends justify that burden, and consider

2    the extent to which the state's concern make the burden

3    necessary," and that's the *Timmons vs. Twin Cities* case, Your

4    Honor, in the Supreme Court of the United States.

5         "Even when a law imposes only a slight burden on the

6    right to vote, relevant and legitimate interests of sufficient

7    weight still must justify that burden," and that's the *Democratic*

8    *Executive Committee of Florida vs. Lee* case, an Eleventh Circuit

9    case in 2019, Your Honor.  "To establish an undue burden on the

10   right to vote under the Anderson/Burdick test, plaintiffs need

11   not demonstrate discriminatory intent behind the signature-match

12   scheme of the notice provisions because we are considering the

13   constitutionality of a generalized burden on the fundamental

14   right to vote for which we apply the Anderson/Burdick balancing

15   test instead of a traditional equal protection inquiry," and

16   that's cited in the *Lee* case.

17        Your Honor, the fundamental right to vote is one of

18   the most fundamental rights that we share.  My client's equal

19   protection argument is straightforward.  States may not, by

20   arbitrary action or other unreasonable impairment, burden the

21   citizen's right to vote, quote, "Having once granted the right to

22   vote on equal terms, the State may not, by later arbitrary and

23   disparate treatment, value one person's vote over that of

24   another," and that's the *Bush v. Gore* test, Your Honor.

25        This requires, quote, "Specific rules designed to

1    ensure uniform treatment in order to prevent," quote, "arbitrary

2    and disparate treatment to voters," end quote.  The right to vote

3    extends to all phases of the voting process from being permitted

4    to vote, to placing one's vote in the ballot box, to having that

5    vote actually counted.  Thus, the right to vote applies equally

6    to the initial allocation of the franchise as well as the manner

7    that they exercise.  Once the right to vote is granted, the State

8    may not draw distinctions between voters that are inconsistent

9    with the guarantees of the Fourteenth Amendment's equal

10   protection clause, and that's the *Pierce v. Allegheny County*

11   *Board of Election* case.  Treating voters different thus violates

12   the equal protection clause when disparate treatment is the

13   result of arbitrary processes.

14          By changing the process for handling defective

15   ballots from something other than what is authorized by the

16   Georgia General Assembly and set forth in the Georgia Election

17   Code created an *ad hoc* system, Your Honor.  The Supreme Court of

18   this country has stated that, quote, "A consent decree must, of

19   course, be modified if, as it later turns out, one or more of the

20   obligations created upon the parties has become impermissible

21   under federal law," and that's the *Rufo*, R-U-F-O, *vs. Inmates of*

22   *Suffolk County Jail* case, 502 US 367, a 1992 case, Your Honor.

23   That's exactly the case here, Your Honor.  The litigation

24   settlement is improper because in it Secretary Raffensperger

25   promulgated a rule regarding federal elections that's contrary to

1    Georgia's statutorily prescribed defective absentee-ballot system

2    and that, in turn, is a constitutional violation, Your Honor.

3         The Supreme Court held long ago, quote, "We can

4    perceive no reason for holding the power confined to the states

5    of the Constitution," end of quote.  "To set the time, manner and

6    place for federal elections," quote, "has ceased to exist because

7    the operation of the system has not fully realized the hopes of

8    those by whom it was created.  Still less can we recognize the

9    doctrine that because the Constitution has been found in the

10   march of time sufficiently comprehensive to be applicable to the

11   conditions not within the minds of the framers and not arising in

12   their time, it may therefore be wrenched from the subjects

13   expressly embraced within it and amended by judicial decision

14   without action by the design organs in the mode by which alone

15   amendments can be made," and that's the *McPherson vs. Blacker*

16   case, Your Honor, 146 US 1, and that's an 1892 case, Your Honor.

17        The defendants lack any authority whatsoever to alter

18   Georgia statutory defective absentee-ballot procedure and the

19   *McPherson* holding makes it abundantly clear that even though

20   Secretary Raffensperger can make rules regarding the time, place

21   and manner of elections, no deference should be given to his

22   unauthorized actions that are contrary to the Georgia Election

23   Code.

24        The litigation settlement has also created a system

25   in which citizens who vote by absentee ballot are treated

differently than individuals who vote in person with regard to
confirming their identity and rejecting ballots.  Remember that
three-person panel, Your Honor.  Introducing the requirement that
three people must decide the outcome of a defective absentee
ballot also creates more discretion and room for disparate
treatment of absentee ballots.  Quite frankly, Your Honor, they
weren't even doing that.  What we're learning is some county
officials didn't apply the litigation settlement
signature-matching system at all and that's where it was applied.
It was different from county to county.  It was different in
Fulton.  It was different in Brunswick.  It was different in
Floyd.  It was different in Hancock.

We can tell that the litigation settlement and the
signature-matching requirements create disparate treatment
amongst voters by looking at Georgia historic absentee-ballot
rates which I discussed.  They skyrocketed, Your Honor, from
several hundred thousand to well over a million votes.

We also know that nonpolitical organizations that
concern (inaudible) that increasing absentee ballots that there
would be an increase in voter fraud and irregularities.  These
issues constitute equal protection violations with respect to
Georgia election results were the (inaudible).

The remedy we're asking for here is simple, Your
Honor.  Prevent Secretary Raffensperger from certifying Georgia's
presidential election results until a full, proper hand count

1    recount is performed.  That way we can be confident that whatever

2    the election result is, whether it's President Trump or Vice

3    President Joe Biden, the results are valid.

4           The so-called, quote, "hand recount" that the

5    Secretary announced also led to violations of due process.  Once

6    the Secretary declared that a recount, re-canvassing and audit

7    would occur he was required to ensure those things were actually

8    done and were done properly in all 159 counties, Your Honor.

9    However, it seems that only a recount was done as evidenced by

10   the affidavits that are attached to our motion, Your Honor, and

11   the testimony here today.  The recount wasn't truly a hand

12   recount, wasn't properly conducted, and monitors weren't allowed

13   to actually and meaningfully observe the entire recount.  In

14   other words, it wasn't transparent, Your Honor.  And they can --

15   under the new system they can post those ballots electronically

16   for the whole world to see on the web.  You heard the testimony

17   of Ms. Voyles about this, a poll manager who's worked for

18   20 years doing this, who personally observed the problems of the

19   recount.  The defendant's failure to ensure that the processes of

20   these full hand recounts and the audit where followed creates a

21   due process concern.

22          The United States Election Assistance Commission,

23   which has been congressionally created, provides in its election

24   management guidelines that a critical part of any canvass of the

25   vote must include allowing observers to check any possible,

1    quote, "signature mismatches on absentee-ballot envelopes or in

2    the poll votes," end of quote.  So although a full hand recount

3    could have identified some of these issues created by the

4    November 3rd election and proper handling of the absentee

5    ballots, because that full hand recount wasn't a full hand

6    recount we've lost the ability to ensure that the votes were

7    accurately tabulated.  The Secretary could publish scanned images

8    of signatures on absentee ballots, as he indicated he would do,

9    so that the public at large could review those images, but thus

10   far the Secretary hasn't done that.

11          The bottom line is this:  Doesn't it make sense to

12   delay the certification of the election results until

13   December 8th so that a proper recount could be completed with

14   monitors being given proper access to observe in all 159

15   counties?  If that isn't done, if the Court doesn't issue the TRO

16   and order a recount, then what happens if we find out months down

17   the line when a full analysis really is completed that Georgia

18   electoral college votes were awarded to the wrong candidate.

19   Let's not even get to that because we can avoid it now.  We can

20   ensure that Georgia's ballots are correctly handled and tallied

21   so that regardless of who the winner is we can be confident in

22   the outcome.

23          All we need is for Secretary Raffensperger to do what

24   he said he would do, follow Georgia law, not the litigation

25   settlement, in handling defective absentee ballots, perform a

1    full hand count and at that recount ensure workers are trained in

2    signature matching and that monitors have access to the entire

3    recount process and the ability to address concerns and

4    irregularities they observe.

5         Let me just address a few final points, Your Honor.

6    As far as laches and mootness claims, it just makes no sense

7    since it wasn't a clear -- it wasn't clear there was a problem

8    until the election and until the recount raised these issues.  As

9    the Secretary of State said just last week, he would do the

10   recount, audit and recount, and suit wasn't brought until it was

11   clear no recount canvass was taking place concerning absentee

12   ballot signature checks and until it was clear observers were

13   unable to meaningfully monitor the recount.

14        Your Honor, in addition to the affidavits that we've

15   submitted, we've received many, many more that we haven't

16   submitted and many, many calls and emails from other folks.  As

17   to the signature matching being uniform, how can it be uniform

18   and yet no guidance has been provided by the Secretary of State?

19        So in closing, Your Honor, we would ask that Your

20   Honor grant the TRO, as we believe there is time to do that and

21   it would ensure Georgia has an accurate recount, an accurate hand

22   recount, so that the voters and the citizens of the state can be

23   proud of their vote.  Thank you.

24        THE COURT:  All right.  Mr. Smith, a few things.

25   First, we seem to be conflating the terminology of "hand recount"

1    with "audit," and I know that in your motion and in your briefing

2    you refer to it as a hand recount.  But to be clear, what you're

3    challenging is the process that the Secretary of State has

4    undergone, which is the audit of the voting, because, as we heard

5    from the Secretary of State, the recount would not occur until

6    after the vote is certified so that has not even occurred yet.

7    What you are challenging, if I'm hearing you correctly, is the

8    audit that has already occurred; is that right?

9           MR. SMITH:  Your Honor, we're challenging -- what

10   we're challenging is what he said he was going to do, what he

11   said over a week ago.  He said -- he came out in his press

12   conference and he said he was going to do a re-canvass recount,

13   hand recount and audit, that's what he said.  That's what we're

14   challenging.

15          THE COURT:  All right.

16          MR. SMITH:  Not the statutory recount that occurs

17   after, as counsel said.

18          THE COURT:  All right.  Yeah, that's what I figured.

19   I just wanted to make sure the record was clear on that.

20          Did your client vote in person or by absentee?

21          MR. SMITH:  He voted in person, I believe, Your

22   Honor.

23          THE COURT:  Okay.  You referenced a number of other

24   affidavits, declarations, calls that you've received.  Obviously

25   none of that is in the record, none of that is before me.

1           As for the declarations that you have submitted, as

2   well as the live testimony that was presented today, all of that

3   has been submitted and considered.  I believe you referenced

4   declarations that have not been considered.  Again, for clarity

5   of the record, everything that has been submitted that was timely

6   submitted in support of your motion has been accepted and

7   admitted.

8           MR. SMITH:  Yes, that's correct, Your Honor.

9           THE COURT:  Let's take a 10-minute recess and we'll

10  be back.

11      (a recess was taken from 5:31 p.m. until 5:47 p.m.)

12          THE COURT:  All right.  We're back on the record.

13  Mr. Smith, can you hear me?

14          MR. SMITH:  Yes, I can hear you, Your Honor.

15          THE COURT:  Okay.  Great.

16          All right.  Plaintiff's motion for temporary

17  restraining order is denied and let me go through my reasoning

18  for that.

19          First, as I obviously was concerned about going in,

20  first and foremost is the standing issue.  With regard to the

21  elections and electors clause, Supreme Court precedent is clear

22  that a state government's failure to properly follow the

23  elections clause of the Constitution does not confer standing on

24  a private citizen.  That's *Lance v. Coffman*, a Supreme Court case

25  of 2007.  The electors clause, which shares a similarity with the

1   elections clause, has been interpreted in the same manner.  So I

2   find the plaintiff lacks standing under either of those clauses.

3          Equally, plaintiff lacks standing under his equal

4   protection claim.  Wood brings a disparate treatment theory, but

5   there is no evidence in the record that plaintiff has been

6   treated differently than any other voter in the Georgia election.

7   He is bringing a generalized grievance about the conduct of the

8   government which, again, the Supreme Court has consistently held

9   does not state an Article III case or controversy.

10          With regard to the vote-dilution theory that was

11  raised today, that has been squarely rejected for purposes of

12  imputing standing.  To the extent a fraudulent vote dilutes valid

13  votes, it impacts all of the voters, not a single voter, and no

14  single voter is specifically disadvantaged and so for that reason

15  the plaintiff lacks standing in that regard as well.

16          So does his status as a republican donor which is, I

17  think, a creative argument, one that I don't know has been put

18  forth much in previous authorities, but it certainly does not

19  improve his standing in this case and that has been rejected by

20  the Eleventh Circuit again because it does not give this

21  particular plaintiff, this particular voter, any individualized

22  grievance under the Eleventh Circuit case in *Jacobson* of this

23  year.

24          The plaintiff also lacks standing for his due process

25  claim relating to the hand recount or the "audit" as we have

1   referred to it.  Again, this is a generalized grievance.

2   Plaintiff did not allege that he was designated by any political

3   party to serve as a monitor nor that he represented any party in

4   designating monitors.  His grievance is based on his status as a

5   voter and a donor so he lacks any particularized injury

6   sufficient to give him standing.

7          And although third-party standing could be

8   appropriate in some circumstances, the case law disfavors it and

9   the plaintiff has not shown and put on any evidence that the

10  Georgia republican party or even the monitors themselves are

11  seeking a vindication of their rights.  And I do find it

12  significant, as I noted earlier, that neither the republican

13  party nor the Trump campaign or any other candidate has joined

14  this lawsuit, that would have certainly changed the analysis when

15  it comes to standing.  What's before me is an individual donor,

16  an individual voter, and under existing Supreme Court and

17  Eleventh Circuit authorities it is abundantly clear that he lacks

18  standing to bring this case.

19         Another procedural hurdle that was discussed and that

20  I agree with as another basis for denying this motion, at least

21  with respect to the plaintiff's challenge to the settlement

22  agreement -- now, this does not apply to his challenge to the

23  audit, but it does to the settlement agreement which is the

24  laches argument.  I didn't hear any justification for why the

25  plaintiff delayed bringing this claim until two weeks after the

1   general election and on the cusp of the election results being

2   certified.   The settlement agreement was entered over 8 months

3   ago.   At least three statewide elections have been performed in

4   Georgia under the terms of this same settlement agreement,

5   including the general election, and the absentee-ballot counting

6   that is the core of the settlement agreement started over two

7   months ago in September.

8           The only reason that was proffered - and, again, it

9   is only a proffer without any evidence - is that the plaintiff

10   did not vote in those previous elections.   Again, that is not

11   evidence that's been submitted.   But even assuming that that is

12   true, it still does not justify the delay because the settlement

13   agreement was entered, again, over 8 months ago and whether or

14   not this particular plaintiff chose to vote has nothing to do

15   with whether he thought he had a redress with the courts to

16   challenge that settlement agreement.   Again, I don't find that he

17   has standing to do so.   But even if he did, his undue delay

18   prejudiced the Secretary of State and certainly prejudiced the

19   millions of Georgia citizens who have already voted in this

20   election and for that reason the laches argument also prevails

21   here.

22           I also want to note the Supreme Court has been fairly

23   explicit even during this term in cautioning that federal courts

24   last-minute interference with state election laws is ordinarily

25   inappropriate and that caution certainly applies to the remedies

1    that the plaintiff is seeking here.

2           Even if we were to leave aside the procedural

3    hurdles, the standing issues and the laches defense, it appears

4    to me that the plaintiff fails to state a claim that could

5    withstand a motion to dismiss and so I find that he has not

6    satisfied his burden of establishing a likelihood of success on

7    the merits.

8           There's no doubt that the right to vote, even an

9    individual's right to vote, is sacrosanct and it is of the most

10   fundamental significance under our Constitution.  But just

11   because the right to vote is fundamental does not mean that

12   individual voters have the right to dictate the manner in which

13   votes will be cast, accepted, or rejected.  The decision of how

14   the right to vote will be implemented is a power that is retained

15   by the states and it's not for the courts to meddle with that

16   process unless the regulations that are imposed by the state rise

17   to the level of a constitutional deprivation of the right to

18   vote.

19          The plaintiff here is claiming a violation of his

20   constitutional rights.  But, again, as an individual voter

21   plaintiff can only make a case for that constitutional violation

22   if he can demonstrate that the state classified voters in

23   disparate ways or placed undue restrictions on his right to vote

24   and neither has been shown here.

25          First as to Count One, the equal protection clause

1   relating to the settlement agreement, plaintiff has not

2   demonstrated how he has been treated differently than other

3   voters.  He is not an absentee voter, as Mr. Smith acknowledged.

4   He does not explain how the procedures in the settlement

5   agreement treated him differently than any other similarly

6   situated voter.  Nor does he show how the settlement agreement

7   placed any undue restrictions on his individualized right to

8   vote.

9          With regard to Count Two, the equal protection

10  clause -- I'm sorry, the elections and electors clause

11  violations, again, leaving aside the standing issues with an

12  individual voter seeking to bring claims under those clauses,

13  plaintiff's allegations is that the settlement agreement

14  contravenes state law and was entered without authority because

15  only the legislature could enact those procedures.  I don't see

16  merit to that argument, frankly.  I find, based on the record

17  before me, that the settlement agreement was consistent with

18  state law and granted the Secretary of State his authority to

19  issue implementing rules and regulations that are consistent with

20  state law.

21          But even if that hurdle could be overcome, it still

22  does not rise to the level of a constitutional violation for this

23  particular plaintiff because it does not impose any disparate

24  treatment as to him or impose any undue burden on his

25  constitutional right to vote.  If anything, it achieves

1    consistency -- or at least seeks to achieve consistency among all

2    county election officials in the state to follow the same exact

3    procedure when it comes to accepting or rejecting absentee

4    ballots.  And by doing that it actually furthers plaintiff's

5    stated goals as he indicated that they were in his complaint in

6    his motion and in this argument today, which is of achieving

7    free, fair, and transparent public elections.

8            Certainly we heard some evidence today of some

9    isolated issues and problems that may have occurred at the county

10   level.  But, again, those are grievances that should have and

11   probably were, it sounds like, taken up with county officials.

12   And if that did not satisfy the concerns certainly that could

13   have been sought and redressed with a lawsuit against those

14   county officials.  But bringing this claim against the Secretary

15   of State on federal constitutional grounds does not have merit.

16           With regard to the due process challenge - and

17   Mr. Smith clarified today that that challenge is on both

18   procedural and substantive due process grounds - the procedural

19   due process ground requires the plaintiff to show a private

20   interest that's affected by the fairness or unfairness of the

21   official action.  The plaintiff, again, did not serve -- or at

22   least there's no evidence that the plaintiff served or sought to

23   serve as an election monitor or that he was involved in the

24   monitoring process.  And even if he did, monitoring an election

25   or monitoring an audit of an election is not a constitutional

1 right.  There is no constitutional right in monitoring an

2 election.  Monitoring an election is not a life, it's not a

3 liberty, and it's not a property.  So for that reason the

4 procedural due process claim fails.

5    The substantive due process claim also fails and that

6 is an easier call because it is well-established by a consistent

7 body of precedent, both at the Supreme Court and circuit court

8 levels, that garden-variety election disputes, including disputes

9 surrounding the counting and marking of ballots, does not rise to

10 the level of a constitutional deprivation and that is exactly

11 what we heard from Ms. Voyles' testimony.

12    I credit her testimony.  I found her to be credible

13 on the concerns that she raised and the observations that she

14 raised from what she observed during her part and process in the

15 election, but those are exactly the garden-variety issues with

16 voting and counting of votes that the Supreme Court and circuit

17 courts have consistently held are not constitutional violations

18 and are not substantive due process violations.  The plaintiff

19 provides no authority for the proposition that that conduct and

20 that type of conduct rises to the level of a constitutional

21 violation.

22    With regard to the likelihood of irreparable harm,

23 again, that countenances against the plaintiff here again.  There

24 is no evidence that this plaintiff, this particular voter, this

25 particular donor will suffer any harm, much less irreparable

harm, by denying this motion.  The fact that the candidate or

candidates that this plaintiff voted for or whose campaigns he

donated to did not prevail in the election does not meet the

legal standard of harm, much less irreparable harm.  Again, the

plaintiff's grievances are generalized and are of a third-party

nature.  The plaintiff here has suffered no unique harm.

Finally, with regard to the balancing of equities and

the public interest.  Again, both of those factors warrant

denying plaintiff's motion.  The relief that the plaintiff is

seeking here is quite striking as we have observed today.  It

would require halting the certification of results in a state

election in which millions of people have voted.  It would

interfere with an election after it has already begun, which is a

significant hardship that certainly outweighs any threatened

injury to this particular plaintiff, which, again, I find that he

has not suffered any legal injury, and it harms the public

interest in countless ways, particularly in the environment in

which this election occurred and the need by our state, our

district and our community, to have certainty in the results of

the election.  To halt the certification at literally the 11th

hour would breed confusion and potential disenfranchisement that

I find has no basis in fact or in law.  So for all of those

reasons, the plaintiff's motion is denied.

Is there anything he will for us to take up today,

Mr. Smith?

```
 1                    MR. SMITH:  No, Your Honor.

 2                    THE COURT:  Anything on behalf of the Secretary of

 3     State?

 4                    MS. McGOWAN:  No, Your Honor.  Thank you.

 5                    THE COURT:  Mr. Hamilton on behalf of the democratic

 6     party.

 7                    MR. HAMILTON:  No.  Thank you, Your Honor.  Thank you

 8     for your time.

 9                    THE COURT:  All right.  Mr. Greenbaum?

10                    MR. GREENBAUM:  No, Your Honor.

11                    THE COURT:  Okay.  All right.  Thank you everyone.  I

12     hope everyone stays healthy and safe.  All right.  We're

13     adjourned.

14                        (proceedings concluded at 6:05 p.m.)

15

16

17

18

19

20

21

22

23

24

25
```

1    UNITED STATES DISTRICT COURT

2    NORTHERN DISTRICT OF GEORGIA

3    CERTIFICATE OF REPORTER

4

5            I do hereby certify that the foregoing pages are a

6    true and correct transcript of the proceedings taken down by me

7    in the case aforesaid.

8

9                        This the 23rd day of November, 2020.

10

11                                    /S/ Alicia B. Bagley
                                      ALICIA B. BAGLEY, RMR, CRR
12                                    OFFICIAL COURT REPORTER
                                      (706) 378-4017
13

14

15

16

17

18

19

20

21

22

23

24

25